UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MARY E. ORMOND, *et al.*,          )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )   CASE NO. 1:05-cv-1908-DFH-TAB
                                    )
ANTHEM, INC.,                       )
ANTHEM INSURANCE COMPANIES, INC., )
LARRY C. GLASSCOCK,                 ]
and GOLDMAN, SACHS & CO.            ]
                                    ]
            Defendants.             )

ENTRY ON PENDING MOTIONS

The plaintiffs in this case are former policyholders of mutual insurance
company Anthem Insurance Companies, Inc. ("Anthem Insurance").  Plaintiffs
allege a number of claims that stem from the demutualization of Anthem
Insurance and the initial public offering of stock in Anthem, Inc. ("Anthem
Holding").[1]  The current version of the complaint is the Third Amended Complaint
("the Complaint"), which consists of 403 numbered paragraphs in 124 pages and
refers to numerous complex documents central to the demutualization transaction
and the initial public offering.  In brief, the plaintiffs allege that Anthem Insurance
and its former chief executive officer, Anthem Holding, and Goldman, Sachs & Co.

---

[1]The Complaint does not always distinguish between the actions of Anthem
Insurance and Anthem Holding.  Where the Complaint's references are not
precise,  the court has used the term "the Anthem defendants."

engaged in a scheme to limit the number of Anthem Insurance policyholders who would become shareholders in the new stock company and to keep the price of shares in the initial public offering as low as possible. The plaintiffs have asserted claims for violations of federal and state securities laws, violations of Indiana statutes governing insurance demutualization, breach of fiduciary duty, negligence, breach of contract, unjust enrichment, negligent tax advice, and negligent misrepresentation.

The defendants have moved to dismiss all of the plaintiffs' claims under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. As discussed in detail below, the court grants the defendants' motions in part and denies them in part. The court dismisses plaintiffs' claims under federal and state securities statutes because the plaintiffs have not alleged fraud "in connection with" a securities transaction. On state law claims, the court concludes that because this case was transferred from a district court in Ohio pursuant to 28 U.S.C. § 1404(a), Ohio choice of law rules apply and require application of Ohio statutes of limitations to claims arising under other states' laws, so that plaintiffs' claims are timely. The court dismisses plaintiffs' claims asserted directly under the Indiana demutualization statute, Title 27, Article 15 of the Indiana Code, but does not dismiss common law claims arising from the transaction. The court dismisses, however, plaintiffs' claims for unjust enrichment and the Indiana plaintiffs' claims for negligent misrepresentation. The court also dismisses the negligence and breach of contract claims against Goldman Sachs.

The claims that survive the motion to dismiss are the following:  breach of fiduciary duty by Anthem Insurance, Anthem Holding, and former CEO Larry Glasscock; negligence by Anthem Insurance, Anthem Holding, and Glasscock; breach of contract by Anthem Insurance and Anthem Holding; negligent tax advice by Anthem Insurance and Anthem Holding; and negligent misrepresentation by Anthem and Anthem Holding asserted by plaintiffs who are citizens of Ohio, Kentucky, and Connecticut.

*Standard for Rule 12(b)(6)  Motion*

In ruling on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must assume as true all well-pleaded facts set forth in the complaint, construing the allegations liberally and drawing all inferences in the light most favorable to the plaintiff.  *Brown v. Budz*, 398 F.3d 904, 908-09 (7th Cir. 2005).   The Supreme Court recently summarized a plaintiff's pleading obligations:  "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citation omitted).  A plaintiff must "raise a right to relief above the speculative level," *id.* at 1965, by pleading "enough facts to state a claim to relief that is plausible on its face," *id.* at 1974.   In analyzing the motion to dismiss, the court has examined the Third Amended Complaint along with the transaction documents that were attached to it or that were referred to in the

pleading and central to it.  See Fed. R. Civ. P. 10(c); *Wright v. Associated Insurance Companies, Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (holding that in considering motion under Rule 12(b)(6), court may consider documents referred to in the complaint and central to it without converting motion to one for summary judgment); *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (stating that documents attached to defendant's motion to dismiss are considered part of the pleadings if the complaint refers to them and they are central to the plaintiff's claim).[2]

*Factual Allegations*

Without vouching for the accuracy of the Complaint, the court assumes for the purpose of the motion to dismiss that the facts alleged in the Complaint are true.  In light of the length of the Complaint, this entry provides only a relatively short summary of the allegations.  Anthem Insurance was a mutual insurance company that provided health insurance for its policyholders.  On June 18, 2001, the Board of Directors of Anthem Insurance approved a Plan of Conversion, through which it would convert from a mutual insurance company to a stock

---

[2]After the oral argument on the motions to dismiss, plaintiffs filed a Submission of Additional Authorities in Opposition to Defendants' Motions to Dismiss, which was a 21-page brief that discussed ten additional cases, only two of which were decided after the argument.  Docket No. 69.  The defendants filed a joint Motion to Strike the discussion of the second through ninth cases, or for leave to file a response.  Docket No. 71.  Defendants' motion is granted to the extent that the court strikes the discussion of all but the later-issued cases. Plaintiffs' submission is in substance an unauthorized surreply brief, and a far cry from the concise reference to supplemental authority that might be appropriate. Cf. Fed. R. App. P. 28(j) (imposing 350-word limit on such filings).

insurance company.  Anthem Insurance would become a wholly-owned subsidiary of a newly-formed stock holding company, Anthem, Inc.  Cmplt. ¶ 50.

A mutual insurance company is owned by its member-policyholders, so a demutualization transaction effectively transfers valuable ownership rights from the policyholders to a new set of shareholders in a stock company.  Under Indiana law governing the demutualization of an insurance company, Anthem Insurance was required to provide its policyholders consideration in exchange for the membership interests they possessed.  These membership interests included the right to receive distributions in the event of liquidation, the right to vote to elect directors, and the right to vote on a variety of matters relating to the administration of Anthem Insurance.  Cmplt. ¶ 49.  In its Plan of Conversion, Anthem Insurance proposed to extinguish these membership interests in exchange for consideration in the form of cash or common stock of Anthem Holding.  Eligible members who wanted to receive stock needed to affirmatively elect to receive stock; if they did not affirmatively elect to receive stock, Anthem Insurance assumed that they preferred to receive cash.

Section 6.1(b) of the Plan of Conversion stated that members who failed to make an election to receive stock "may be paid in cash, subject to the limitations set forth in Section 6.1(d)." Section 6.1(d) explained that Anthem Insurance would pay cash raised in the Initial Public Offering ("IPO") of Anthem stock to members based on their allocated number of shares in increasing order, paying cash first

to members who had been allocated the fewest number of shares.  In the event that all available cash had been distributed, Anthem Insurance would provide stock even to members who had not elected to receive stock.  Cmplt. ¶ 54.

The Plan of Conversion stated that the aggregate consideration the Anthem defendants would distribute to policyholders would be equal to the value of approximately 100 million shares of Anthem stock, subject to a possible upward adjustment.  Cmplt. ¶ 58.  The Anthem defendants would issue these shares first to the members who elected to receive stock.  Next, they would divide any remaining shares between the IPO and eligible members who had not elected to receive stock.  *Id.*

The amount of cash that the Anthem defendants would distribute to members who received cash was tied directly to the share price in the IPO.  The number of shares allocated to each member would be multiplied by either (1) the price at which the common stock was offered in the IPO, or (2) the price of the stock in the IPO enhanced by a "top-up" provision of as much as 10% in the event that the average closing price of Anthem common stock for the twenty consecutive days following the date of the demutualization exceeded 110% of the price at the IPO.  Cmplt. ¶ 59.

On March 16, 1998, Anthem Insurance engaged Goldman, Sachs & Co. ("Goldman Sachs") to act as its financial advisor in connection with the proposed

demutualization.  The Indiana Demutualization Law required Anthem Insurance to submit a fairness opinion from a qualified, independent financial advisor that concluded that the consideration it would pay to eligible policyholders in exchange for their membership interests was fair from a financial point of view.  Cmplt. ¶ 61.  Goldman Sachs delivered a fairness opinion to the Board of Directors of Anthem Insurance on June 18, 2001 concluding that the consideration to be distributed in cash and in stock was fair from a financial point of view.

Anthem Insurance mailed its policyholders a number of documents discussing the proposed demutualization.   On August 17, 2001, Anthem Insurance sent a Member Information Statement describing the Plan of Conversion and other issues related to the demutualization. Cmplt. Exs. B1 & B2. In Part 1 of the Member Information Statement, Anthem Insurance predicted that the IPO price for the new Anthem Holding stock would be between $25 and $45 per share.  Using the median of $35 per share, Anthem Insurance indicated that between 26.4 million and 30.5 million shares would be sold at the IPO, which would raise between $924 million and $1.0674 billion.  Cmplt. ¶ 64.  In Part 2 of the Member Information Statement, Anthem Insurance stated that it intended to offer 28,600,000 shares of common stock in the IPO, with an additional 4.29 million shares available to the underwriters as an over-allotment.  Cmplt. ¶ 66.[3]

---

[3]The underwriter of an IPO is sometimes given an over-allotment, also called a "green shoe," which allows it to sell additional shares within a specified period of time at the offering price in the event that the offering is oversubscribed.

The plaintiffs allege that it was unusual for a demutualizing company to set the default form of consideration for members as cash.  Cmplt. ¶¶ 72-76.  Though the documents made it clear that the default would be cash, the Member Information Statement stated that the IPO would raise only a limited amount of cash and that it was "likely" that many members who had not elected to receive stock would ultimately receive stock instead of cash.  Anthem Insurance repeated this statement in the Questions and Answers document, the Instruction Guide, and the Stock Election Card.  Cmplt. ¶¶ 68-71.

On October 1, 2001, Anthem Insurance distributed a Supplemental Information Summary to all members.  This document stated that Anthem Insurance expected to offer 28.6 million shares in the IPO at a price between $33 and $37 per share.  Anthem Insurance would issue the remaining 71.69 million shares (out of the total of approximately 100 million shares) to policyholders.  The Supplement stated that Anthem Insurance would pay approximately $990.0 million in cash to policyholders, which was an increase from the $837.2 million predicted in the Member Information Statement.  Cmplt. ¶¶ 79-80.

On October 2, 2001, the Indiana Commissioner of Insurance held a public hearing regarding the proposed demutualization, as required by law.   On October 25, 2001, the Commissioner issued an order approving the Plan of Conversion.  The members approved the demutualization on October 29, 2001, and the IPO was launched later the same day.

Anthem Insurance filed a number of documents with the U.S. Securities and Exchange Commission in preparation for the IPO.  In the First Amendment to the Registration Statement, filed on October 1, 2001, Anthem Insurance estimated that it would distribute over 25 million shares to approximately 775,000 eligible policyholders.  Anthem Insurance did not amend this language in the Second Amended Registration Statement filed on October 15, 2001.  Cmplt. ¶ 84.  In the Third Amended Registration Statement, filed on October 26, 2001, Anthem Insurance made significant changes.  The number of shares planned for the IPO increased from 28.6 million to 40 million shares.  Cmplt. ¶ 87.  Increasing the size of the IPO meant that the IPO would generate much more cash, meaning that many fewer policyholders would receive stock compensation.  In the Third Amended Registration Statement, Anthem Insurance also estimated that five million shares would be distributed among 150,000 policyholders.  Finally, Anthem Insurance estimated that instead of $990.9 million, the IPO would raise $1.335 billion.  Cmplt. ¶ 91.  Anthem Insurance also increased the number of aggregate shares allocated to large-group policyholders from 7.6 million to 11.5 million.  Cmplt. ¶ 104.  These changes were made only three days before the meeting at which policyholders would vote on the proposed Plan of Conversion.  The plaintiffs allege that many policyholders had already cast their votes and mailed in their ballots by that late date.  Cmplt. ¶ 87.

The final prospectus for the IPO, dated October 29, 2001, stated that Anthem Insurance would increase the IPO even further to 48 million shares (plus

7.2 million additional shares for the over-allotment).  Anthem Insurance estimated that $1.625 billion in cash would be available as consideration for policyholders' membership interests.  Cmplt. ¶¶ 93-94.

