UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARY E. ORMOND, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-cv-1908-DFH-TAB |
| | ) | |
| ANTHEM, INC. and | ) | |
| ANTHEM INSURANCE COMPANIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON MOTION FOR CLASS CERTIFICATION

Plaintiffs have filed this lawsuit against Anthem, Inc. and Anthem Insurance Companies, Inc. alleging several state law claims based on the 2001 demutualization of Anthem Insurance.  After two rounds of motions practice, plaintiffs are left with the following state law claims:  breach of fiduciary duty, negligence, breach of contract, providing negligent tax advice, and negligent misrepresentation.  See *Ormond v. Anthem, Inc.*, 2009 WL 102539 (S.D. Ind. Jan. 12, 2009); *Ormond v. Anthem, Inc.*, 2008 WL 906157 (S.D. Ind. March 31, 2008).  Plaintiffs have now moved to certify a plaintiff class and two subclasses. As explained below, the court grants the motion for class certification for the proposed claims based on the theory that defendants depressed the price of the initial public offering of stock, and the court will certify a subclass consisting of those plaintiffs who received proceeds from the demutualization because they were participants in employee benefit plans covered by the federal Employee Retirement

Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*  The court denies class certification with respect to plaintiffs' other theories and the proposed subclasses of plaintiffs who did not receive stock they contend they should have received and plaintiffs who received erroneous tax advice from defendants.

*Facts as Alleged by Plaintiffs*

A little background, borrowed from the plaintiffs' as-yet unproven complaint, is necessary.  In June 2001, the board of directors of Anthem Insurance approved a Plan of Conversion ("the Plan") to convert Anthem Insurance, then a mutual insurance company, into a new stock insurance company.  Compl. ¶ 55.[1]  Anthem Insurance would become a wholly-owned subsidiary of the new Anthem, Inc.  The demutualization of a mutual insurance company transfers the ownership interests from the company's member-policyholders to the new stock insurance company's shareholders.  In return for extinguishing their interests, Anthem Insurance compensated its policyholders with cash or stock in Anthem, Inc.  Policyholders had the option to choose cash or stock, but the default option was cash for policyholders who expressed no choice.  To receive stock, policyholders had to make an affirmative election.  Compl. ¶ 57.  A total of 769,705 Anthem Insurance policyholders did not elect to receive stock.  Dkt. No. 126, Ex. 1.

_____

[1]References to the complaint are to the current version of the complaint, the Fourth Amended Complaint, Dkt. No. 122.

The Plan provided that if policyholders elected stock, they would receive stock.  If they failed to elect stock, the Plan provided that they "may be paid in cash."  Compl. ¶ 58.  The Plan explained that Anthem Insurance would pay cash to policyholders who did not elect stock.  The cash would come from the initial public offering (IPO) of Anthem stock.  Anthem Insurance planned to pay cash to policyholders with the fewest number of shares in Anthem.  If and when the cash raised from the IPO would run out, the plan was to begin paying policyholders in stock even if they had not elected to receive stock.  Compl. ¶ 59.

The Plan provided that the aggregate consideration that the Anthem defendants would distribute to policyholders would be equal to the value of 100 million shares of Anthem stock, subject to a possible upward adjustment.  Compl. ¶ 63.  The Anthem defendants would issue stock first to members who elected to receive stock and then would divide the remaining shares between the IPO and eligible members who had elected not to receive stock, but for whom not enough cash was available.  *Id.*

The Plan tied the cash compensation to be paid to policyholders directly to the IPO share price.  The policyholders receiving cash would receive an amount equal to the number of shares allocated to the member multiplied by either (1) the IPO price or (2) the IPO price enhanced by a "top-up" provision of up to 10 percent more if the average closing prices of Anthem stock for the twenty consecutive days

following the date of the demutualization exceeded 110 percent of the IPO price. Compl. ¶ 64.

Anthem Insurance mailed several documents to its policyholders in the months before the demutualization.  On August 17, 2001, Anthem Insurance sent out a Member Information Statement describing the Plan.  Compl. ¶ 66.  Part one of the statement estimated that the Anthem IPO would have an offering price of between $25 and $45 per share.  Using the middle value of $35 per share, the statement estimated that between 26.4 million and 30.5 million shares would be sold in the IPO, which would raise between $924 million and $1.07 billion. Compl. ¶ 67.  Part two of the statement said that Anthem Insurance intended to offer 28.6 million shares at the IPO, with an additional 4.29 million shares available to the underwriters as an over-allotment, for a total of 32.89 million shares.  Compl. ¶ 68.  In other documents mailed to policyholders on August 17, 2001, Anthem Insurance made it clear that, while the default method of compensation would be cash, many policyholders who did not elect stock would nonetheless receive stock because the IPO would generate a limited amount of cash.  Compl. ¶¶ 69-73.

On October 1, 2001, Anthem Insurance distributed a supplemental Member Information Statement.  The supplemental statement informed members that Anthem Insurance expected to offer 28.6 million shares in the IPO at a price between $33 and $37 per share.  Compl. ¶ 80.  Anthem Insurance would issue

71.69 million shares (the remainder, after the IPO, of the 100 million share total) to policyholders. Finally, the supplement stated that Anthem Insurance would pay $991 million, as opposed to the $837 million estimated in the initial statement, in cash to policyholders. Compl. ¶¶ 81-82.