Anthem Insurance ultimately sold 55.2 million shares of Anthem Holding stock to the public at a price of $36 per share and issued approximately 48.1 million shares to members.  Thus, the former members owned a minority of the shares of the newly-formed company.  Cmplt. ¶ 98.  Instead of the $1.625 billion that Anthem Insurance had estimated in the prospectus would be available in cash to compensate former members, the Anthem defendants paid members a total of $2.063 billion in cash.  Cmplt. ¶ 100.

That increase in available cash might seem like a good thing for plaintiffs who did not ask to receive stock as compensation in the demutualization transaction.  After the IPO, however, the stock price continued to climb, and hindsight shows that payment in stock was the better choice, at least in the short to medium term.  Such seller's remorse does not show any wrongdoing, but plaintiffs have offered several theories that they contend amount to actionable wrongdoing by the defendants so that plaintiffs should recover the benefit of having opted for stock or other measures of damages.

Plaintiffs allege that the defendants' motive for increasing the size of the IPO, despite the fact that the increased size of the IPO would necessarily decrease

the price of each share, was to streamline the shareholder base and to eliminate shareholder servicing costs.   Cmplt. ¶ 136.   The plaintiffs allege that the defendants wanted to ensure that a large number of shares would be sold in large blocks in the IPO.   Cmplt. ¶ 141.   The plaintiffs also allege that the Anthem defendants saved at least $10 million per year in servicing costs by eliminating the small shareholders.   Cmplt. ¶ 174.   Goldman Sachs also benefitted from increasing the size of the IPO by nearly doubling its fees and providing its clients with the opportunity to reap profits from the purchase and sale of Anthem stock in the days and months following the IPO.   ¶ 189.

The plaintiffs allege that the defendants purposely set the IPO price as low as possible.   Cmplt. ¶ 141.   In support of this allegation, they point to testimony by Goldman Sachs executives in which they stated that clients often pressured Goldman Sachs to set the price of an IPO so that it would double or triple on the first day of trading.   Cmplt. ¶ 142.   The plaintiffs also point to the performance of Anthem stock, which opened at $36 per share, and increased to $40.90 by the end of the first day of trading.  By November 30, 2001, the stock was trading at $50.85 per share.   By April 30, 2002, the closing stock price was $68.20 per share. Cmplt. ¶ 151.

The plaintiffs also allege that the actions of the Anthem defendants after the IPO reveal that the information Anthem Insurance provided to policyholders before the IPO was misleading.   Anthem Insurance had stated that it planned to use the

funds earned through the IPO to expand the company's business, fund acquisitions, and pay down debt. Cmplt. ¶ 123. However, the Anthem defendants used all of the IPO proceeds to cash out members. They even borrowed almost $229 million by issuing Security Equity Units, so that they would be able to cash out the maximum number of members. Cmplt. ¶ 125.

The named plaintiffs in this case seek to represent the class of policyholders who received cash in exchange for their membership interests. In December 2001, the Anthem defendants paid cash compensation to policyholders who had not elected to receive stock as compensation. Each allocated share was multiplied by the IPO share price of $36 plus the 10% top-up provision for a total of $39.60 per share. Cmplt. ¶ 128. The plaintiffs allege that the price of the shares was depressed because the defendants set the IPO price too low, which caused policyholders to receive an inadequate and unreasonable amount of cash in exchange for their membership interests. Cmplt. ¶ 173. Of the $2.06 billion in total cash compensation, the plaintiffs have alleged that the policyholders who received the first $1,302,444,000 would have received cash even if the IPO had remained at the original size of 32.89 million shares. These policyholders were allocated a relatively small number of shares through the demutualization. These policyholders have asserted claims only based on the allegedly "Depressed Price" of the shares in the IPO. Cmplt. ¶ 129.

A subset of the proposed "Depressed Price" class makes up the proposed "Denied Stock" subclass.  These policyholders ultimately received cash, but allegedly would have received stock if the defendants had not increased the size of the IPO.  These policyholders have asserted claims for the depressed price of the shares and for being denied stock altogether.  Cmplt. ¶ 130.  The members of this subclass seek damages in the amount of $11.69 per share, which is the difference between what they were paid for each share and the price at which the shares were being traded on December 3, 2001, when the policyholders who received stock actually received their stock certificates.  Cmplt. ¶¶ 177-181.

The final subclass is made up of policyholders who relied upon the tax advice that Anthem Insurance provided with regard to the cash they received in exchange for their membership interests.  Section 1.4 of the Member Information Statement stated:  "Each Eligible Statutory Member receiving cash . . . will recognize taxable income in the year in which the cash is received.  The amount of such cash will generally constitute long term capital gain . . ."  Relying on this tax advice to the effect that policyholders had a zero basis in their interests, the "Tax Misinformation" subclass reported the full amount of the cash they received as long-term capital gains on their income tax returns.  Cmplt. ¶ 197.  The plaintiffs allege that the tax advice Anthem Insurance dispensed was erroneous. Cmplt. ¶¶ 198-207.

*Discussion*

-13-

I.      *Alleged Securities Law Violations*

The plaintiffs have alleged violations of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by Anthem Holding, Anthem Insurance, and Goldman Sachs.  They have also asserted a claim for controlling person liability against Larry Glasscock, president and CEO of Anthem Insurance at the time of the demutualization. Plaintiffs have also asserted claims based on violations of Indiana securities laws. The court dismisses all of the federal and state securities fraud claims because the plaintiffs who received cash for their mutual company ownership interests have not alleged fraud "in connection with" the purchase or sale of a security.

A.      *Violations of §  10(b) and Rule 10b-5*

The elements of a securities fraud claim are:  (1) the use or employment of a manipulative or deceptive device or contrivance; (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, *i.e.*, a causal connection between the material representation and the loss.   *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  Congress enacted the Private Securities Litigation Reform Act of 1995, which provides exacting pleading requirements for federal securities fraud claims.  15 U.S.C. § 78u-4; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007).  Plaintiffs must state with particularity the

facts that constitute the alleged violation and the facts that demonstrate scienter. *Id.*, citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976).

The "Depressed Price" class and "Denied Stock" subclass are made up of former Anthem Insurance policyholders who received cash in exchange for their membership interests. By definition, they did not elect to receive Anthem stock in exchange for their membership interests in the mutual company. For their federal securities claims to survive, the Complaint must demonstrate that despite their failure to elect stock, they were injured "in connection with" the purchase or sale of a "security."

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), the Supreme Court interpreted the "in connection with the purchase or sale of a security" requirement to require plaintiffs bringing federal securities claims to have been purchasers or sellers of a security. An antitrust consent decree had required Blue Chip Stamp Co. to offer a substantial number of shares in its newly formed corporation, Blue Chip Stamps, to retailers who had used the company's services in the past. The plaintiff was a retailer who had been offered shares in the new company but did not purchase them, allegedly because of misleading representations Blue Chip made in the prospectus for the offering. *Id.* at 726.

The Supreme Court determined that the legislative history of the Exchange Act and a comparison of the Act with other federal securities laws suggested that

Congress had intended to limit the availability of a private remedy for securities fraud to actual purchasers or sellers of securities. *Id.* at 733-36. The Court also relied on policy considerations for guidance. One consideration was the danger of "vexatious litigation" that could ensue if plaintiffs who were not actual purchasers or sellers of securities were able to bring claims, which would distract defendants from their normal business activities and require them to engage in extensive and expensive discovery procedures. *Id.* at 740-41. This would place a settlement value on these claims that was out of proportion with the plaintiffs' chances of success at trial. *Id.* The Court also wanted to prevent trial courts from having to decide claims in which evidence about the number of shares involved and the motivation for the failure to purchase or sell shares would be limited to the plaintiffs' subjective testimony. *Id.* at 746-47.

The Supreme Court determined that the plaintiff had no entitlement or contractual right to purchase Blue Chip Stamp stock, despite the consent decree. *Id.* at 750. The Court stated that the consent decree was not enforceable by those, like the plaintiff in the case, who were not parties to it, even if they were intended to benefit from it. *Id.*, citing *United States v. Armour & Co.*, 402 U.S. 673 (1971) and *Buckeye Coal & R. Co. v. Hocking Valley Co.*, 269 U.S. 42 (1925). The Court held that the plaintiff was no different from any other member of the public who chose not to purchase the stock and did not have standing to bring a claim under the Exchange Act. *Id.* at 751-52.

-16-

In applying the newly announced rule to the plaintiff, the Court recognized that the Exchange Act defines the purchase or sale of securities to include a contract to purchase or sell securities. *Id.* at 750-51.  The Court noted that the Act's definitions of the terms "buy" and "purchase," include "any contract to buy, purchase, or otherwise acquire," and the definitions of the terms "sale" and "sell" include "any contract to sell or otherwise dispose of."  *Id.* at 750, n.13, citing 15 U.S.C. § 78c(a)(13) & (14).  These definitions are considerably narrower than those offered by the Senate Committee on Banking and Finance, which would have defined the terms "buy" and "purchase" to include "any contract to buy, purchase, or otherwise acquire, contract of purchase, attempt or offer to acquire or solicitation of an offer to sell a security or any interest in a security," and the terms "sale" and "sell" to include "any contract of sale or disposition of, contract to sell or dispose of, attempt or offer to dispose of, or solicitation of an offer to buy a security or any interest therein."  *Id.*, citing S. 2693, 73d Cong., 2d Sess. (1934).  The Court refused to reinsert language that would have included the offeree of stock in these definitions when Congress had explicitly rejected this language.  *Id.*

The plaintiffs here have conceded that their membership interests in the mutual company do not fall within the definition of a security.  Pl. Br. 10, n.24, citing *Dryden v. Sun Life Assurance Co. of Canada*, 737 F. Supp. 1058, 1063 (S.D. Ind. 1989), and *Sofonia v. Principal Life Ins. Co.*, 378 F. Supp. 2d 1124, 1129-30 (S.D. Iowa 2005).  Instead, the plaintiffs have asserted three theories under which they try to meet the "in connection with" requirement:

(1)     Plaintiffs are purchasers and sellers of securities based on the shares the Anthem defendants allocated to them and the exchange of those allocated shares for cash;

(2)      Plaintiffs had contractual and statutory rights to purchase and sell Anthem stock, which places them within the statutory definitions of purchasers and sellers;

(3)     Even if plaintiffs were not purchasers or sellers of securities, the fraudulent scheme "coincided with" the sale of the IPO shares and the issuance of Anthem stock to the members who elected to receive stock.

The court does not find any of these theories persuasive.

### 1.     *Allocation of Shares*

The plaintiffs cite a recent decision by the Eastern District of New York in which the court held that a group of plaintiffs who had elected to receive cash in a demutualization satisfied the "in connection with" requirement.  Pl. Br. Ex. A, *In re MetLife Demutualization Litigation*, No. 00-2258, slip op. at 17 (E.D.N.Y. Aug. 29, 2006).  The court determined that the insurance company had dealt with policyholders' membership interests in the company through a three-step process. First, the company extinguished all policyholders' interests in the mutual company.  Second, the company provided consideration to the policyholders in the form of allocated shares in the new company.   Next, the company asked policyholders to decide whether they would like to exchange their allocated shares for cash, policy credits, or shares of stock in the new company.  *Id.* at 2-3.

The court next discussed whether the policyholders who elected to receive cash had received security interests in the public company when they were allocated shares. The court relied on several important pieces of evidence in reaching its decision. First, the court noted the timing of the company's transactions with the policyholders. The company allocated shares to all policyholders at some time prior to January 30, 2000. *Id.* at 4. The demutualization did not take place until April 2000, more than three months later. *Id.* at 5. During these three months, the policyholders who later elected to receive cash had stock in their names. *Id.* at 4.