Anthem Insurance's SEC filings show that during October, it gradually increased the planned size of the IPO and correspondingly the amount of cash available to pay members who did not elect to receive stock. The IPO launched on October 29, 2001, and 55.2 million shares were sold to the public, leaving 48,095,675 shares for policyholders. Compl. ¶ 100. Of the 55.2 million shares sold, the proceeds of only 52.1 million were allocated to the Class in this case. Compl. ¶ 220. The IPO price was $36 per share. Compl. ¶ 123. Because of the large size of the IPO, $2,063,600,000 was paid to policyholders in cash. Compl. ¶ 102. Plaintiffs calculated $2,063,600,000 by multiplying the share price of $39.60 ($36 IPO price plus the 10 percent "top-up" premium) by the 52.1 million shares allocated to the policyholders. Compl. ¶ 130. Anthem advised policyholders who received cash that all of the cash each policyholder received was a taxable capital gain. Compl. ¶ 237. According to plaintiffs, this advice was incorrect. They say that none of the cash that policyholders received from the demutualization was taxable. Compl. ¶ 239. Plaintiffs claim that the policyholders who received the first $1,302,444,000 of cash compensation would have received cash even if Anthem Insurance had not increased the size of the IPO from the original of 32.89 million shares. The policyholders who received the

remainder of the $2,063,600,000 would have received stock if Anthem Insurance had not increased the size of the IPO.  Compl. ¶¶ 131-32.

This increase in the amount of cash generated by the IPO is at the heart of the plaintiffs' complaint.  As the amount of cash available to compensate members who did not elect stock increased, the number of members who were compensated in stock decreased.  Compl. ¶ 104.  After the IPO, the price of Anthem stock increased substantially, Compl. ¶ 219, and the plaintiffs now contend that they would have been better off if they had received stock, *i.e.*, they complain that they did not receive the stock they could have asked for but did not.[2]

---

[2]Timing is everything.  The court also has pending before it a claim by a putative class of Anthem (now Wellpoint) employees who claim that the company and its executives violated fiduciary duties under ERISA by *allowing* the employees to invest in Anthem/Wellpoint stock in early 2008 when there was a sharp drop in its price.  See *West v. Wellpoint, Inc.*, No. 1:08-cv-486 (S.D. Ind.).

*Proposed Class and Subclasses*

Plaintiffs ask the court to certify one class and two subclasses. The proposed class, known as the "Depressed Price Class," would consist of:

> All former members of Anthem Insurance residing in Ohio, Indiana, Kentucky and Connecticut who received cash compensation in connection with the demutualization of Anthem Insurance on November 2, 2001, and the communities comprised of them and their spouses, if any, excluding:
>
> > (i) all employers located in Ohio and Connecticut that maintained Anthem group health insurance policies on their respective employees and retirees and that received demutualization compensation (the "Grandfathered Groups");
> > (ii) Defendants, their predecessors and successors in interest;
> > (iii) the officers and directors of Defendants, their predecessors and successors;
> > (iv) counsel of record in this action and their respective parents, spouses and children; and
> > (v) judicial officers who enter an order in this action, and their respective parents, spouses and children.

Pl. Br. 3-4. The members of the Depressed Price Class are those members who did not elect stock and received cash instead. Plaintiffs allege that defendants harmed the class by taking three actions: (1) allocating Anthem shares to "grandfathered groups" that were not entitled to them, *e.g.*, Compl. ¶ 271; (2) setting an IPO price too low to minimize the compensation paid to Class members and to maximize the number of shares sold to the public, *e.g.*, Compl. ¶¶ 272-73; and (3) diluting the Class Members' ownership interest in Anthem Insurance and causing them to pay unnecessary costs, *e.g.*, Compl. ¶ 274.

The first proposed subclass, known as the "Denied Stock Subclass," consists of "each member of the Class whose membership interests were cashed-out by Anthem with cash over and above the first $1,302,444,000 of the $2,063,600,000 in cash paid in exchange for Anthem Insurance membership interests." Pl. Br. 5. Plaintiffs allege that the members of this subclass would have received stock if Anthem had limited the IPO to 32.89 million shares (including the underwriters' over-allotment), as it had indicated in the supplemental Member Information Statement.

The second proposed subclass, known as the "Tax Misinformation Subclass," consists of everyone in the Depressed Price Class except those:

> (i) identified by a federal taxpayer identification number other than a social security number; and
> (ii) whose only policies or contracts of insurance with Anthem were continuously in force for less than one year as of November 2, 2001.

Pl. Br. 7. Plaintiffs allege that the Anthem defendants gave the members of this proposed subclass erroneous tax advice that caused them to overpay their income taxes. *E.g.*, Compl. ¶ 287.

*Discussion*

Class certification depends not on which side seems likely to prevail but on whether the requirements of Federal Rule of Civil Procedure 23 are met. See *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). Plaintiffs seeking to

certify a class must satisfy all four requirements of Rule 23(a) and at least one of the subparts of Rule 23(b). *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008). The familiar requirements of Rule 23(a) are numerosity, commonality, typicality, and adequacy of representation. Failure to meet any of these requirements will bar class certification. See *id.* Plaintiffs also must satisfy one of the subparts of Rule 23(b). In this case, plaintiffs seek certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

I.    *Rule 23(a) Requirements*

Defendants concede that the proposed class and subclasses satisfy the numerosity and commonality prongs of Rule 23(a). Defendants base their opposition on the adequacy element.[3]

A.    *Adequacy*

---

[3]Defendants argue in a lengthy footnote that the ERISA preemption issue discussed below in terms of the Rule 23(b)(3) predominance factor also bars typicality. Def. Br. 33 n.19. The court's conclusion below on the Rule 23(b)(3) issue applies as well to the typicality element. At page 2 of their surreply brief, defendants criticize plaintiffs for failing to respond to footnote 19. If the point was that important, it should not have been relegated to footnote 19 of the principal brief.