The court also examined the language of the Plan of Reorganization that had been approved by the Board of Directors and distributed to all policyholders. The court concluded that the language in the Plan was ambiguous as to whether all policyholders would acquire an interest in the stock based on the allocation of shares because various terms within the plan contradicted one another on this point. *Id.* at 9. On the one hand, provisions in the plan discussed the allocation of shares to all eligible policyholders. *Id.* at 7 (quoting one provision that stated: "each Eligible Policyholder shall be paid consideration based on the allocation to the Eligible Policyholder of a number of Allocable Common Shares."). All policyholders also had some interest in the allocable shares because the number of shares they were allocated would determine the amount of shares, cash, or policy credits they would receive. *Id.* at 8. On the other hand, another provision in the plan stated that the consideration given to eligible policyholders in

exchange for their membership interests would be either shares, cash, or policy credits.  *Id.*

Because the terms of the Plan were ambiguous, the court looked at extrinsic evidence to determine if the allocable shares constituted a security interest.  The ballot the policyholders used to elect shares, cash, or policy credits stated:  "you may elect to receive cash for your Common stock."  This language implied that each policyholder already possessed common stock that she had the ability to exchange for cash if she so chose.  *Id.* at 10.  The New York State Superintendent of Insurance also stated in a letter to all policyholders:  "A total of 700 million shares of Company Common Stock, representing 100% of the equity ownership of the Company prior to reorganization, will be allocated to Eligible Policyholders as consideration for the surrender of their Policyholders' Membership Interests." *Id.* at 11.

Based on all of this evidence, the court determined that shares had been allocated to all policyholders, including those who later chose to receive cash, as consideration for their policy interests in the company.  The court concluded that the policyholders who had elected cash met the definition of the plaintiff class that had previously been certified.  *Id.* at 11-12, citing *In re MetLife Demutualization Litigation*, 229 F.R.D. 369, 372 (E.D.N.Y. 2005) (defining plaintiff class in relevant part as all policyholders "whose rights as participating policyholders were exchanged for shares of stock in MetLife Co., pursuant to defendants' plan of

demutualization"). The court also held that these plaintiffs met the "in connection with" requirement for federal securities claims based on having received an allocation of shares. The court distinguished these plaintiffs from the plaintiffs in *Blue Chip Stamps*. MetLife had performed individualized calculations before allocating shares to each of the plaintiffs, while the plaintiffs in *Blue Chip Stamps* had simply been offerees of stock who chose not to purchase the stock. *Id.* at 16.[4] Second, the plaintiffs in *MetLife* gave their membership rights in exchange for their allocable shares, while the plaintiffs in *Blue Chip Stamps* did not give up anything for their ability to purchase shares. *Id.*

Here, the plaintiffs argue that the Anthem defendants used a multi-step process similar to the process MetLife used, so that the allocable shares the Anthem defendants assigned to each policyholder were security interests. By this reasoning, the plaintiffs were both buyers of the security interests (in consideration for which they exchanged their membership interests) and sellers of security interests (by exchanging their allocated shares for cash).

───────────────

[4]The plaintiffs in *Blue Chip Stamps* were not merely members of the public who had the ability to buy stock on a public market. A consent decree required the company to offer a substantial number of shares of the new company to retailers who had a history of using the old company's product. These customers of the old company were offered shares in proportion to their past stamp usage. Contrary to the *MetLife* court's statement, Blue Chip Stamps did appear to have performed individualized calculations with regard to offering stock to the plaintiffs. *Blue Chip Stamps*, 421 U.S. at 726.

A close look at the language in the Anthem Plan of Conversion reveals critical differences between this Plan and MetLife's Plan.  The court in *MetLife* determined that the language of that Plan was ambiguous on the issue of whether policyholders who received cash had exchanged their membership interests in the company for allocated shares.  In contrast, the Anthem Plan specifically stated that the consideration that would be given for extinguishing membership interests was either stock or cash.  Article V § 5.1 of the Plan stated: "The aggregate consideration to be distributed to the Eligible Statutory members in exchange for their Membership Interests will be shares of Common Stock or cash. . . ." Cmplt. Ex. A.  Similarly, Article VI, § 6.1 stated: "Every Eligible Statutory Member will be entitled to shares of Common Stock or cash. . . ." *Id.*  Most important, there was a provision in the Plan that described the nature of the allocation of shares. Article V, §  5.1 stated:  "Solely for purposes of calculating the amount of such consideration, each Eligible Statutory Member will be allocated (but not necessarily issued) shares of Common Stock in accordance with this Plan." *Id.*

In contrast to the MetLife Plan, the Anthem Plan described a process in which Anthem Insurance would calculate the number of shares that would potentially be available to each policyholder, but would not actually issue those shares until after the demutualization.  At that point, the Anthem defendants would issue shares to those policyholders who had affirmatively elected to receive stock or who had made no affirmative election but would be given stock because of an inability to pay cash to all of the policyholders who preferred cash.

The other information Anthem Insurance sent to policyholders supports this interpretation of the Plan.  When Anthem Insurance sent policyholders the card on which they could elect to receive stock in August 2001, the package included a Member Information Statement, a Member Record Card, and a Questions and Answers Booklet.  The Member Information Statement stated:

> your Member Record Card (Card 4) identifies the current Policy or Policies on which your consideration will be based and the estimated number of shares of Anthem, Inc. common stock allocated to you if the Plan becomes effective and you are an Eligible Statutory Member.  This number is only an estimate.  The actual number of shares that will be allocated to you on the Effective Date may vary from the number shown.

Pl. Ex. B1 at 11.  Similarly, the Question and Answer booklet states:

> Each Eligible Statutory Member will be allocated a fixed component of 21 shares of Anthem, Inc. common stock, plus a variable component depending on a number of factors, such as policy type and duration of continuous coverage.  You may find your estimated allocation on your Member Record Card (Card 4). This allocation is an estimate only, and the actual number of shares could be more or less than the amount shown.

Cmplt. Ex. F at 6.  These statements provide evidence that, unlike MetLife policyholders, the Anthem Insurance policyholders were not actually allocated shares prior to the date of the demutualization.  They were merely given estimates of what their allocations might be.  The members chose cash before the final calculation of their allotment of shares was made.

Though the Anthem defendants made a calculation at some point about how many shares would be allocated to each policyholder, the plaintiffs did not

exchange their membership interests in Anthem Insurance for the allocated shares. Neither did they exchange their allocated shares for cash. They exchanged their membership interests directly for cash. Thus, even if the court were to find the reasoning of *MetLife* persuasive, the documents included in the pleadings show that the policyholders who received cash from the Anthem defendants were not purchasers or sellers of a security.

### 2. *Statutory and Contractual Rights*

The plaintiffs next argue that they were purchasers of securities because the definition of security encompasses the plaintiffs' statutory and contractual rights to receive Anthem stock. As discussed above, the Exchange Act's definition of "buy" and "purchase," includes "any contract to buy, purchase, or otherwise acquire," and the definition of the terms "sale" and "sell" includes "any contract to sell or otherwise dispose of." 15 U.S.C. § 78c(a)(13 &14). The plaintiffs have cited many cases in which courts have held that plaintiffs who had contractual rights to purchase or sell stock had standing to assert federal securities claims even if the purchase or sale never occurred. See, *e.g., Wharf (Holdings) Ltd. v. United International Holdings, Inc.*, 532 U.S. 588, 593-94 (2001)(holding that holder of option to purchase stock had standing to assert a claim under § 10(b) of the Exchange Act); *Griggs v. Pace American Group, Inc.*, 170 F.3d 877, 879-80 (9th Cir. 1999) (holding that holder of contingent rights to receive stock had standing to bring federal securities claims).

The plaintiffs here did not have a contractual or statutory right to receive Anthem stock.  The Indiana Code states that the consideration to be distributed to eligible members of a demutualized insurance company shall be:

(1)    cash;

(2)    stock or other securities of the former mutual or of the parent company;

(3)    additional paid up insurance or annuity benefits;

(4)    any combination of the forms of consideration listed in this subsection; or

(5)    other forms of consideration described in the plan of conversion and approved by the commission.

Ind. Code § 27-15-8-1. As eligible members of the mutual company, the plaintiffs had a statutory right to receive some form of consideration in exchange for their membership interests in Anthem Insurance, but not necessarily stock.  Similarly, the Plan of Conversion that the members approved stated that the consideration that the Anthem defendants would distribute to eligible members would be shares of common stock or cash.  Cmplt. Ex. A, Art. V § 5.1; Art. VI § 6.1.  The Plan and subsequent documents that Anthem Insurance sent to all members stated that eligible members who failed to affirmatively elect to receive stock "*may* be paid in cash . . . ."  See *id.* at Art. VI § 6.1(b) (emphasis added).  Thus, the plaintiffs do not meet the "in connection with" requirement based on a statutory or contractual right to receive stock.

-25-

3.    *"Coincident with" the Purchase or Sale of a Security*

Finally, the plaintiffs argue that even if they were not purchasers or sellers of securities, they have standing to sue for violations of security laws because the alleged fraudulent scheme "coincided with" a securities transaction.  They cite the Supreme Court's decision in *S.E.C. v. Zandford*, 535 U.S. 813 (2002), for the proposition that a plaintiff has standing to sue under federal securities law as long as the scheme "coincides with" a securities transaction.  By this reasoning, the plaintiffs would have standing to sue under federal securities law because the defendants' alleged scheme coincided with the sale of Anthem shares in the IPO and the issuance of stock to members who elected to receive stock in exchange for their membership interests.

In *Zandford*, the SEC alleged that a broker violated § 10(b) of the Exchange Act and Rule 10b-5 through a scheme in which he sold a customer's securities and used the cash proceeds for himself.  *Zandford*, 535 U.S. at 815.  The scheme involved the broker writing checks to an account that was in his own name, which he would not have been able to cash without selling securities from the customer's account.  Though the sales of the securities were not fraudulent in themselves, the retention of the cash proceeds from the sales was fraudulent.  *Id.* at 815-16.  The Court was not revisiting the requirement it announced in *Blue Chip Stamps* that a plaintiff asserting a federal securities claim must have been an actual purchaser or seller of a security; the broker was unquestionably a seller of securities.  The

issue presented was whether the "in connection with" requirement limited claims to those in which the misrepresentation or scheme involved the value of a security.

The Court stated that the "in connection with" requirement of the statute should be construed broadly so as to "effectuate [the statute's] remedial purposes." *Id.* at 819. The Court held that it was not necessary for the fraud to include a misrepresentation about the value of a security. *Id.* at 825. Rather, to meet the "in connection with" requirement, it was sufficient that the fraudulent acts "coincided with" the sale of securities. *Id.* The redemption of each check required the sale of securities, so each sale was made in furtherance of the scheme. Thus, the sales were "properly viewed as a 'course of business' that operated as a fraud or deceit on a stockbroker's customer." *Id.* at 821.

*Zandford* was an action brought by the SEC against the individual stockbroker. The plaintiffs have cited a number of cases in which lower federal courts have applied language from *Zandford* to cases that involve only private parties. Pl. Br. 12. In two of the cases, the courts cited *Zandford* for a narrow exception to the general rule that a plaintiff must have purchased or sold a security to have standing to bring a claim for violations of federal securities laws. In *Grippo v. Perazzo*, 357 F.3d 1218 (11th Cir. 2004), the plaintiff had given a large sum of money to a company that he believed would invest it in a variety of securities. He filed a complaint after discovering that there was no evidence the

company had ever invested any of the money in any security.  The court had to determine whether the plaintiff satisfied the "in connection with" requirement despite the fact that his money had not been used to purchase securities.  The court cited dicta from *Zanford* in which the Supreme Court stated that it found reasonable the SEC's interpretation that a claim against a broker who accepts payment for securities that he never intends to deliver satisfies the "in connection with" requirement.  *Id.* at 1223, citing *Zandford,* 535 U.S. at 819-20.  The court determined that the plaintiff had provided payment to a broker for securities that the broker never intended to deliver, and therefore met the "in connection with" requirement.  *Id.*

In *Schnorr v. Schubert*, No. 05-303, 2005 WL 2019878, at *5 (W.D. Okla. Aug. 18, 2005), the court again pointed to dicta in *Zandford* that adopted the SEC's position that a broker who accepts payment for securities that he never intends to deliver has acted "in connection with" the purchase or sale of a security.[5]  The court made it clear that, to apply this narrow exception to the general rule that a plaintiff has to have been an actual purchaser or seller of a security, the plaintiff must have actually paid for what he or she believed were