Defendants make several arguments against the adequacy of the named plaintiffs and the class counsel.  To certify a class, the named representative must fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(4).  The adequacy standard involves two elements.  First, a class representative must have a sufficient stake in the outcome to ensure zealous advocacy and must not have claims antagonistic to or conflicting with claims of other class members.  Second, counsel for the named plaintiffs must be experienced, qualified, and generally able to conduct the litigation on behalf of the class.  See *Susman v. Lincoln American Corp.*, 561 F.2d 86, 90 (7th Cir. 1977).

### 1.    *Class Representatives*

Defendants first fault the named plaintiffs for having insufficient knowledge about this litigation.  However, the class representatives need "to have only a marginal familiarity with the facts comprising the action." *Johnson v. Rohr-Ville Motors, Inc.*, 189 F.R.D. 363, 369 (N.D. Ill. 1999).  The Seventh Circuit has noted that the Supreme Court was satisfied by a "named plaintiff [who] did not understand her complaint at all, could not explain the statements in it, had little knowledge of what the lawsuit was about, did not know the defendants by name, nor even the nature of the misconduct of the defendants." *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U.A.*, 657 F.2d 890, 896 (7th Cir. 1981), discussing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 366 (1966).

The court is satisfied that the named plaintiffs have sufficient knowledge about this litigation.  Defendants point out that the named plaintiffs' knowledge of the complaint comes entirely from their lawyers, Cescato Dep. 73; Ormond Dep. 71; Heekin Dep. 45-46, but each named plaintiff testified that he or she has a basic knowledge about the facts underlying the complaint.  Ormond Dep. 74 (explaining that she received cash from the demutualization but would have been better off with stock); Cescato Dep. 79-80 (explaining that Anthem distributed stock to improper parties, undervalued the IPO, and gave incorrect tax advice); Heekin Dep. 44-45 (explaining the demutualization process and the improper tax advice); Moore Dep. 99-102 (explaining dilution of value of shares, improper allocation of shares, and undervaluation of shares).  These plaintiffs have sufficient knowledge of this litigation to satisfy the minimal knowledge requirements imposed by Rule 23(a).

On a similar note, Anthem argues that the class representatives do not serve as an adequate "fiduciary check" on the class counsel because the representatives are not actively involved in the litigation.  The named plaintiffs' communications with class counsel have been minimal.  Ormond has communicated with attorney Dennis Barron on several occasions and has met once with attorney Eric Zagrans.  Ormond Dep. 34-38.  Cescato has regular communications with Barron and receives court filings from him.  Cescato Dep. 43-44.  Moore has talked on the phone with Barron a handful of times.  Moore Dep. 33-34.  The parties have not directed the court to information establishing

that Heekin is in communication with class counsel.   Given the relatively undemanding standard for a class representative's involvement in the case, the court is satisfied that the class representatives are in sufficient communication with class counsel.  Cescato in particular appears to be in close communication with Barron and receives the filings in this case.

Finally, defendants argue that the Estate of Mary Moore cannot be an adequate representative because the estate's executor, William Moore, will have conflicting allegiances to the class and the beneficiaries of the Estate's trust. Plaintiffs did not respond to this argument.  The court will not certify the Estate of Mary Moore as a class representative.

### 2.   *Class Counsel*

Defendants argue that three class counsel – Eric Zagrans, Dennis Barron, and Michael Becker – cannot adequately represent the proposed class because they have an impermissible conflict of interest created by their simultaneous representation of different plaintiffs in Ohio in cases concerning the Anthem demutualization.   The plaintiffs in the Ohio cases are employees who were members of employer-provided Anthem health insurance plans.   Defendants contend that the Ohio plaintiffs allege that shares of Anthem stock that should have gone to them went to their employers instead, while plaintiffs in this case allege that they should have received some of the stock that went to those same

Ohio employers.  Defendants argue that the plaintiffs in the Ohio cases and the plaintiffs in this case are suing for the same pool of stock.  Def. Br. 41.  Plaintiffs disagree and assert that they and the Ohio plaintiffs are claiming rights to separate and distinct pools of stock.  Pl. Reply Br. 15.

Defendants submitted evidence suggesting conflicts only in their surreply brief, and plaintiffs have not had an opportunity to respond to this evidence.  The court will not deny class certification without affording plaintiffs an opportunity to respond to this new evidence.  In any event, defendants do not challenge the adequacy of Kathleen A. DeLaney and Edward O. DeLaney as class counsel, so the potential  disqualification of Zagrans, Barron, and/or Becker would not preclude class certification.  Where class certification is otherwise appropriate, the court will certify all five counsel as class counsel for now.  No later than 28 days after issuance of this entry, however, plaintiffs shall file a response to the defendants' surreply and accompanying evidence on this point.[4]

Defendants' final adequacy argument is that attorneys Barron and Becker are not qualified to serve as class counsel.  Plaintiffs must show that the class counsel is "qualified, experienced, and able to conduct vigorously the proposed litigation."  *Young v. Magnequench Int'l, Inc.*, 188 F.R.D. 504, 507 (S.D. Ind. 1999).  Barron asserts in his declaration that he is involved or has been involved in eleven