---

[5]The court in *Schnorr* was deciding whether the plaintiff's federal claims were preempted by SLUSA.  SLUSA preempts class actions based on state law that meet several requirements, including allegations that the defendant misrepresented or omitted a material fact "in connection with" the purchase or sale of a covered security.  15 U.S.C. § 78bb(f)(1)(A).  Every federal court of appeals that has considered the issue has interpreted the "in connection with" requirement based on the meaning of that phrase in the Exchange Act and Rule 10b-5.  See *Kircher v. Putnam Funds Trust*, 403 F.3d 478, 482 (7th Cir. 2005), reversed on other grounds, 547 U.S. 633 (2006).

securities.  So to meet the "in connection requirement," there must be an actual purchase of something, whether it is a security or what the person believes will be a security.  *Id.*

The courts in both *Grippo* and *Schnorr* held that plaintiffs who thought they had purchased or sold a security had alleged fraud "in connection with" the purchase or sale of a security.  The Complaint here, however, does not allege that the plaintiffs thought they had purchased or sold a security, so the special rule adopted in those two cases for that form of fraud is not relevant to this Complaint. None of the courts in the other cases the plaintiffs cited held that plaintiffs who were not purchasers or sellers of a security met the "in connection with" requirement because the fraudulent act "coincided with" the sale of a security. See *Simpson v. AOL Time Warner*, 452 F.3d 1040, 1050-51 (9th Cir. 2006), vacated and remanded on other grounds by *Simpson v. Homestore.com, Inc.*, No. 04-55665, — F.3d —, 2008 WL 787565 (9th Cir. Mar. 26, 2008) (plaintiffs were actual purchasers of stock); *Rowinski v. Salomon Smith Barney, Inc.*, 398 F.3d 294, 300-02 (3d Cir. 2005) (plaintiff sought to represent class of people who had accounts with a brokerage firm); *Behlen v. Merrill Lynch*, 311 F.3d 1087, 1089 (11th Cir. 2002) (plaintiff had purchased shares from a mutual fund); *Araujo v. John Hancock Life Insurance Co.,* 206 F. Supp. 2d 377, 383 (E.D.N.Y. 2002) (plaintiff owned a variable universal life insurance policy which permitted him to invest premiums in a mutual fund account).   The plaintiffs have not shown that *Zandford* allows a private plaintiff who has not purchased or sold a security, or

thought that he had purchased or sold a security, to file a claim based on alleged fraud in violation of federal securities laws.

The court concludes that the plaintiffs have failed to satisfy the "in connection with" requirement for federal securities fraud claims in their Complaint. There is no need to discuss whether they have adequately pleaded the scienter element or whether they filed their federal securities claims within the statute of limitations. The court dismisses the federal securities claims under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

B.    *Claim for Controlling Person Liability*

The plaintiffs have asserted a claim for controlling person liability against Larry Glasscock, as president and CEO of Anthem and Anthem Insurance at all relevant times. Cmplt. ¶¶ 293-300. Section 20(a) of the Exchange Act provides for liability of persons who "control" those who are primarily liable for violations of the Exchange Act. 15 U.S.C. § 78t. To state a claim for control person liability, the complaint must allege (1) a primary securities violation by the controlled person or entity; (2) that the defendant exercised "general control" over the controlled person or entity; and (3) that the defendant "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992). Because the

plaintiffs failed to plead a primary securities violation, the court must dismiss the § 20(a) claim under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  See *Van Dyke v. Coburn Enterprises, Inc.*, 873 F.2d 1094, 1100 (8th Cir. 1989) (affirming jury verdict that there was no controlling person liability when there was no underlying securities violation); *City of Austin Police Retirement System v. ITT Educational Services, Inc.*, 388 F. Supp. 2d 932, 951 (S.D. Ind. 2005) (dismissing claim for control lability based on failure to plead a primary securities violation).

C.    *Violations of Indiana Securities Laws*

The plaintiffs have also asserted a claim that the defendants violated Indiana Code § 23-2-1-12.  One requirement of a claim under Indiana state securities law is that the plaintiff allege misconduct "in connection with the offer, sale or purchase of any security."  Ind. Code § 23-2-1-12.  The language in the Indiana statute includes the same "in connection with" requirement as federal securities laws.  Indiana applies the case law interpreting the federal securities laws to its securities statute.  *Powell v. American Bank & Trust Co.*, 640 F. Supp. 1568, 1575 (N.D. Ind. 1986).  Because the plaintiffs have not satisfied the "in connection with" requirement of a federal securities violation, they have also not adequately pleaded the "in connection with" requirement under Indiana law.  The Indiana securities claims must be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

II.     *Statutes of Limitations*

Defendants contend that all of plaintiffs other state law claims are barred by applicable statutes of limitations.  Defendants contend that the applicable statutes of limitations are those under Indiana law, and that those statutes all expired on claims arising from the 2001 demutualization transaction before plaintiffs filed their original complaint in 2005.  In this case, however, Ohio choice-of-law principles govern such questions, and Ohio courts would apply Ohio statutes of limitations to all state law claims, regardless of which state's law provides the substantive right of recovery.

The plaintiffs filed this action originally in the Northern District of Ohio. That court transferred the case to this district under 28 U.S.C. § 1404(a).  When a court has transferred a claim to a new venue under section 1404(a), well established doctrine requires the transferee court to apply to state law claims the choice-of-law rules of the transferor state.  *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 383 (7th Cir. 2003), citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964).  Thus, the Ohio choice of law rules apply to the state law claims.

The parties disagree about what Ohio's choice-of-law rule is with regard to statutes of limitations.  Section 142 of the Restatement (Second) of Conflict of Laws offers a rule for determining which state's statute of limitations to apply to an action involving events in more than one state.  It is not clear that Ohio has

actually adopted § 142 of the Restatement (Second) of Conflict of Laws.[6]   The parties here have agreed that Ohio courts would apply § 142 of the Restatement (Second) of Conflict of Laws, but they disagree as to which of two versions of § 142 should apply.   Pursuant to *Van Dusen*, the *Erie* doctrine and 28 U.S.C. § 1404(a), this court's task is to predict how the Ohio Supreme Court would decide this question.

A.   *Section 142 of Restatement (Second) of Conflict of Laws*

The American Law Institute revised § 142 in 1988.  The plaintiffs argue that the original version of § 142 is the settled law of Ohio.  The defendants argue that the Ohio Supreme Court would adopt the 1988 revision today.

The original version of Section 142 states:

---

[6]The Ohio Supreme Court has expressly adopted some sections of the Restatement (Second).   See, *e.g.*, *Morgan v. Biro Manufacturing Co., Inc.*, 474 N.E.2d 286, 289 (Ohio 1984) (adopting sections 6, 145, 146); *Gries Sports Enterprises, Inc. v. Modell*, 473 N.E.2d 807, 810 (Ohio 1984) (adopting section 188); *Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.*, 453 N.E.2d 683, 686 (Ohio 1983) (adopting section 187).   The Ohio Supreme Court has also made statements that hint that it has adopted the Restatement in general.  See, *e.g.*, *Lewis v. Steinreich*, 652 N.E.2d 981, 984 (Ohio 1995) ("In making choice-of-law determinations, this court has adopted the theories stated in the Restatement of the Law 2d, Conflict of Laws.").   However, the sections of the Restatement that the court explicitly adopted and the general statements it made regarding the adoption of the Restatement were all in the context of choice-of-law issues that involved decisions about which state's substantive law should be applied, and were not related to statutes of limitations.  One Ohio Appeals Court panel stated: "The Supreme Court of Ohio has never adopted Section 142."   *Resner v. Owners Insurance Co.*, No. CA-2001-0091, 2002 WL 236970, at *2 (Ohio App. Feb. 14, 2002).

(1)    An action will not be maintained if it is barred by the statute of limitations of the forum, including a provision borrowing the statute of limitations of another state.

(2)    An action will be maintained if it is not barred by the statute of limitations of the forum, even though it would be barred by the statute of limitations of another state, except as stated in § 143.

Restatement (Second) of Conflict of Laws § 142 (1971).  This version adopted the traditional common law approach under which the law of the forum state governed on procedural matters, including statutes of limitations.  See *Sun Oil Co. v. Wortman*, 486 U.S. 717, 724-26 (1988).[7]  Despite the fact that application of other sections of the Restatement might require the use of a different state's substantive law, this version of § 142 requires courts to use the statute of limitations of the forum state.[8]  The theory behind this rule is that substantive law

_____

[7]Most states consider statutes of limitations procedural law in the context of conflicts of law, while the federal courts treat them as substantive law for the purpose of the *Erie* doctrine.  See *Guaranty Trust Co. of N.Y. v. York,* 326 U.S. 99, 110 (1945), citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).  The result requires some mental flexibility.  The Supreme Court justified this puzzling situation in *Sun Oil Co. v. Wortman*, 486 U.S. 717 (1988), by explaining that the definitions of the terms "substance" and "procedure" vary depending on the purpose for which the dichotomy between them is drawn.  The  purpose of the dichotomy in *Erie* jurisprudence is to "establish . . . substantial uniformity of predictable outcome between cases tried in a federal court and cases tried in the courts of the State in which the federal court sits."  *Id.* at 726-27.  Characterizing statutes of limitations as substantive under *Erie* leads to uniformity with the forum state's law.  On the other hand, the purpose for drawing a substance/procedure dichotomy in a conflicts of law situation is "to give both the forum State and other interested States the legislative jurisdiction to which they are entitled."  *Id.* at 727.  Characterizing statutes of limitations as procedural in the conflicts of law context allows the forum state to control the statutes of limitations for claims brought in that forum.

[8]In *Sun Oil Co. v. Wortman*, 486 U.S. 717, 722 (1988), the Supreme Court
(continued...)

dictates whether a right exists, while statutes of limitations merely control whether a state will provide a remedy for the violation of that right. The theory is that a state should be permitted to choose whether to allow its courts to provide a remedy even if there would be no remedy in a different forum. See *id.* at 725.

In contrast, the 1988 revision of § 142 provides more flexibility in the choice of a statute of limitations:

> Whether a claim will be maintained against the defense of the statute of limitations is determined under the principles stated in § 6. In general, unless the exceptional circumstances of the case make such a result unreasonable:
>
> (1) The forum will apply its own statute of limitations barring the claim.
> (2) The forum will apply its own statute of limitations permitting the claim unless:
>   (a) maintenance of the claim would serve no substantial interest of the forum; and
>   (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.

Restatement (Second) of Conflict of Laws § 142 (1988). This version was an attempt by the American Law Institute to reflect what it described as the "emerging trend" of dismissing a claim that would be barred by the statute of

---

[8](...continued)
held that the application of a forum state's statute of limitations to claims that are substantively governed by another state's law did not violate the Due Process Clause of the Fourteenth Amendment or the Full Faith and Credit clause of Article IV of the Constitution.

limitations of the state that had the most significant relationship to the occurrence and the parties.  *Id.*, comment e.

As discussed above, the Ohio Supreme Court has not explicitly adopted either version of § 142, and has provided no indications that it would adopt the 1988 revision.[9]  The plaintiffs have cited several cases in which Ohio courts have cited and applied the original version of § 142 when deciding choice-of-law disputes. See, *e.g.*, *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir. 1998) (applying Ohio statute of limitations to claim under California law); *Godwin v. Real Estate Inv. Mgmt., Inc.*, No. 2:00-cv-1402, 2001 WL 1681122, at *3-4 (S.D. Ohio Aug. 21, 2001)(applying Ohio statute of limitations to claim under Tennessee law); *Males v. W.E. Gates & Assoc.*, 504 N.E.2d 494, 495 (Ohio Cm. Pl. 1985).  The plaintiffs have also cited numerous cases in which Ohio courts have applied the statute of limitations of Ohio as the forum state without expressly relying on § 142.  See *Charash v. Oberlin College*, 14 F.3d 291, 299 (6th Cir. 1994); *Toledo Museum of Art v. Ullin*, 477 F. Supp. 2d 802, 805-06 (N.D. Ohio 2006); *Alexander & Assoc., Inc. v. Wilde*, No. H-86-34, 1987 WL 15918, at *1 (Ohio App. Aug. 21, 1987); *Barile v. University of Virginia*, 507 N.E.2d 448, 451 (Ohio App. 1986); *Lee v. Wright Tool & Forge Co.*, 356 N.E.2d 303, 305 (Ohio App. 1975); *Howard v. Allen*, 283 N.E.2d 167, 169 (Ohio 1972).