---

[4]The court hereby grants defendants' motion to file their surreply brief and accompanying evidence.  See Dkt. No. 154.

class action cases, and Becker asserts that he is involved or has been involved in nine class action cases.  Defendants respond that none of the cases have been certified as a class action.  Despite Barron's and Becker's limited experience in certified class actions, the court is not concerned with the overall adequacy of class counsel.  Any experienced class action attorney must have had a first class action,  typically as part of more experienced teams.  Three of the class's attorneys have extensive trial experience in complex litigation, and the lead class counsel have extensive class action experience.  See generally Zagrans Dec.; K. DeLaney Dec.; E. DeLaney Dec.  Taken together, plaintiffs' team of counsel is adequate to represent the class, and even if Zagrans, Becker, and Barron were to be disqualified, DeLaney & DeLaney could adequately represent the class.

II.     *Rule 23(b)(3) Requirements*

       In addition to satisfying the Rule 23(a) requirements, plaintiffs must satisfy one of the subparts of Rule 23(b).  Plaintiffs seek to certify a class under Rule 23(b)(3), which requires them to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Defendants argue that individual issues on several elements of plaintiffs' claims will dominate common issues.  These challenges require the court to look ahead to the merits of the case, though not to try to decide those merits.

Defendants devote most of their Rule 23(b)(3) argument to the predominance element. "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy . . . ." *Id.* If common questions of law or fact do not predominate over the plaintiffs' individual issues, class certification is not appropriate under Rule 23(b)(3).

A.     *Reliance*

Defendants contend that class certification is not appropriate because the plaintiffs' claims require them to show that individual class members relied on representations made by the Anthem defendants and that those individual issues will predominate over common issues. The court addresses this argument separately for the proposed class and each proposed subclass.

1.     *The Depressed Price Class*

Defendants argue that common questions do not predominate in the Depressed Price Class's claims because the claims "depend upon a showing that Anthem Insurance's demutualization-related disclosures to class members were . . . both material and the proximate cause of the class members' alleged injuries." Def. Br. 12.  Essentially, defendants argue that the Depressed Price Class can

-15-

succeed only if it can show that Anthem's disclosures convinced the members of the Class not to elect stock.

Defendants' characterization of the class's claims is not accurate.  While plaintiffs believe that Anthem Insurance deceived class members into not electing stock, their surviving claims do not require proof of deception or reliance on deception.[5]  Rather, the class claims focus on the Anthem defendants' conduct that had no impact on class members' decisions not to elect stock.  For instance, in the breach of fiduciary duty claim, the plaintiffs allege that the class was harmed when the Anthem defendants took three actions:  they misallocated shares, they set and kept the IPO price too low, and they diluted the class members' equity interest in Anthem Insurance.   Compl. ¶¶ 271-74.   The negligence and breach of contract claims rely on similar actions.

_____

[5]In contrast to the remaining claims, the court dismissed the plaintiffs' securities fraud claims, which would have required a showing of reliance.  See *Ormond v. Anthem, Inc.*, 2008 WL 906157.  In addition, the latest complaint explicitly disavows any allegation that the class members relied on misrepresentations: "Although Plaintiffs allege reliance by the Commissioner on the material misrepresentations and omissions of material fact regarding the limited amount of available cash and the likelihood of members receiving stock without a stock election made by Glasscock and other witnesses on behalf of Anthem and Anthem Insurance, Plaintiffs do not allege reliance by the members of the Class or Subclass on any of the various written misrepresentations made by Anthem and Anthem Insurance. Instead, Plaintiffs allege that such written misrepresentations were additional deceptive and manipulative acts committed in furtherance of the devices, schemes or artifices to defraud that are alleged herein." Compl. ¶ 252(j).

This case is different from *Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742 (7th Cir. 2008), cited by the defendants.  In *Thorogood*, the plaintiff brought a claim for deceptive advertising.  The court held that common issues did not predominate because the district court would need to hold individual hearings to determine if each class member was deceived by the advertising.  *Id.* at 747-48. The court went on to explain that where proving reliance is not a problem, class certification may be appropriate even though individual damages determinations would be necessary:  "Aggregate class proof of monetary relief may . . . be based on sampling techniques or other reasonable estimates, under accepted rules of evidence."  *Id.* at 748, quoting 3 Newberg on Class Actions § 10:3, at 480 (4th ed. 2002).

Unlike the plaintiff in *Thorogood*, the plaintiffs in this case do not need to show that individual members of the Depressed Price Class relied on any representations by the Anthem defendants.  The central issue for the class claims will be whether the Anthem defendants improperly took actions that depressed the amount of compensation paid to class members.   The only individual determinations that would be needed if the class succeeds on the merits would be damages determinations.   As *Thorogood* points out, the need for such determinations does not ordinarily mean that individual issues predominate.  In this case, any award of damages could be determined based on a formula because all class members were paid according to a formula.  Accord, 2 Newberg on Class Actions § 4:25, at 159 (4th ed. 2002) (failure to certify an action under Rule

23(b)(3) on the sole basis that individualized damage determinations make the class unmanageable is disfavored and should be the exception rather than the rule).