---

[9]The Supreme Court of Ohio last discussed the issue of statutes of limitations in a conflict of laws context in *Howard v. Allen*, 283 N.E.2d 167 (Ohio 1972).  The court stated there that the "long-established rule in Ohio is that limitation provisions are remedial in nature, and are therefore controlled by the law of the forum." *Id.* at 169.

In *Metz v. Unizan Bank* , 416 F. Supp. 2d 568, 574 (N.D. Ohio 2006), the court denied the plaintiffs' motion to certify to the Ohio Supreme Court the question of which state's statute of limitations to apply.  The court stated:  "this Court has found there to be sufficient guidance in the current state and federal law to allow it to make a reasoned and principled decision on the statute of limitations issue under Ohio law . . . ."  *Id.*  The court held that it was settled law in Ohio that the statute of limitations of the forum state is applied even if liability is determined by another state's substantive law.  *Id.*, citing *Charash*, 14 F.3d at 299.

In the face of all of the precedent to the contrary, the defendants argue that Ohio would apply the 1988 Revision of § 142.  They rely on *Curl v. Greenlee Textron, Inc.,* 404 F. Supp. 2d 1001 (S.D. Ohio 2005), in which Judge Marbley predicted that the Ohio Supreme Court would adopt the 1988 Revision. Recognizing that the Ohio Supreme Court has never explicitly adopted § 142 of the Restatement, the *Curl* court reasoned that the Ohio Supreme Court had shown a commitment to the approach the Restatement embodies.  *Id.* at 1007.  The court described the Ohio Supreme Court's shift away from what it called the formalistic "substance/procedure dichotomy" conflict of laws rules toward a more flexible case-by-case approach.  *Id.* at 1005.  The Ohio Supreme Court embraced the more flexible approach when it adopted the Restatement's balancing test that applied the substantive law of the state with the "more significant relationship" for choosing substantive tort law to apply in *Morgan*, 474 N.E.2d at 288-89.  The *Curl*

court stated that this commitment to the general principles espoused in the Restatement was evidence that the Ohio Supreme Court would modify its approach to conflicts involving statutes of limitations as well. *Curl*, 404 F. Supp. 2d at 1006-07, citing *Washburn v. Soper*, 319 F.3d 338, 342 (8th Cir. 2003). The court also opined that the Ohio legislature had signaled its commitment to the flexible approach to conflicts questions in April 2005 when it reenacted a borrowing statute, under which Ohio will "borrow" the limitations of the state of accrual if it is shorter than the Ohio limitations period. *Id.* at 1008; see Ohio Rev. Code § 2305.03(B).[10]

In predicting that the Ohio Supreme Court would adopt the 1988 Revision of § 142 for claims that arose before the 2005 legislation took effect, the *Curl* court relied on two arguments. First, the court stated: "there are no prudential reasons why the Ohio Supreme Court would not also adopt the 1988 Revision. Indeed, that revision only refines the most significant relationship approach already embraced by the court." *Id.* at 1011. Second, the court cited several circuit court decisions applying the 1988 Revision's "most significant relationship" approach. *Id.*, citing *Ortiz v. Gaston County Dyeing Machine Co.*, 277 F.3d 594, 594-96 (1st Cir. 2002); *Jaurequi v. John Deere Co.*, 986 F.2d 170 (7th Cir. 1993); *Roulston v. Foree Tire Co., Inc.*, 899 F.2d 19 (9th Cir. 1990); *Held v. ManufacturersHanover Leasing Corp.*, 912 F.2d 1197,1202-03 (10th Cir. 1990); *Warner v. Auberge Gray*

---

[10]As a result of the 2005 Ohio legislation, this case may present a case of nearly last impression.

*Rocks Inn, Ltee.*, 827 F.2d 938 (3d Cir. 1987).[11]  The court therefore predicted that

the Ohio Supreme Court would apply the 1988 Revision.

In this case, this federal court's task is to predict whether the Ohio Supreme

Court would apply the original version of § 142 or the 1988 Revision, not to decide

what it believes the rule in Ohio *ought* to be.  The Seventh Circuit has warned that

a federal court predicting how a state court would rule must "be careful to avoid

---

[11]The context in which each of these courts analyzed the statute of limitations issue was markedly different from the Ohio context.  In *Ortiz*, the First Circuit applied the 1988 Revision, citing the Massachusetts Supreme Court's decision in *New England Tel. & Tel. Co., v. Gourdeau Constr. Co.*, 647 N.E.2d 42, 45 (Mass. 1995), which explicitly adopted the 1988 Revision. In *Warner*, decided before § 142 was even revised, the Third Circuit relied on the New Jersey Supreme Court's decision in *Heavner v. Uniroyal, Inc.*, 305 A.2d 412 (N.J. 1973), in which the court held that if a cause of action arose in another state and New Jersey had no substantial interest in the matter, New Jersey would borrow the substantive law and statute of limitations of the other state.  In *Jaurequi*, the Seventh Circuit analyzed whether a statute of repose, not statute of limitations,  prevented the application of Texas law.  In addition, the court explicitly stated that it was not making its decision based on § 142 of the Restatement because no Texas court had formally adopted or applied § 142, and instead applied the factors relevant to choice-of-law analysis from § 6 of the Restatement.  *Jarequi*, 986 F.2d at 172 n.4.  In *Roulston*, an unpublished Ninth Circuit decision, the court held that it did not need to decide which state's statute of limitation to apply because the claims were time-barred under both the Texas and Arizona statutes of limitations.  The court also noted that it was not clear whether the Arizona Supreme Court would adopt the 1988 Revision.  The *Curl* opinion characterized this case as finding that the Arizona Supreme Court would "likely adopt the 1988 Revision," *Curl*, 404 F. Supp. 2d at 1011.  The Ninth Circuit actually stated only:  "it is arguable that the Arizona Supreme Court would follow the Restatement's lead."  *Roulston*, 1990 WL 35216, at *1 n.2.  Finally, in *Held*, the Tenth Circuit had to apply the statute of limitations from a state law to an action that was brought under § 502 of ERISA because § 502 provides no statute of limitations.  The court relied on the 1988 Revision and chose the New York statute of limitations over the one from Colorado.  The court did not discuss why it used the 1988 Revision and not the original version of § 142, and did not consider whether Colorado, the forum state, had adopted any version of § 142.

the temptation to impose upon a state what it, or other jurisdictions, might consider to be wise policy." *Lexington Insurance Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1093 (7th Cir. 1999).  A federal court must also recognize that any pronouncement it makes about the content of state law is a "significant intrusion on the prerogative of the state courts to control that development." *Id.* at 1092, quoting *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1416 (7th Cir. 1994) (Ripple, J., dissenting).  Accordingly, the Seventh Circuit has instructed:  "when a federal court must make predictions about how the highest state court would decide a case in the absence of caselaw directly on point, conservatism is in order . . . ." *Id.* at 1092.  See also *Dayton v. Peck, Stow & Wilcox Co.*, 739 F.2d 690, 694 (1st Cir. 1984) (stating that federal courts are in a poor position to endorse fundamental policy innovations); *Rhynes v. Branick Mfg. Corp.*, 629 F.2d 409, 410 (5th Cir. Unit A 1980) (stating that federal courts should be "extremely cautious" about adopting substantive innovations in state law).

With these cautions in mind, the court predicts that the Ohio Supreme Court would apply the original version of § 142 of the Restatement to these claims. The Ohio Supreme Court has had twenty years in which it could have adopted the 1988 Revision if it had seen fit to do so.  Ohio courts before and after *Curl* have consistently applied the approach embodied by the original version of § 142.  The court in *Metz* found that it was settled law in Ohio that the statute of limitations of the forum state is applied even if liability is determined by another state's substantive law.  *Metz*, 416 F. Supp. 2d at 574.  In the face of this nearly

universal application of the original version of § 142, the Ohio Supreme Court has remained silent.

However persuasive the opinion of the district court in *Curl* might be in terms of how the Ohio courts ought to rule, it is not persuasive in terms of predicting how the state court would rule.  First, the *Curl* court relied on the decisions of other jurisdictions to reach its decision.  In *Lexington Insurance Co. v. Rugg & Knopp*, 165 F.3d at 1093, the Seventh Circuit stated:

> That other jurisdictions favor a policy cannot weigh heavily in a federal court's determination in an unsettled area of a state's law if there is any significant indication that that state's own law either disfavors the policy in question directly or that promoting the policy would run afoul of established state standards of judicial interpretation or statutory construction.

The decisions of other circuit courts to apply the 1988 Revision have little relevance for the limited purpose of predicting Ohio law, at least where the Ohio courts have repeatedly addressed the issue.  *Curl* remains the only example of an Ohio court applying the 1988 Revision.  No other courts have cited *Curl* or followed its example.  It is one thing for the court to assume from the Ohio Supreme Court's decision to adopt some sections of the Restatement of Conflict of Laws that it intended to adopt the entire Restatement.  It is a much bigger leap to assume that the Ohio court's decision to adopt some sections of the Restatement amounted to a delegation to the American Law Institute of the authority to craft Ohio's conflicts of law jurisprudence through future revisions of the Restatement.  The court is unwilling to make that leap.

B.   *Application of § 142 of the Restatement*

Under the original version of § 142, Ohio courts will dismiss an action if it is barred by Ohio's statute of limitations or based on Ohio's borrowing statute. Anthem Insurance first mailed materials to members describing the Plan of Conversion on August 17, 2001, Cmplt. ¶ 63, so no cause of action could possibly have accrued before that date (and no plaintiff suffered harm until at least several months later). Ohio's statute of limitations for breach of contract is fifteen years for written contracts and six years for contracts not in writing. Ohio Rev. Code §§ 2305.06 & 2305.07. Ohio's statute of limitations for breach of fiduciary duty, negligence, and negligent misrepresentation is four years. Ohio Rev. Code § 2305.09(D). Ohio's statute of limitations for unjust enrichment is six years. Ohio Rev. Code § 2305.07; *Drozeck v. Lawyers Title Insurance Corp.*, 749 N.E.2d 775, 780 (Ohio App. 2000). The plaintiffs filed their original Complaint on August 16, 2005, which is less than four years after the earliest date a cause of action could possibly have accrued. None of the plaintiffs' remaining claims are barred by Ohio's statutes of limitations.

The court recognizes that the result of this analysis is that Ohio statutes of limitations will apply to claims arising under the laws of other states, including states like Indiana that would bar these claims under their own statutes of limitations if the case had been filed in Indiana originally. That odd result, however, is the product of *Van Dusen v. Barrack* and the Ohio courts' decisions to

apply Ohio statutes of limitations to cases venued in Ohio, regardless of the applicable substantive law.[12]

III.   *Fair Value Claims*

The plaintiffs have asserted claims against Anthem Holding and Anthem Insurance for violations of Indiana insurance statutes, breach of fiduciary duty, unjust enrichment, negligence, and breach of contract. They have asserted claims against Goldman Sachs for negligence and breach of contract. They have also asserted claims for breach of fiduciary duty and negligence against Glasscock.

A.   *Indiana Demutualization Law*

The plaintiffs have alleged that Anthem Holding and Anthem Insurance violated their statutory obligations under Title 27, Article 15 of the Indiana Code ("Demutualization Law") by failing to describe adequately the manner in which the "fair value" of Anthem Insurance would be determined and by failing to pay adequate consideration in exchange for policyholders' membership interests. Cmplt. ¶¶ 308-17.   The plaintiffs allege that Anthem Holding and Anthem

_____

[12]Ohio's "borrowing statute" went into effect on April 7, 2005. All of the plaintiffs' common law claims accrued before April 7, 2005. In *State v. LaSalle*, 772 N.E.2d 1172, 1175 (Ohio 2002), the Ohio Supreme Court stated: "absent a clear pronouncement by the General Assembly that a statute is to be applied retrospectively, a statute may be applied prospectively only." There is no evidence that the Ohio General Assembly intended its borrowing statute to be applied retrospectively. See *Curl*, 404 F. Supp. 2d at 1008. Ohio's borrowing statute does not bar any of the plaintiffs' common law claims.