### 2.   *The Denied-Stock Subclass*

The proposed Denied-Stock Subclass presents a different situation.  These are the Anthem policyholders who did not elect to receive stock but now complain that they wanted stock and should have received it.  Plaintiffs believe that the members of this subclass were deceived into not electing stock.  They allege they were injured by the Anthem defendants' decision to increase the size of the IPO at the last minute.  Plaintiffs allege that this increase in the size of the IPO also increased the amount of cash available to compensate individuals who would have received stock but for the increase.  See Compl. ¶ 27 ("The members of the Denied-Stock Subclass actually received cash compensation instead of stock only because, as the result of the direct or indirect actions and participation of each Defendant, the number of shares initially offered for sale to the public was substantially increased . . . .").

It is evident from the pleadings that stock was available to any policyholder who preferred to receive it.  The theory of this subclass must be that they actually preferred stock to cash (or at least a mixture of stock and cash to only cash), and that they relied upon the early disclosures, estimated that they would probably

receive approximately the amount of stock they wanted, and therefore chose not to exercise their option that would have guaranteed that they would receive stock. Plaintiffs therefore would need to show that individual members of the proposed subclass relied on Anthem Insurance's statements. They would also have to show that the Anthem defendants' decision to increase the size of the IPO was wrongful and that it harmed the members of the proposed subclass. This determination would be common to all members of the proposed subclass, but individual inquiries into individual reliance and choices about whether to exercise the option to receive the stock that these plaintiffs now say they wish they had received would predominate over the common issues. The proposed Denied-Stock Subclass fails to satisfy the predominance inquiry and will not be certified.

### 3. *The Tax Misinformation Subclass*

The proposed Tax Misinformation Subclass also fails to satisfy the predominance prong. Plaintiffs claim that the Anthem defendants injured the members of this proposed subclass by telling policyholders that some forms of compensation received from the demutualization would be taxable as a capital gain when in fact they were not taxable, causing members to pay taxes unnecessarily. The claims of the proposed Tax Misinformation Subclass will require the plaintiffs to show that members of the proposed subclass relied on advice given by the Anthem defendants.

The first claim of the subclass is for "negligent tax information."  An essential element of any negligence claim is causation.  Plaintiffs allege (and must prove) that the Anthem defendants' tax information "caused the class members . . . to overpay their respective federal and state income taxes . . . ."  Compl. ¶ 311.  Similarly, to show causation for their negligent misrepresentation claim, plaintiffs must prove that the members of the proposed subclass "justifiably relied to their detriment" on the Anthem defendants' alleged misrepresentations.  See Compl. ¶ 323.[6]

To succeed on either claim, plaintiffs must show that individual subclass members paid unnecessary taxes because of the information they received from the Anthem defendants about tax consequences of the transaction.  That is, the plaintiffs must show that the subclass members relied on the information.  Class certification is not appropriate for these claims because the reliance issues will predominate over common issues.  See *Basic, Inc. v. Levinson*, 484 U.S. 242 (1988)

---

[6]In the next paragraph of the complaint, the plaintiffs allege:  "Because such tax information was so material to a reasonable person's compliance with the tax laws that he or she would have reasonably relied on it for tax return purposes, the reliance and causation elements are presumed and can be established on a class-wide basis."  Compl. ¶ 324.  Plaintiffs do not press this argument in their briefs, and they have not directed the court to any cases in the subclass members' jurisdictions where courts presumed reliance for claims similar to these.  Absent such authority, the court is not prepared to presume that individual subclass members relied on the tax information provided by the Anthem defendants.  Individuals make tax decisions for many reasons, and they may consult many people in the course of those decisions.  See *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 666 (9th Cir. 2004) ("The shortcut of a presumption of reliance typically has been applied in cases involving securities fraud and, even then, the presumption applies only in cases primarily involving a 'failure to disclose' . . . .").

("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones.").

Thorogood is more helpful to the defendants on this proposed subclass.  As in Thorogood, "the evaluation of the [subclass] members' claims will require individual hearings."  See Thorogood, 547 F.3d at 747.  Under this approach, when a central issue in a case – such as causation or reliance – requires individual proof, class certification under Rule 23(b)(3) is not appropriate.  Accord, Clark v. Experian Information Solutions, Inc., 256 Fed. Appx. 818, 821 (7th Cir. 2007) (affirming denial of class certification and holding that Rule 23(b)(3) class action was not appropriate for a statutory consumer fraud claim when the claim required the class members to show "that he or she was, in some manner, deceived by the misrepresentation").

B.    *Choice of Law*

The Depressed Price Class claims for negligence, breach of fiduciary duty, and breach of contract claims survive the defendants' reliance argument. Defendants' next Rule 23(b)(3) argument is that common issues will not predominate because different states' laws will apply to these surviving claims. Defendants point out that class certification is generally inappropriate if multiple

states' laws will apply to the class members' claims.   See *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002).

Because this case was transferred from an Ohio district court under 28 U.S.C. § 1404(a), this court held in a prior entry that Ohio's choice-of-law rules apply to plaintiffs' claims against the Anthem defendants.  *Ormond v. Anthem, Inc.*, 2008 WL 906157, at *15, citing *Van Dusen v. Barrack*, 376 U.S. 612 (1964).  The court finds that Ohio choice-of-law principles will call for application of Indiana law to all plaintiffs' claims that are otherwise suitable for class treatment.  Choice-of-law issues therefore pose no obstacle to class certification.

All of plaintiffs' remaining claims are closely analogous to claims by shareholders against a corporation.  Plaintiffs were policyholders in a mutual insurance company who then received compensation as the mutual company went through the legal alchemy of demutualization and was transformed into a publicly traded stock corporation.  See Dkt. No. 153, Ex. B at 17-18 (Anthem Member Information Statement explaining that membership in a mutual insurance company is governed by the company's articles of incorporation, bylaws, and records, and identifying which categories of customers were deemed members with a right to proceeds from demutualization).