Insurance concealed facts and made misrepresentations to the Indiana Department of Insurance.  Anthem Holding and Anthem Insurance have moved to dismiss these claims based on the absence of a private cause of action under the Indiana Demutualization Law.

To determine whether an individual has the right to a private cause of action for the violation of a statute, a court must look at the intent of the legislature.  *City of Muncie v. Peters*, 709 N.E.2d 50, 56 (Ind. App. 1999).  Indiana courts have consistently held that there is no private cause of action under a statute when the legislature has expressly provided for a method of enforcement of the statute.  See*, e.g., Stulajter v. Harrah's Indiana Corp.*, 808 N.E.2d 746, 748-49 (Ind. App. 2004) (finding no private cause of action under statute regulating gaming industry that was enforced by the Indiana Gaming Commission because legislature had not included a provision granting a private cause of action); *Roberts v. Sankey*, 813 N.E.2d 1195, 1199 (Ind. App. 2004) (finding no private cause of action under statute providing for the licensure of hospitals when the legislature specified a range of other available remedies for violations of the statute).  The Indiana Supreme Court has stated:  "As a general rule, a private party may not enforce rights under a statute designed to protect the public in general and containing a comprehensive enforcement mechanism."  *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251, 1260 (Ind. 2000).

The Indiana legislature enacted the Demutualization Law in 1999, which established the procedures for demutualizing a mutual insurance company. The statute requires the Board of Directors of the converting mutual company to draft a Plan of Conversion that, among other things, describes the manner in which the fair value of the mutual company will be determined and the amount, if known, of consideration that will be distributed to eligible policyholders. Ind. Code § 27-15-2-2. The converting mutual must file the Plan of Conversion with the Commissioner of Insurance for approval. Ind. Code § 27-15-3-1. Only after the Commissioner has approved the plan and at least two-thirds of the members have voted in favor of the demutualization can the converting mutual company consummate the plan. Ind. Code §§ 27-15-5-7; 27-15-6-1.

The Demutualization Law provides a mechanism for judicial review. It specifically states: "A person who is aggrieved by an agency action of the commissioner under this article may petition for judicial review of the action under IC 4-21.5-5." Ind. Code § 27-15-15-1. All petitions for review must be filed no later than thirty days after the Commissioner issues her order. Ind. Code § 27-15-15-2. There is no indication in the text of the statute that the legislature intended to provide a private cause of action for violations of the statute. Instead, the only reference to judicial review in the statute makes it clear that persons who are aggrieved by the Commissioner's decision must use the general procedures for seeking review of administrative orders detailed in Indiana Code 4-21.5-5. Thus,

-45-

the plaintiffs are unable to bring a private cause of action alleging violations of the Indiana Demutualization Law.

B.    *Effect of Statute on Common Law Claims*

The defendants argue that the plaintiffs' common law claims for breach of contract, negligence, unjust enrichment, and breach of fiduciary duties are attempts to make an "end run" around judicial review of the Commissioner's order, which is the remedy the statute provides.  Anthem Br. 26.  The plaintiffs have responded that in these counts of the Complaint, they are not challenging the Commissioner's decision to approve the Plan of Conversion, so the statutory remedy does not apply.

The provision of the statute that discusses the time for filing a petition for judicial review includes broad language.  The Demutualization Law states:

> All petitions for judicial review of, and any action challenging the validity of or arising out of:
>
> > (1) the approval or disapproval of; or
> > (2) any action proposed to be taken under;
>
> any order or determination of the commissioner in connection with a plan of conversion under this article must be filed not later than thirty (30) days after the order or determination is issued by the commissioner.

Ind. Code § 27-15-15-2.  By its terms, this section's thirty-day time limit could apply to "any action . . . arising out of . . . any action proposed to be taken under any order or determination of the commissioner," and thus could arguably apply

to plaintiffs' common law claims about the demutualization transaction.  The defendants argue that the plaintiffs had only thirty days in which to file a request for judicial review, which they did not do.  Because of the plaintiffs' failure to use the statutory process for judicial review, the defendants argue that the court does not have jurisdiction to hear common law claims that arose out of the Plan of Conversion.  (For purposes of this argument, the court assumes that the thirty-day limit is not a statute of limitations for purposes of Ohio choice-of-law.)[13]

The plaintiffs point out accurately that it would have been impossible for them to have filed a petition for judicial review or a civil action asserting any of these claims within thirty days of the Commissioner's approval.  The Commissioner of Insurance issued her order on October 25, 2001.  Thirty days after October 25 was November 24, 2001.  The IPO launched on October 29 and the entire demutualization was complete by November 2, 2001, so the policyholders knew the final price that Anthem Insurance had set for the Anthem stock in the IPO.  However, the Plan of Conversion stated that the Anthem defendants would use commercially reasonable efforts to mail the payments or

---

[13]The court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(d)(2) because the parties are citizens of diverse states and the amount in controversy, aggregating the claims of all proposed class members, exceeds $5,000,000.   No state can prevent a federal court from exercising subject matter jurisdiction conferred upon it by Congress.  *Goetzke v. Ferro Corp.*, 280 F.3d 766, 778-79 (7th Cir. 2002); *Truck Components Inc. v. Beatrice Co.*, 143 F.3d 1057, 1061 (7th Cir. 1998).  If state law would deny the plaintiffs a remedy for their alleged cause of action, the district court could dismiss the cause of action for failure to state a claim upon which relief may be granted.  *Goetzke*, 280 F.3d at 779.

notices of the number of shares that had been designated to the policyholders within *six weeks* of the date of the demutualization.  Cmplt. Ex. A §§ 6.2 & 6.3.  In addition, the "top-up" provision meant that the plaintiffs could not know for nearly a month after the IPO what the relevant stock price would be.   The plaintiffs have alleged that the policyholders who did not elect to receive stock did not know until they received checks in the mail in December 2001 whether they would receive cash or stock in exchange for their membership interests.  Cmplt. ¶ 128.  Thus, the plaintiffs could not possibly have known until more than thirty days after the Commissioner's order that they had been injured by the defendants' actions, which is an essential element of all of their claims.

In *Martin v. Richey*, 711 N.E.2d 1273, 1284 (Ind. 1999), the Indiana Supreme Court held that the application of a statute of limitations to a plaintiff who could not have known of her injury within that time period violated Article I, Section 12 of the Indiana Constitution.   The plaintiff had asserted a medical malpractice claim against her doctor based on the doctor's failure to diagnose her with breast cancer.  The latency of the cancer prevented her from discovering her condition until after the two year statute of limitations from the time of the doctor's alleged malpractice had already lapsed.  *Id.* at 1279.  The court pointed to Article I, Section 12 of the Indiana Constitution, which states in relevant part: "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law."  The court held

that this provision provides a right of access to courts that the legislature cannot restrict unreasonably.  The court stated:

> the medical malpractice statute of limitations is unconstitutional as applied when plaintiff did not know or, in the exercise of reasonable diligence, could not have discovered that she had sustained an injury as a result of malpractice, because in such a case the statute of limitations would impose an impossible condition on plaintiff's access to courts and ability to pursue an otherwise valid tort claim.  To hold otherwise would be to require a plaintiff to bring a claim for medical malpractice before becoming aware of her injury and damages, an essential element of any negligence claim, and this indeed would be boarding the bus to topsy-turvy land.

*Id.* at 1284, citing *Dincher v. Marlin Firearms Co.*, 198 F.2d 821, 823 (2d Cir. 1952) (Frank, J., dissenting).[14]


Plaintiffs' membership interests in the old mutual insurance company were valuable property interests.  Applying the thirty day limitation to the plaintiffs' ability to assert any claims in connection with the demutualization would, at a minimum, raise serious issues under Article I, Section 12 of the Indiana Constitution, at least as applied to those claims that are based on injuries that could not have been discovered or ascertained until after the thirty-day deadline had passed.  See *Martin*, 711 N.E.2d at 1284.  The Indiana Supreme Court has

---

[14]The court included an excerpt from Judge Frank's dissenting opinion: "Except in topsy-turvy land, you can't die before you are conceived, or be divorced before ever you marry, or harvest a crop never planted, or burn down a house never built, or miss a train running on a non-existent railroad. For substantially similar reasons, it has always heretofore been accepted, as a sort of legal 'axiom,' that a statute of limitations does not begin to run against a cause of action before that cause of action exists, i.e., before a judicial remedy is available to the plaintiff." *Martin*, 711 N.E.2d at 1284.

often explained that it tries to interpret Indiana statutes as constitutional to the extent that the statutory language will permit.  *E.g.*, *A Woman's Choice-East Side Women's Clinic v. Newman*, 671 N.E.2d 104, 107 (Ind. 1996), citing *Brady v. State*, 575 N.E.2d 981, 984 (Ind. 1991); *A Woman's Choice*, 671 N.E.2d at 111 (Dickson, J., concurring) ("overriding obligation to construe our statutes in such a way as to render them constitutional if reasonably possible" overcame literal interpretation of statutory language).  In light of these considerations, the court construes the thirty-day limit in Indiana Code § 27-15-15-2 as not applying to claims for damages that could not have been known during or before the expiration of the thirty-day period.

The defendants also argue that the sole available remedy was an appeal from the Commissioner's order as provided in the Demutualization Law.  They argue that the plaintiffs' pursuit of the fair value claims in federal court was an attempt to make an "impermissible end run" around their statutory remedy. Anthem Br. 41.  Indiana courts have consistently held that they lack jurisdiction to hear claims that challenge the decisions of Commissioners of state agencies who have been delegated legislative authority, but those decisions do not bar these plaintiffs' common law claims.  In *Indianapolis Water Co. v. Boone Circuit Court*, 307 N.E.2d 870 (Ind. 1974), the Indiana Supreme Court held that the courts did not have jurisdiction to hear claims by customers who alleged the Water Company had charged them excessive rates.  The statute governing the regulation of public utility rates specifically stated that it did not "release or waive" any other right of

action that a person may have.  Ind. Code § 8-1-2-117.  The court stated:  "the above statute may well have afforded the plaintiffs in the court below an action had the Water Company fraudulently concealed or withheld information from the Public Service Commission, or if the Water Company had charged rates in excess of those fixed by the Commission."  *Indianapolis Water Co.*, 307 N.E.2d at 872. Instead, the court found that the plaintiffs were alleging that the Public Utility Commission had erred in setting the rates, which was a legislative task that the legislature delegated to it.  The court found that the Public Utility Commission had held hearings and considered the evidence that the plaintiffs sought to introduce. *Id.* at 872.  Because the customers were challenging the Commission's decision, their exclusive remedy was to seek judicial review of the decision as provided by the statute.  *Id.* at 873.  See also *Haste v. Indianapolis Power & Light Co.*, 382 N.E.2d 989, 990 (Ind. App. 1978) (holding that the court did not have jurisdiction to hear claims that company was unlawfully applying its new rates retroactively because the only remedy available was judicial review as described by the statute).

In *Indiana Bell Telephone v. Friedland*, 373 N.E.2d 344, 345 (Ind. App. 1978), the plaintiff claimed that the telephone company assessed him a rate that included an inappropriate charge.  The court stated that a claim attacking the validity and reasonableness of the rate itself was within the exclusive jurisdiction of the Public Service Commission.  *Id.* at 347.  The court also held it did not have jurisdiction to hear a claim attacking the application of the rate.  *Id.* at 349.  The

court explained that the statute outlined a procedure through which someone could lodge a complaint about the application of excessive rates by a utility company.  The complainant must file a petition with the Commission stating that the company was not complying with the Commission's order.   Then the Commission would investigate.  If it determined that the company was charging illegal rates, it would issue an order to desist.  If the company did not comply with the order, the Commission could bring suit against the company to compel compliance.  *Id.* at 351.  If the Commission were to find that the company was not charging illegal rates, the complainant would be permitted to appeal to assert that the Commission's finding was incorrect.   *Id.*

More relevant here is the Seventh Circuit's decision in *Ordower v. Office of Thrift Supervision*, 999 F.2d 1183 (7th Cir. 1993).  There the plaintiffs were account holders in a bank that had converted from a mutual to a stock form who alleged that the company had undervalued its net worth in its representations to the Office of Thrift Supervision and had misled the account holders.  The Seventh Circuit held that it could not provide relief for claims challenging the valuation of the company by the Office of Thrift Supervision or seeking an injunction of the Office's approval of the conversion.  However, the court found that a federal court could consider claims asserting breach of fiduciary duty by the company in its interactions with account holders.  *Id.* at 1188.  The court explained:

> That the [Office of Thrift Supervision] has found the substance of a
> transaction in compliance with federal law – which is all the OTS's approval
> establishes – does not relieve the bank's managers of the duty to tell the

> truth when asking the depositors to approve the transaction. The
> depositors are free to turn down the managers' proposal. A district court
> accordingly may consider whether the materials describing the transaction
> and soliciting that approval were complete and accurate.