Defendants appear to concede that Indiana law applies to the breach of fiduciary duty claims.  Def. Br. 28 n.16.  Both sides cite *Bryan v. DiBella*, where

the Ohio Court of Appeals applied the law of the state of incorporation to a breach

of fiduciary duty claim against a corporation.  2009 WL 638472, at *3 (Ohio App.

Mar. 12, 2009).  The court based its decision on the internal affairs doctrine,

which it summarized as follows:

> The internal affairs doctrine is a conflict of laws principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs.  A corporation's internal affairs include matters peculiar to the relationship among or between the corporation and its current officers, directors, and shareholders.  "[O]therwise a corporation could be faced with conflicting demands."  *Edgar v. MITE Corp.* (1982), 457 U.S. 624, 645.  See, also, Restatement of the Law 2d, Conflict of Law (1971) 307-08, Section 302, Comment b; Restatement of Law 2d, Conflict of Law (1971) 332-34, Section 309.

*Bryan v. DiBella*, 2009 WL 638472, at *3 n.1.  This court has previously explained:

"To maintain uniform governance in a free market, the law of the state in which

a company incorporates governs its internal affairs."  *Gulley v. Moravec*, 2008 WL

596002, *4 (S.D. Ind. Feb. 29, 2008), citing *CTS Corp. v. Dynamics Corp. of*

*America*, 481 U.S. 69, 90 (1987) ("This beneficial free market system depends at

its core upon the fact that a corporation – except in the rarest situations – is

organized under, and governed by, the law of a single jurisdiction, traditionally the

corporate law of the State of its incorporation."); see also *Nagy v. Riblet Products*

*Corp.*, 79 F.3d 572, 576 (7th Cir. 1996) (observing that although Indiana courts

have not expressly adopted the "internal affairs doctrine," Indiana "presumptively

conforms to the norm in looking to the law of the state of incorporation for

internal-affairs issues").  There is even a constitutional dimension to the internal

affairs doctrine.   When one state attempts to impose its own laws on the

relationship between another state's corporation and its shareholders, the effort can run afoul of the Commerce Clause of the United States Constitution. Compare *Edgar v. MITE Corp.*, 457 U.S. 624, 644 (1982) (holding unconstitutional an Illinois statute requiring advance state approval for hostile takeovers of non-resident corporations with Illinois shareholders), with *CTS Corp.*, 481 U.S. at 89 (Indiana law governing voting rights of shareholders in Indiana corporation did not violate Commerce Clause because, among other reasons, it did not apply to non-Indiana corporations). Accord, *Gulley v. Moravec*, 2008 WL 596002, at *6; Restatement (Second) of Conflicts, §§ 302 & 309 (1971) (law of state of incorporation governs shareholders' claims against directors and officers).

The reasoning behind the internal affairs doctrine extends to plaintiffs' claims here for negligence and breach of contract where both types of claims arise from the plaintiffs' relationship with Anthem in the demutualization process. The court also reaches the same result of applying Indiana law through Ohio's general standards applicable to the negligence and breach of contract choice-of-law principles.

As the court noted in its prior entry, Ohio has adopted section 145 of the Restatement (Second) of Conflict of Laws to determine which state's substantive law to apply to tort claims. *Ormond v. Anthem, Inc.*, 2008 WL 906157, at *15 & n.6, citing *Morgan v. Biro Manufacturing Co.*, 474 N.E.2d 286, 289 (Ohio 1984). Section 145 requires the court to apply the law of the state with the "most

significant relationship" to the occurrence and the parties.  The court should consider the following factors:  the place of the injury; the place where the conduct that caused the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties was centered.  2008 WL 906157, at *25.

The Anthem defendants, the alleged tortfeasors, are both Indiana corporations located in Indiana.  They made decisions about the Anthem IPO – the actions that allegedly caused the plaintiffs' injuries – in Indiana.  Plaintiffs resided in Indiana, Ohio, Kentucky, and Connecticut, but their relationship with Anthem was focused in Indiana.  Indiana is the state with the most significant relationship to all members of the proposed Depressed Price Class, and Ohio courts would apply Indiana law to the negligence claim.[7]

Indiana law also applies to plaintiffs' claims for breach of contract.  Plaintiffs allege that the members of Anthem Insurance had a contract with Anthem Insurance requiring it to pay fair, reasonable, equitable, and adequate consideration to members for their membership interests.  Compl. ¶ 294.  They allege that this contractual obligation was both express and implied and that it

---

[7]In its prior entry, the court noted that the state of citizenship of each plaintiff determined the substantive law that would apply to the negligent misrepresentation claim concerning tax advice.  *Ormond v. Anthem, Inc.*, 2008 WL 906157 at *29-30.  The state of citizenship was appropriate because a different section of the Restatement (Second), section 148, applies to misrepresentation claims, and it requires the court to consider where the plaintiffs received and relied on the misrepresentations.

derived from several sources.  Compl. ¶¶ 295-96.  Ohio enforces choice-of-law provisions in contracts, with exceptions not applicable here.  *Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.*, 453 N.E.2d 683, 686 (Ohio 1983).  If the parties to a contract do not choose the law that applies, the law of the state where the contract is to be performed governs.  *Id.* at 685.  Plaintiffs' contract claim is based on a number of express and implied agreements.  One of the express agreements, the Plan of Conversion, chose Indiana law to govern the agreement.  Dkt. No. 150, Ex. 1, § 12.13.  The other alleged agreements had to be performed in Indiana because the Anthem defendants paid the class members from Indiana.  The internal affairs doctrine has been described as an instance of a contractual choice-of-law provision.  When a shareholder buys stock in a corporation, the shareholder agrees in effect to the terms of a contract providing that it will be governed by the law of the state of incorporation.  See *Nagy v. Riblet Products Corp.*, 79 F.3d at 576; *Gulley v. Moravec*, 2008 WL 596002, at *5.  Under either analysis, Indiana law will apply to the contract claims.