*Id.* at 1188.

Here, unlike in *Indianapolis Water Co.* and *Ordower*, the plaintiffs are not challenging the validity of the Commissioner of Insurance's order approving the demutualization of Anthem. Unlike in *Indiana Bell Telephone,* there is also no statutory scheme through which people aggrieved by events that occur subsequent to the Commissioner's order can seek redress. The plaintiffs, like the plaintiffs in *Ordower*, allege that Anthem Holding and Anthem Insurance breached their contractual and fiduciary duties to their policyholders and acted negligently both before *and after* the Commissioner had approved the demutualization. Thus, the statutory thirty-day time limit in Indiana Code § 27-15-15-2 does not bar these claims.

IV.     *Unjust Enrichment*

The plaintiffs have asserted unjust enrichment claims against Anthem Holding, Anthem Insurance, and Goldman Sachs. As explained above, Ohio choice-of-law principles govern the choice of law applicable to these claims. The Ohio Supreme Court has adopted the general principles of the Restatement (Second) of Conflict of Laws to determine which state's substantive law to apply to a claim. *Lewis v. Steinreich*, 652 N.E.2d 981, 984 (Ohio 1995). Section 221 of

the Restatement (Second) of Conflict of Laws governs actions for restitution.  The court will consider certain contacts to determine which state has the most significant relationship to the occurrence and the parties, including:  the place where the relationship between parties was centered; the place where the benefit or enrichment was received; the place where the act conferring the benefit was performed; the domicile, residence, place of incorporation and place of business of the parties.

Here, the relationship between the parties was centered in Indiana, where the headquarters of Anthem Holding and Anthem Insurance were and are located.  Anthem Holding and Anthem Insurance allegedly saved servicing costs in Indiana.  The approval of the demutualization by the Commissioner and the meeting at which the members approved the Plan of Conversion, which allowed the demutualization process and IPO to proceed, both took place in Indiana.  Thus, the state with the most significant relationship to the occurrence and the parties for the purpose of the unjust enrichment claims is Indiana.  The court will apply Indiana substantive law to the unjust enrichment claims.

The plaintiffs have alleged that Anthem Holding and Anthem Insurance were unjustly enriched by saving substantial servicing costs when they prevented hundreds of thousands of members from becoming shareholders.  A claim for unjust enrichment "permit[s] a recovery . . . where, in fact, there is no contract, but where the circumstances are such that under the law of natural and

immutable justice there should be a recovery as though there had been a promise." *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991) (reversing verdict for plaintiffs), quoting *Clark v. Peoples Saving & Loan Association*, 46 N.E.2d 681, 682 (Ind. 1943). To prevail on a claim of unjust enrichment, a plaintiff must show that a measurable benefit has been conferred on the defendant that it would be unjust to allow the defendant to retain. *Id.* An unjust enrichment claim usually requires the defendant to have impliedly or expressly requested the benefit. *Fowler v. Perry*, 830 N.E.2d 97, 104 n.2 (Ind. App. 2005), citing *Bright v. Kuehl*, 650 N.E.2d 311, 315 (Ind. App. 1995). Conferring a benefit without the expectation of a payment or other consideration falls short of demonstrating an unjust enrichment claim. *Sonnenburg*, 573 N.E.2d at 408.

The plaintiffs have not asserted a viable unjust enrichment claim. First, unjust enrichment is an appropriate claim only when there is no governing contract. *DiMizio v. Romo* , 756 N.E.2d 1018, 1025 (Ind. App. 2001). The plaintiffs have alleged that they had an enforceable contract with Anthem Holding and Anthem Insurance based on the Plan of Conversion and the Demutualization Law, under which they were entitled to receive fair compensation in exchange for their membership interests. Cmplt. ¶¶ 357-59. The plaintiffs are entitled to bring a claim for breach of that contract based on their assertion that they did not receive fair compensation, and they have done so. In contrast to the breach of contract claim, the unjust enrichment claim seeks a return of the servicing costs that Anthem Holding and Anthem Insurance saved. These savings were a

consequence of the decisions that the members themselves made not to elect stock compensation.

Even accepting the plaintiffs' theories, Anthem Holding and Anthem Insurance did not impliedly or expressly request the savings in shareholder servicing expenses. Plaintiffs have alleged at most that the companies hoped that many members would choose not to receive stock compensation so there would be fewer shareholders. There was simply no promise or agreement between the parties with regard to the servicing costs. The plaintiffs chose not to elect stock compensation with the expectation that they would receive "fair compensation" for their membership interests. There is no allegation that they expected payment or some other form of consideration in exchange for providing Anthem Holding and Anthem Insurance with the benefit of saving money on their servicing costs. Plaintiffs have failed to state a viable claim for unjust enrichment against Anthem Holding and Anthem Insurance.

Plaintiffs have also asserted a claim for unjust enrichment against Goldman Sachs. They have alleged that Goldman Sachs was unjustly enriched by receiving an additional $41.4 million in underwriting fees when Anthem Holding and Anthem Insurance increased the size of the IPO. Goldman Sachs received its fees based on a written contract with Anthem Insurance in return for acting as the company's financial advisor and lead underwriter for the IPO.

A claim for unjust enrichment is appropriate only where there is no governing contract. *DiMizio*, 756 N.E.2d at 1025. The plaintiffs claim that Goldman Sachs had a conflict of interest in writing the fairness opinion and also serving as lead underwriter for the IPO. Indiana law does not prohibit a financial advisor from serving as the underwriter in an IPO. Anthem Insurance also disclosed the dual role Goldman Sachs would play in the Part 1 of the Member Information Statement. Cmplt. Ex. B2 at 36. In any case, Anthem Holding and Anthem Insurance conferred the benefit on Goldman Sachs, not the plaintiffs; so there would be no basis for the court to return any unjust enrichment directly to the plaintiffs. Plaintiffs have not asserted a viable claim for unjust enrichment against Goldman Sachs.

V.    *Other Common Law Claims Against Goldman Sachs*

A.    *Negligence Claim*

The plaintiffs have brought a claim for negligence against Goldman Sachs. They have alleged that Goldman Sachs assumed a duty to exercise reasonable care in pricing the IPO so that the consideration paid to the policyholders would be fair and reasonable. They claim that Goldman Sachs breached this duty, which led to foreseeable injuries to the plaintiffs. Cmplt. ¶¶ 347-51.

As explained above, Ohio choice-of-law rules apply. Ohio has adopted § 145 of the Restatement (Second) of Conflict of Laws to determine which state's

substantive law to apply to tort claims.  *Morgan*, 474 N.E.2d at 289.  Section 145 of the Restatement states that the court should apply the law of the state that has the most significant relationship to the occurrence and the parties with respect to negligence claims.  The factors the court should consider are:  the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties is centered.  *Id.* at 145(2).  Goldman Sachs is headquartered in New York.  All of Goldman Sachs' relevant actions were related to the demutualization process and IPO, which took place in Indiana.  The Anthem defendants ultimately priced the IPO in Indiana after negotiations among all of the underwriters.  The plaintiffs reside in Indiana, Ohio, Kentucky, and Connecticut.  The court determines that the state with the most significant relationship to the occurrence and the parties for the purpose of the negligence claim is Indiana and will apply Indiana law.

To recover on a common law negligence claim under Indiana law, the plaintiff must establish that the defendant had a duty to conform his conduct to a standard of care arising out of his relationship with the plaintiff, the defendant failed to conform his conduct to this standard of care, and that the breach of the duty proximately caused an injury to the plaintiff.  *Vaughn v. Daniels Co. (West Virginia), Inc.*, 841 N.E.2d 1133, 1143 (Ind. 2006).  "Absent a duty, there can be no breach, and therefore, no recovery for the plaintiff in negligence."  *Id.*, citing *Hopper v. Colonial Motel Properties, Inc.*, 762 N.E.2d 181, 188 (Ind. App. 2002).

The plaintiffs have alleged that Goldman Sachs owed a duty to Anthem Insurance's policyholders.  Goldman Sachs has responded that its only duty was to Anthem Insurance.  The plaintiffs have urged the court to analyze whether Goldman Sachs owed the policyholders a duty based on the relationship between the parties, the reasonable foreseeability of harm, and public policy concerns.  See *Indiana Bell Telephone Co. v. Maynard*, 705 N.E.2d 513, 514 (Ind. App. 1999).

The court does not find it necessary to perform this analysis in this case. In *Massey v. Merrill Lynch & Co.*, 464 F.3d 642, 650 (7th Cir. 2006), the Seventh Circuit held that a financial advisor who wrote a fairness opinion for a corporation regarding a possible merger did not owe a duty to individual shareholders of the corporation.  The fairness opinion in *Massey* stated:

> This opinion is for the use and benefit for the Board of Directors of the Acquiror.  Our opinion addresses only the financial fairness of the Exchange Ratio, and does not address the merits of the underlying decision by the Acquiror to engage in the Merger, and does not constitute a recommendation to any stockholder as to how such stockholder should vote on the proposed merger or any matter related thereto.

*Id.* The court held that the fairness opinion and other documents unambiguously established that the financial advisor's duties ran exclusively to the corporation, not the plaintiffs as individual investors.  *Id.*

Here, Anthem Holding and Anthem Insurance referred to Goldman Sachs' fairness opinion in the Member Information Statement.  Cmplt. Ex. B2 at 3.  The Member Information Statement specifically stated that the fairness opinion was

delivered "solely for the information and assistance of Anthem's Board of Directors and [was] not a recommendation to Anthem Insurance's Statutory Members as to how to vote on the Plan." *Id.* The Anthem defendants also provided a copy of Goldman Sachs' fairness opinion to all policyholders as an appendix to the Member Information Statement. The fairness opinion itself stated:

> Our advisory services and the opinion expressed herein are provided solely for the benefit and use of the Board in connection with its consideration of the transactions contemplated by the Plan and may not be relied upon by any other person. This opinion does not constitute a recommendation to any Statutory Members as to how such Statutory Members should vote on the proposed Plan or as to the form of Consideration that any policyholder should elect.

Cmplt. Ex. G at 6. This language is almost identical to the language Merrill Lynch used in its fairness opinion in *Massey*, which the Seventh Circuit found did not establish that Merrill Lynch owed a duty to individual shareholders. See also *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 317-18 (5th Cir. 2002) (holding that financial advisor who wrote fairness opinion did not owe a duty to debenture holders based on its contract with the corporation).

The agreement in which Goldman Sachs agreed to serve as lead underwriter for the Anthem Insurance IPO included a similar limitation:

> This Agreement shall be binding upon, and inure solely to the benefit of, the Underwriters, the Company and Anthem Insurance and . . . the officers and directors of the Company and Anthem Insurance and each person who controls the Company or any Underwriter, and their respective heirs, executors, administrators, successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

-60-

Goldman Sachs Ex. F at 31¶ 13.[15]  The language in this agreement makes it clear that Goldman Sachs' duties ran exclusively to Anthem Holding, Anthem Insurance, and their officers and directors.