Because Indiana law will apply to the plaintiffs' remaining negligence, breach of fiduciary duty, and contract claims, choice-of-law issues do not pose a predominance problem for the plaintiffs.

C.   *ERISA Preemption*

Defendants also contend that the Depressed Price Class cannot be certified because some members of the class will be subject to an ERISA preemption defense that will prevent common issues from predominating.  The issue arises because many Anthem policyholders who received payments upon demutualization were members by virtue of their participation in employer group health plans.  Most (though not all) of the employer group health plans were governed by the federal Employee Retirement Income Security Act, better known as ERISA, 29 U.S.C. § 1001 *et seq.*

Nothing in ERISA directly addresses the issue of demutualization proceeds, but the United States Department of Labor has offered public guidance stating the view that demutualization proceeds (such as the stock and cash here) belong to the benefit plan rather than to the individual employees or participants.  2001 WL 34119473, at 2 (Feb. 15, 2001) (addressing Prudential demutualization).  In the Anthem demutualization, however, Anthem relied on Indiana's demutualization law and took the approach that the proceeds should be distributed to individual participants in employee benefit plans rather than directly to the plans themselves.[8]

_____

[8]Anthem filed with the Department of Labor a "Notice of Application for Prohibited Transaction Exemption," which stated:

> All Eligible Members that are [ERISA] Plans or Plan Participants participate in the transactions on the same basis and within their class groupings as all Eligible Members that are not Plans or Plan Participants.  * * * *Unlike most insurance companies, Anthem generally treats individual certificate holders under its group contracts as members instead of the group contract*
> (continued...)

Defendants argue that ERISA preempts these plaintiffs' state law claims, relying on 29 U.S.C. § 1144(a), which provides that ERISA's provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan," but with exceptions, including an exception for state laws that regulate insurance generally.  See 29 U.S.C. § 1144(b)(2)(A); *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 334 (2003) (holding that Kentucky law requiring health insurers to deal with "any willing provider" fell within savings clause and was not preempted by ERISA); *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 365-66 (2002) (holding that Illinois law requiring health maintenance organizations to provide independent review of disputes between primary care physician and HMO fell within savings clause and was not preempted by ERISA).

Despite two rounds of motions to dismiss, and despite the fact that ERISA issues were addressed repeatedly in the demutualization transaction documents, the class certification motion is the first time that defendants have brought the ERISA issue to the court's attention.  (The defense is pled as the twentieth affirmative defense in the answer.)  It seems highly improbable that ERISA would

---

[8](...continued)

*holders.*  Thus, in most cases, employers that fund their Plans with Anthem Group contracts are not members of Anthem.

66 Fed. Reg. 40,743 to  40,744, ¶ II-(g) & Summary ¶ 3 (2001), filed as Dkt. 153, Ex. A (emphasis added).  See also 66 Fed. Reg. 56133.  Interestingly, Anthem took the approach that Indiana law required this result and apparently did not take the position that ERISA preempted the Indiana law providing for this result.

both preempt plaintiffs' claims and leave them without any effective remedy in a case of  true wrongdoing by fiduciaries in a demutualization transaction.  The court also wonders whether Anthem would have available to it a defense of failure to exhaust a plan's administrative remedy, as Anthem suggests, if no notice was provided that such a remedy was available.  See 29 U.S.C. § 1133 (requiring all ERISA plans to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim").

At the class certification stage, the court may take a preliminary look at a defense identified as an obstacle to certification.  See, *e.g.*, *Nelson v. IPALCO Enterprises, Inc.*, 2003 WL 23101792, at *6-7 (S.D. Ind. Sept. 30, 2003) (granting class certification despite argument that weak release defense would bar many class members' claims; court could take preliminary look at defense).  But at this stage the court's task is not to decide the merits of the defense, and the briefing on this issue has been only limited.  The court's task now is only to evaluate how the defense might affect the mix of common and individual issues and the manageability of the case.

At this stage and on the present record, the court concludes that ERISA preemption issues call for the creation of a subclass of plaintiffs who received proceeds because they were participants in employee benefit plans governed by ERISA.  Named plaintiff Daniel Cescato falls within that subclass and can

represent it.   This approach will complicate the case but should not make it unmanageable.  Cf. *Nelson*, 2003 WL 23101792, at *7 (finding that release defense would be susceptible to resolution on classwide basis and might call for creation of subclass), citing *Korn v. Franchard Corp.*, 456 F.2d 1206, 1210 (2d Cir. 1972) (reversing district court's denial of class certification; validity of release could be determined on broad basis and might call for creation of sub-class).