Goldman Sachs did not owe a duty to the individual policyholders in providing a fairness opinion with regard to the demutualization or with regard to setting the initial price and size of the IPO.  The plaintiffs' claim for negligence against Goldman Sachs is dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

B.     *Breach of Contract Claim*

The plaintiffs have also asserted a claim for breach of contract against Goldman Sachs.  The plaintiffs allege that Goldman Sachs breached its contracts with Anthem Holding and Anthem Insurance, in which it had explicitly and implicitly promised to determine an IPO price that would result in Anthem

---

[15]The court can consider documents attached to a motion to dismiss if the complaint refers to them and they are central to a claim.  *E.g.*, *Wright v. Associates Insurance Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994).  This exception to the general rule that the court will consider only documents attached to the complaint when ruling on a motion to dismiss is aimed at cases, like this one, that require the interpretation of contracts.  *Levenstein v. Salafsy*, 164 F.3d 345, 347 (7th Cir. 1998).  The Complaint discusses the contractual relationship between Goldman Sachs and the Anthem defendants, but does not include copies of the relevant contracts.  Cmplt. ¶¶ 347, 365.  Goldman Sachs attached to its motion to dismiss copies of the contracts in which it agreed to serve as lead underwriter of the IPO and provide a fairness opinion in reference to the demutualization.  Goldman Sachs Exs. B & F.  The court has reviewed and will discuss both of these documents.

Insurance paying fair, reasonable, equitable, and adequate consideration to each eligible policyholder.  The plaintiffs  argue that they can enforce these contracts between  Goldman Sachs, Anthem Holding, and Anthem Insurance because they were third party beneficiaries of the contracts.  Cmplt. ¶ 365-68.

Goldman Sachs entered into an agreement with Anthem Insurance to provide a fairness opinion on March 16, 1998.  Goldman Sachs Ex. B.  Goldman Sachs entered into an agreement to serve as the lead underwriter of the Anthem, Inc. IPO on October 29, 2001.  Goldman Sachs Ex. F.  Both contracts state that they will be governed in accordance with New York law.  Goldman Sachs Ex. B at 5; Ex. F at 31 ¶ 15.   The Ohio Supreme Court has adopted § 187 of the Restatement (Second) of Conflict of Laws, which provides that, subject to limited exceptions, the law of the state the parties to a contract chose will govern their contractual rights and duties.  *Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.*, 453 N.E.2d 683, 686 (Ohio 1983).  The court will apply New York law to determine whether the plaintiffs were third party beneficiaries of these contracts.

Under New York law, a party who is not a party to the contract is a third party beneficiary under the contract

> if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Levin v. Tiber Holding Corp.*, 277 F.3d 243, 248 (2d Cir. 2002), quoting Restatement (Second) Contracts § 302 (1981).  The parties must express an intent to benefit a third party on the face of the agreement; otherwise, the third party is merely an incidental beneficiary who has no right to enforce the contract.  *In re Gulf Oil/Cities Service Tender Offer Litigation*, 725 F. Supp. 712, 733 (S.D.N.Y. 1989); *Port Chester Electrical Construction Corp. v. Atlas*, 357 N.E.2d 983, 986 (N.Y. 1976).

The plaintiffs argue that the policyholders are not named as third party beneficiaries of the contracts, but that they were intended beneficiaries because the whole reason for the engagement of Goldman Sachs was to determine whether and how the policyholders would receive fair value from the demutualization.  This argument fails because of the text of the contracts.   The Engagement Letter specifically stated:  "any written or oral advice provided by Goldman Sachs in connection with our engagement is exclusively for the information of the Board of Directors and senior management of the Company . . . ."  Goldman Sachs Ex. B at 2-3.  Likewise, the Underwriting Agreement stated:

> This Agreement shall be binding upon, and insure solely to the benefit of, the Underwriters, the Company and Anthem Insurance and . . . the officers and directors of the Company and Anthem Insurance and each person who controls the Company or any Underwriter, and their respective heirs, executors, administrators, successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Goldman Sachs Ex. F at 31 ¶ 13.  This language makes it clear that the parties did not intend to benefit any other persons through their contracts.  While the policyholders, including the plaintiffs, ultimately received copies of the fairness opinion and may have been influenced by it, New York law treats them as merely incidental beneficiaries of the contract between Anthem Holding, Anthem Insurance, and Goldman Sachs.  The plaintiffs do not have a right to enforce the terms of the contract.  The plaintiffs' claim for breach of contract against Goldman Sachs is dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

VI.    *Tax Advice Claims*

The plaintiffs have alleged that Anthem Holding and Anthem Insurance informed members that the full amount of cash they would receive in exchange for their membership interests was taxable as a capital gain.  This information appeared in Section 1.4(iiii) of the Plan of Conversion, Member Information Statement Part 1, and the Questions and Answers mailing.  The defendants promised to obtain written tax opinions to back up the advice on the tax consequences, but they allegedly never provided legal authority to support this advice.  The plaintiffs allege that the information Anthem Holding and Anthem Insurance provided about the tax consequences of receiving cash was erroneous.  Cmplt. ¶¶ 380-83.  Some of the plaintiffs have asserted claims for negligence and negligent misrepresentation based on this erroneous information.

As explained above, Ohio choice-of-law rules apply.  Ohio has adopted the sections of the Restatement (Second) of Conflict of Laws that discuss how to determine which state's substantive law to apply to claims involving misrepresentation (§ 148) and torts in general (§ 145).  See *Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818, 820-21 (6th Cir. 1990) (applying § 148(2) in analysis of Ohio choice-of-law rules); *Carder Buick-Olds Co., Inc. v. Reynolds & Reynolds, Inc.*, 775 N.E.2d 531, 543-44 (Ohio App. 2002) (applying § 148(2));  *Morgan*, 474 N.E.2d at 289 (adopting § 145).

### A.   *Negligent Misrepresentation Claims*

Under § 148(2) of the Restatement, the court applies the law of the state that has the most significant relationship to the occurrence and the parties when the plaintiff's action in reliance took place in a state other than that where the false representations were made.  The factors the court should consider include: the places where the plaintiffs received the misrepresentations; the place where the defendant made the misrepresentations; the domicile, residence, place of incorporation and place of business of the parties; and the places where the plaintiffs acted in reliance upon the representations.  The comments to § 148 state that if any two of the contacts, apart from the defendant's state of incorporation or place of business, are located wholly in one state, that state will usually be the state with the most significant relationship.  Restatement (Second) of Conflict of Laws § 148 comment j; *Carder Buick-Olds Co.,* 775 N.E.2d at 544.

The proposed plaintiff class includes citizens of Indiana, Ohio, Kentucky, and Connecticut. Each plaintiff received the representations in the mail, presumably in his/her state of citizenship or residence. The defendant made the representations in Indiana, which is also the state of incorporation and principal place of business of Anthem Holding and Anthem Insurance. Cmplt. ¶¶ 16-17. The plaintiffs acted in reliance on the representations when paying their federal and state taxes, which presumably included income taxes that they paid to their states of citizenship or residence.

The defendants argue that the plaintiffs received and relied upon the information in four different states. They urge the court to choose the one locale with the most significant relationship to the occurrence in total from among the four possible states. Though it would be more efficient for the court to apply only one state's law, efficiency cannot be the court's chief consideration. "Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002) (reversing district court's decision to apply one state's laws to claims by plaintiffs who were citizens of various states and holding instead that the law of the state where each plaintiff lived and suffered her injury should be applied).

Because the state of citizenship or residence of each plaintiff is also the state in which he/she received the representations, acted in reliance on the representation, and suffered a loss, the state of citizenship or residence of each plaintiff is the state with the "most significant relationship" to the occurrence and the parties.  The court will therefore apply the substantive law of each state with regard to negligent misrepresentation to the plaintiffs from that state.

The plaintiffs have conceded that Indiana does not recognize a claim for negligent misrepresentation outside of the context of employment relationships. Pl. Br. 34, citing *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 674 (7th Cir. 2001); *Passmore v. Muti-Management Services, Inc.*, 810 N.E.2d 1022, 1027-28 (Ind. 2004).  The claim for negligent misrepresentation is therefore dismissed with regard to plaintiffs who are citizens of Indiana.  Ohio, Kentucky, and Connecticut recognize the tort of negligent misrepresentation.  *Moffit v. Auberle*, 854 N.E.2d 222, 224 (Ohio App. 2006); *Presnell Construction Managers, Inc. v. EH Construction, LLC*, 134 S.W.3d 575, 582 (Ky. 2004); *Savings Bank of Manchester v. Ralion Financial Services, Inc.*, 881 A.2d 1035, 1037 (Conn. App. 2005).  The plaintiffs who are citizens of Ohio, Kentucky, and Connecticut have alleged viable claims for negligent misrepresentation against Anthem Holding and Anthem Insurance.

B.    *Negligence Claim*

The plaintiffs have also asserted that Anthem and Anthem Insurance were negligent in providing erroneous tax advice.  Section 145 of the Restatement

(Second) of Conflict of Laws states that the court should apply the law of the state that has the most significant relationship to the occurrence and the parties with respect to issues in tort. The factors the court should consider are: the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties is centered. *Id.* at 145(2). As discussed above, the state in which the plaintiffs allegedly overpaid their taxes is the state that has the most significant relationship to the occurrence and the parties for the purpose of this claim. Therefore, the court will apply the substantive law of the state of citizenship of each plaintiff with regard to the negligent tax advice claim. This claim appears to add something to the Complaint only for plaintiffs from Indiana since Indiana law does not recognize the more specific tort of negligent misrepresentation in this setting.

The plaintiffs have analogized the claim to a claim against a tax return preparer. See *Davis v. George S. Olive & Co.*, 731 F. Supp. 1380 (S.D. Ind. 1990). This is not a perfect analogy because it appears there was no contractual relationship among Anthem Holding or Anthem Insurance and the policyholders with regard to providing tax information. Nevertheless, plaintiffs have alleged that Anthem Insurance took it upon itself to provide information about the tax consequences of policyholders' decisions to receive cash or stock in exchange for their membership interests. Giving plaintiffs the benefit of their allegations and

reasonable inferences from them, the court must assume that Anthem Insurance realized and expected that many policyholders would rely upon the information it provided instead of seeking advice from a tax professional. The court assumes that Anthem Insurance had no duty to provide the advice in the first place. But one might reasonably argue that if Anthem volunteered to provide that advice under circumstances in which it could reasonably expect that its advice would be followed, it took upon itself a duty to use reasonable care in providing the advice. At least at this pleading stage, the court cannot conclude that plaintiffs have failed to state a viable claim for relief based on the alleged negligence.

*Conclusion*

Accordingly, the court dismisses all the claims for violations of federal and state securities laws, for violations of the Indiana Demutualization Law, and for unjust enrichment under Rule 12(b)(6) for failure to state claims upon which relief can be granted. The court also dismisses the claims against Goldman Sachs for negligence and breach of contract, and the claims for negligent misrepresentation by Indiana plaintiffs. The claims that survive the motion to dismiss are the following: breach of fiduciary duty by Anthem Insurance, Anthem Holding, and Glasscock; negligence by Anthem Insurance, Anthem Holding, and Glasscock; breach of contract by Anthem Insurance and Anthem Holding; negligent tax advice by Anthem Insurance and Anthem Holding; and negligent misrepresentation by Anthem and Anthem Holding asserted by plaintiffs who are citizens of Ohio, Kentucky, and Connecticut. The court will not enter a partial final judgment at

this time.  The court will confer with counsel in the near future to revise the case

management plan with a new schedule.


     So ordered.

Date: March 31, 2008

                                                  _____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Dennis Paul Barron
dennispbarron@aol.com

Edward DeLaney
DELANEY & DELANEY LLC
ed@delaneylaw.net
kathleen@delaneylaw.net
kari@delaneylaw.net
lizzie@delaneylaw.net
jillian@delaneylaw.net
acouture@delaneylaw.net
cblanchet@delaneylaw.net
ereller@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Matthew Davidson Lamkin
BAKER & DANIELS
matthew.lamkin@bakerd.com
sharon.penn@bakerd.com

William B. Monahan
SULLIVAN & CROMWELL LLP
monahanw@sullcrom.com

Gayle A. Reindl
SOMMER BARNARD ATTORNEYS, PC
greindl@sommerbarnard.com
thuber@sommerbarnard.com

Anne Kramer Ricchiuto
BAKER & DANIELS
anne.ricchiuto@bakerd.com
kay.cook@bakerd.com

Christopher G. Scanlon
BAKER & DANIELS
chris.scanlon@bakerd.com
kris.hagan@bakerd.com

Paul A. Wolfla
BAKER & DANIELS

paul.wolfla@bakerd.com
betsy.smith@bakerd.com

Eric Hyman Zagrans
eric@zagrans.com

Gandolfo V. DiBlasi
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004