It will be necessary to distinguish between group policyholders covered by ERISA and those who were not, such as non-employer group policies and employers not governed by ERISA, such as federal, state, and local governments and churches.  See 29 U.S.C. § 1003(b) (excluding certain categories of employee benefit plans from ERISA coverage) and § 1002(32) & (33) (defining governmental plans and church plans).  Anthem has already focused on these issues, for they were identified in the Member Information Statement provided to members to inform them about the demutualization transaction.  See Dkt. No. 2, Ex. B-1 at 8.  For this preemption defense, it will be reasonable to expect defendants to identify from their records those class members whose claims they contend are subject to the defense.

Defendants suggest that there will be an unmanageable multiplicity of issues specific to each particular employee benefit plan.  Based on the nature of plaintiffs' depressed-price claims, in which essentially all policyholders were treated the same, the court does not see that danger.  On this point, defendants

rely on *Cima v. Wellpoint Health Networks, Inc.*, 250 F.R.D. 374, 382-84 (S.D. Ill. 2008), in which the court denied class certification because the class claims would require plan-by-plan analysis. The plaintiffs asserted that their insurer's withdrawal from the market was orchestrated by Wellpoint (Anthem's current name) to force them and/or their employers to buy more expensive health insurance policies. The principal theory was that the strategy violated the terms of the many health insurance policies, thus requiring plan-by-plan evaluation. That is not the case here.

If defendants can show at some later stage that there is a serious issue that requires plan-by-plan consideration, the class certification issue may need to be revisited. The record now before the court indicates that in the demutualization transaction itself, defendants themselves acted across the board, not on a plan-by-plan basis. The plaintiffs' membership interests, and their claims, are based on the Anthem organizational documents and the Indiana demutualization law. The claims do not depend on the details of the health insurance coverage under specific policies. This potential defense will not defeat class certification, whatever its potential merits might be.

D.   *Manageability*

Finally, defendants also contend that the case would pose insuperable management problems as a class action. The court disagrees, at least as applied

to the Depressed Price Class, the ERISA subclass, and the relevant claims and applicable defenses.  The surviving claims of the Depressed Price Class will focus on the defendants' actions and intentions in seeking approval for and finalizing the terms of the demutualization transaction and the initial public offering. Regardless of whether there is any merit to the plaintiffs' claims, discovery and trial on those events should be straightforward, without posing unusual management problems.

*Conclusion*

For the reasons explained above, the court grants in part plaintiffs' motion for class certification and certifies as a plaintiff class:

> All former members of Anthem Insurance residing in Ohio, Indiana, Kentucky and Connecticut who received cash compensation in connection with the demutualization of Anthem Insurance on November 2, 2001, and the communities comprised of them and their spouses, if any, excluding:
>
>> (i) all employers located in Ohio and Connecticut that maintained Anthem group health insurance policies on their respective employees and retirees and that received demutualization compensation (the "Grandfathered Groups");
>> (ii) Defendants, their predecessors and successors in interest;
>> (iii) the officers and directors of Defendants, their predecessors and successors;
>> (iv) counsel of record in this action and their respective parents, spouses and children; and
>> (v) judicial officers who enter an order in this action, and their respective parents, spouses and children.

The class claims shall be those pled for the Depressed Price Class:  breach of fiduciary duty, negligence, and breach of contract.  The plaintiff class shall be

represented by named plaintiffs Mary E. Ormond, Daniel J. Cescato, and Kevin T. Heekin.  The court also certifies a subclass consisting of those plaintiff class members who received proceeds from the demutualization because they were participants in employee benefit plans covered by the federal Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*  The subclass shall be represented by plaintiff Daniel J. Cescato.  Counsel for both the class and the subclass shall be Kathleen A. DeLaney and Edward O. DeLaney of DeLaney & DeLaney, and Eric Zagrans, Dennis Barron, and Michael Becker.  Class counsel shall file no later than October 24, 2009 proposed notices to class members and proposed procedures for providing such notice.   Defense counsel shall immediately undertake the identification of class members and subclass members and shall provide to class counsel **no later than October 24, 2009** a detailed report on how the identification and contact information shall be provided to class counsel.  Class counsel and defense counsel shall confer **no later than October 31, 2009** to see if these matters can be resolved through agreement.  As noted, attorneys Zagrans, Barron, and Becker shall file **no later than October 28, 2009** a response, with evidence as appropriate, to defendants' surreply brief addressing the alleged conflict of interest between this plaintiff class and these attorneys' representations in similar cases in Ohio.  The court will hold a hearing and pretrial conference on **Friday, November 6, 2009, at 9:30 a.m.** to address any such logistical matters that cannot be resolved by agreement.

So ordered.

Date: September 29, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Matthew Thomas Albaugh
BAKER & DANIELS - Indianapolis
matthew.albaugh@bakerd.com

Dennis Paul Barron
dennispbarron@aol.com

Michael F. Becker
BECKER & MISHKIND CO., L.P.A.
mbecker@beckermishkind.com

Edward O'Donnell DeLaney
DELANEY & DELANEY LLC
ed@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Kevin M. Kimmerling
BAKER & DANIELS -North Indianapolis
kevin.kimmerling@bakerd.com

Anne Kramer Ricchiuto
BAKER & DANIELS - Indianapolis
anne.ricchiuto@bakerd.com

Christopher G. Scanlon
BAKER & DANIELS - Indianapolis
chris.scanlon@bakerd.com

Paul A. Wolfla
BAKER & DANIELS - Indianapolis
paul.wolfla@bakerd.com

Eric Hyman Zagrans
eric@zagrans.com