UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


MARY ORMOND, et al., On Behalf of     )
Themselves and All Others Similarly Situated,  )
    )
    Plaintiff,     )
    )
    v.     )     Case No. 1:05-cv-1908-TWP-TAB
    )
ANTHEM, INC. and ANTHEM INSURANCE  )
COMPANIES, INC.,     )
    )
    Defendant.     )
    )


## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


This matter is currently before the Court on Defendants' Anthem, Inc. and Anthem

Insurance Companies, Inc.'s (collectively, "Defendants") Motion for Summary Judgment. The

Plaintiffs in this class-action lawsuit assert claims arising out of the 2001 demutualization of

Anthem Insurance Companies, Inc. ("Anthem"), and the related initial public offering ("IPO") of

stock in its parent company, Anthem, Inc. This demutualization provided the means for Anthem

to compensate its mutual company members in exchange for the liquidation of their interests.

Defendants have moved for summary judgment and the Court heard oral argument addressing

the motion on April 14, 2010. For the reasons set forth below, Defendants' Motion (Dkt. 263) is

**GRANTED IN PART** and **DENIED IN PART**.


### *Summary Judgment Standard*


Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Motion should be granted so long as no rational fact-finder could return a verdict in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the inquiry for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

When ruling on the motion, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id*. at 255. If the non-moving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir.1999). The moving party need not positively disprove the non-movant's case; rather, it may prevail by establishing the lack of evidentiary support for that case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### *Demutualization*

Mutual insurance companies are owned by their policyholders (i.e. members), who, like garden-variety shareholders, have voting rights and share in the company's financial success or failure. Over the course of this century, mutual companies have lost favor, primarily because they face difficulty in raising capital compared to publicly-traded companies. This problem has led hundreds of mutual companies to convert to stock companies over the course of the last 75

years, through a process known as a "demutualization." 3 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 39:43 (3d ed. 2005). Typically, demutualizations are governed by statute and regulated by the state where the insurance company is domiciled.

Anthem is organized under the laws of Indiana. In 1999, a new Indiana statutory scheme governing the demutualization of insurance companies went into effect. The statutes allow an Indiana mutual insurance company to convert to a stock company through a plan of conversion, which must be proposed to and approved by both the State's Commissioner of Insurance ("Commissioner") and two-thirds of the company's membership.[1] Ind. Code § 27-15-1-2 *et seq*. The Commissioner and the Indiana Department of Insurance ("IDOI") are tasked with gathering the expertise and information necessary to reach conclusions regarding: (1) the fairness of the amount and form of consideration to be distributed to the members, both in the aggregate and individually; (2) the compliance of the plan with applicable statute and state laws; (3) the overall fairness, reasonableness and equity of the plan to the members; (4) whether policyholders would be prejudiced by a conversion; and (5) whether the total consideration provided to extinguish the member's interests is equal to or greater than the surplus of the converting mutual company. Ind. Code § 27-15-4-8. A public hearing is required and if the Commissioner reaches a favorable conclusion regarding these five issues, she must approve the plan. If a conversion plan is approved by the Commissioner, it is then submitted to the membership for an approval vote. Ind. Code § 27-15-5-1.

---

[1] An amendment to the mutual company's Articles of Incorporation reflecting the change in corporate structure is also required to accompany any proposed plan of conversion. Ind. Code § 27-15-2-1.

### Factual Background

To put it mildly, this dispute has been zealously litigated by both sides. The quality of the work has been impressive, and the sheer quantity of the motions practice has been astonishing. As a result, the relevant factual circumstances have been described multiple times by both the parties and the Court – both in this case, where the Plaintiffs are former mutual company members who received *cash* in exchange for their interests, and in a related case filed on behalf of members who received *stock* in exchange for their interests. *See Jorling v. Anthem, Inc.,* 1:09-cv-798-TWP-TAB.[2] For this reason, and because many of the relevant facts are uncontested, the Court should be pardoned if it cribs portions of its factual description from prior writings.

Anthem Insurance is the product of numerous mergers, acquisitions, and name changes, a factor which is significant to some of Plaintiffs' claims. The company history began with a merger of two Indiana mutual insurance companies, thus resulting in Associated Insurance Companies, Inc. ("Associated"). Associated's bylaws provided that its membership would be comprised solely of individuals, regardless of whether the individual held a personal policy or was enrolled as a certificate holder in a group plan. Associated then merged with a Kentucky mutual insurance company, Southeastern Mutual Insurance Company ("Southeastern"), and an Ohio mutual insurance company, Community Mutual Insurance Company ("CMIC"), both of which had bylaws defining their memberships as being comprised of individuals who were insured under individual insurance policies and those entities or groups as a whole that had

---

[2] A class has not been certified in the *Jorling* case.

purchased group policies. Unlike Associated's bylaws, under the bylaws of Southeastern and CMIC, the individuals who were the certificate holders or insured persons under group policies did not obtain membership status.

In order to protect the rights of those entities that had obtained membership through the purchase of the group policies from Southeastern and CMIC, a "grandfather" clause was placed in the merger documents. This clause allowed those group policy purchasers (most often employers) with membership status pursuant to the respective company bylaws to become members of Associated, so long as their insurance policies or health care benefits and services contracts remained in effect or were renewed, amended, or replaced without a lapse in coverage. However, new group customers (again typically employers) in Kentucky or Ohio that entered into group contracts with Associated for the first time *post-merger* did not become members. Instead, pursuant to Associated's bylaws, the individual enrollees under those post-merger group policies became members.

After those two mergers, Associated changed its name to Anthem Insurance. In 1997, Anthem merged with Blue Cross & Blue Shield of Connecticut, Inc. ("BCBS Connecticut"), a Connecticut mutual insurance company whose bylaws defined its membership in a manner similar to the way the merged Kentucky and Ohio companies had defined their memberships. Specifically, in the case of group polices, the "group as a whole" was recognized as a member (as opposed to each individual insured or certificate holder under a group policy). As with the prior mergers, Anthem preserved the rights of the BCBS Connecticut "group as a whole" members by having them become members of Anthem Insurance, so long as the group insurance policies or health care benefits contracts remained in effect or were renewed, amended, or

replaced without a lapse in coverage.

Thus, by the time of Anthem Insurance's demutualization in 2001, it had many different types of members, including: (i) "grandfathered groups" in Kentucky, Ohio, and Connecticut; (ii) individuals insured under group policies in Kentucky, Ohio, and Connecticut that were issued to new groups after the Kentucky, Ohio, and Connecticut mergers took place; and (iii) persons insured under individual insurance policies in Kentucky, Ohio, and Indiana. As will be discussed in more detail later, those distinctions are at the root of some of Plaintiffs' claims.

Anthem embarked on the demutualization process through a resolution of its Board of Directors passed on June 18, 2001. However, prior to the adoption of the resolution, Anthem and the IDOI communicated regarding the company's intent to demutualize. The IDOI reviewed and commented on a draft demutualization plan. Anthem employed Goldman Sachs & Co. as its financial advisor and sought assistance from other qualified accounting, actuarial, and legal experts to assist in putting together and, if passed, executing the conversion plan. On June 21, 2001, Anthem formally submitted its application for approval of a final plan of conversion (the "Plan"). At the request of the IDOI, the application was supplemented with more detail in July 2001, and the IDOI deemed the application complete on August 18, 2001. A public hearing was then scheduled to occur in October of that year.

The Plan required that the aggregate amount of consideration distributed to eligible members be equal to the "fair value" of Anthem at the time of the conversion. Article IV of the Plan set forth the manner in which Anthem would seek to determine fair value.

**Article IV**

Anthem Insurance has, with the assistance of its Financial Advisor and other advisors retained in connection with the Conversion and Public Offering, structured the Conversion and proposed Public Offering to provide fair value to the Eligible Statutory Members, and this Plan provides for Eligible Statutory Members to receive aggregate consideration equal to the fair value of Anthem Insurance at the time of the Conversion. In that regard, the Board has received written fairness opinions from the Financial Advisor, a qualified, independent financial advisor, confirming, subject to the limitations and qualifications in such opinions (which opinions will be reaffirmed to the Board as of the Effective Date), that: (I) the provision of aggregate consideration upon the extinguishing of Membership Interests under this Plan and Articles of Amendment is fair to the Eligible Statutory Members, as a group, from a financial point of view, and (ii) the total consideration to be paid to the Eligible Statutory Members under the Plan is equal to or greater than the statutory surplus of Anthem Insurance.

The Plan gave eligible members a choice in terms of how they would like to be compensated in exchange for their ownership interests. Specifically, the eligible member could receive either cash or common stock in Anthem, Inc. (the new parent of Anthem). If an eligible member failed to designate a preference, he received cash as the default option. Nevertheless, if the IPO failed to generate sufficient cash to compensate all eligible members choosing cash, those members with the smallest interests would be compensated in cash first and, when the cash ran out, the remaining members would be compensated in stock. This however, was not a problem. As will be discussed, an increase in the number of shares offered through the IPO assured that Anthem would have sufficient cash to compensate all of the eligible members set to receive cash. In this case, Plaintiffs represent a class of former members who received cash in exchange for their interests.

Pursuant to the Plan, the total amount of consideration to be paid to all eligible members was to be equal in value to 100 million shares of the common stock of Anthem, Inc. offered

through the IPO, regardless of the number of shares actually offered for sale. The amount of consideration allocable to any given eligible member was calculated pursuant to a formula developed by consulting actuaries. The formula had a fixed component and a variable component. This formula was described in detail in an Actuarial Contribution Memorandum ("ACM"), which was attached as an exhibit to the Plan. The fixed component dictated that each eligible member be assigned the value of 21 shares, regardless of the size, type or number of policies held by that member. The variable component dictated that additional shares of value be assigned to an eligible member based upon a calculation accounting for the type, size, number, and duration of insurance policies held by that member. Plaintiffs represent, and Defendants have not contested, that there are 71,108 class members who were allocated only the fixed amount of 21 "value shares" and 668,087 class members who were allocated between 22 and 473 "value shares."[3]

In August 2001, prior to the IDOI approval of the Plan, Anthem began sending out detailed member information packets ("MIP"), aimed at informing members about the Plan, the required approvals, and the Board of Directors' rationale for recommending demutualization. The MIP also included a pamphlet answering anticipated questions and provided each statutory member[4] with his or her estimated allocation of value shares, an estimate of the IPO range for the stock of Anthem, Inc. ($25 to $45 per share with $35 used for assumptive purposes), and a

---

[3]The Court will use the term "value shares" in this entry when describing the 100,000,000 shares allocated to eligible members based upon the two-part actuarial contribution formula. At the choice of the eligible member, these value shares either became actual shares of Anthem, Inc. or cash following the IPO, in accordance with the terms of the Plan.

[4]As required by Indiana law, the records, articles of incorporation, and bylaws of Anthem and its subsidiaries determined which of its insurance customers were considered statutory members. Ind. Code § 27-15-1-9.

statement summarizing what those value shares represented to the members who wished to receive cash in lieu of stock following the IPO.  The statement also described what is known as a "top-up" provision, which allowed for an automatic 10% increase in the cash payment to members choosing cash if the stock price rose rapidly after the IPO.  The statement read :

> Eligible Members that are to receive consideration in the form of cash will receive a check in an amount equal to the number of shares of common stock allocated to them multiplied by the mutual public offering price of shares, or if the average closing price of Anthem, Inc. Common stock for the first 20 consecutive days of trading is greater than 110% of the mutual public offering price, an increased amount to reflect the increased value of the stock, up to an additional ten percent of the public offering price.

The MIP also spelled out the IDOI's role in approval of the Plan and the location of the related public hearing to be held on October 2, 2001.  The MIP provided a date for and description of the special membership meeting to be held on October 29, 2001 for purposes of voting on the Plan, as well as instructions on how to vote by proxy.  And, assuming membership approval of the Plan, a card was provided for the member to return if he preferred stock in lieu of cash.  In addition to information summaries, the MIP included hundreds of pages of detail.

At the time of Anthem's August mailings to members, Anthem further indicated that the new stock company, Anthem Inc., was authorized by its founding documents to issue 900 million shares of common stock and 100 million shares of preferred stock.  In the MIP, Anthem stated it anticipated issuing no preferred shares, 76,080,000 common shares as part of the demutualization, and 28,600,000 shares for sale to the public through the IPO in order to raise capital.  It also indicated that another 100,000 shares were reserved for issuance in connection with a stock purchase plan and that the IPO underwriters held an over-allotment option to increase the IPO sale by 4,290,000 shares.

On October 1, 2001, Anthem sent a second MIP to its members, which included an updated letter signed by its Chairman and its CEO/President, as well as a summary of information outlining an additional capital raising transaction that the Board of Directors had determined would be pursued contemporaneously with the IPO. The Plan allowed for such "Other Capital Raising Transactions" and, according to the letter, Anthem's financial advisors suggested that this transaction was prudent, given the unpredictability of the financial markets in the wake of September 11, 2001. The letter explained that this additional transaction would allow it to raise more cash to pay eligible members in the demutualization, generate more investor interest and demand for Anthem's offerings, and mitigate any negative price pressure that might result from large numbers of eligible members seeking to sell their newly acquired stock soon after the IPO. At the suggestion of its financial advisors from Goldman Sachs, which was also serving as the lead underwriter for the IPO, this mailing also pared down the expected range of the IPO offering to between $33.00 to $37.00. Both of the MIP mailings from Anthem to its members clarified that the Board was encouraging a favorable vote on demutualization from the membership. The mailings also pointed out that if the Plan was not approved by both the IDOI and the membership, the IPO would not go forward. Thus, no consideration would be paid to members and Anthem would remain a mutual company.

The IDOI held its public hearing on the Plan on October 2, 2001. The hearing lasted one business day and was introduced as follows by Sally McCarty, then Commissioner of the IDOI:

> Anthem's proposed conversion to a stock insurance company is a historic event to the insurance industry both in Indiana and across the nation. It is far and away the largest company ever to demutualize in Indiana and the fifth largest health insurance company in the country to demutualize. Perhaps most importantly, Anthem is the first health insurer in Indiana to convert from a mutual to a stock insurance company.

Recognizing the importance of these factors and the resulting significance of this transaction for consumers in Indiana and the seven other affected states, the Indiana Department of Insurance has assembled what I consider to be the finest team of advisors available. Throughout the entire review process our advisors have insisted on strict adherence to the demutualization statute in all matters relating to Anthem's filing. They have reviewed every fact of the filing from the perspective of fairness to Anthem's enrollment. ....

Under the Indiana demutualization law, I, as the Commissioner, must approve Anthem's Plan of Conversion to a stock insurance company if I find that the statutory requirements have been met including that the Plan of Conversion is fair, reasonable and equitable to the eligible members of the mutual insurance company.

The advisory team referred to by the Commissioner included a legal team from the law firm of Sidley Austin Brown & Wood, an actuarial team from Arthur Anderson LLP, an investment banking team from Fox-Pitt, Kelton, Inc., and an accounting team from Pricewaterhouse Coopers LLP. A member from each team provided testimony during the hearing, and similarly qualified professionals from Goldman Sachs and the actuarial consultant, Milliman USA, were offered for questioning. IDOI officials questioned the witnesses and members of the public submitted written questions to the witnesses. The record was kept open for an additional ten days to obtain any further written opinions regarding fairness from both Fox-Pitt, Kelton, Inc. and Pricewaterhouse Coopers, LLC. On October 25, 2001, Commissioner McCarty filed her Findings of Fact, Conclusions of Law, and Order Granting Application With Conditions, which included: (1) obtaining IDOI approval of the final details of the IPO and the "Other Capital Raising Transaction,"[5] (2) Anthem's submission of certain tax opinions and IRS rulings, and (3) Anthems' submission of other *pro forma* documentation. If these conditions

---

[5]The final details specifically included the IPO price and the amount of shares to be sold, which according to both Anthem's and IDOI's experts, could not be determined at the time of the hearing because of changing market conditions.

were met, then the demutualization would be approved by the State.

The small number of returned election cards from the eligible members indicated a high preference for receiving cash, while market research on the IPO indicated high interest on the part of institutional investors. In fact, promised orders from those who had been approached during the marketing efforts indicated a demand of ten or more times the 28.6 million shares planned for the IPO. On October 26, 2011, Anthem filed an amendment to its securities registration statement with the SEC, increasing the size of its public offering to 40 million shares. According to Anthem's CEO, Larry Glasscock, the decision to increase the size of the public offering was intended to assure that it had more cash to distribute to members who opted for cash.

Five members of Anthem's Board who were not employed by Anthem served as a "pricing committee," tasked with setting the final price of the IPO. The pricing committee met with Anthem advisors, IDOI advisors, and the full Board of Directors leading up to the special membership meeting on October 29, 2001. At that meeting, 95% of members voted to approve the demutualization and adopt the Plan. The appropriate amendments to the Articles of Incorporation were passed as well. Later that day, after further meetings between the pricing committee and its advisors from lead underwriter Goldman Sachs, Anthem filed a prospectus with the SEC identifying the offering price of the IPO as $36.00 per share and further increasing the size of the IPO to 48 million shares, with an additional 7.2 million shares allotted as an option to the IPO underwriters. This resulted in an aggregate sale of 55,200,000 shares, if the underwriters exercised their option in full.

The "Other Capital Raising Transaction," which was being pursued concurrently with the IPO, was described in the Prospectus as well:

> Concurrently with the closing of this initial public offering, we are selling 4,000,000 6.00% equity security units for a total gross offering of $200.0 million, plus up to an additional $30.0 million if the underwriters' option to purchase additional units is exercised in full. Each unit will initially consist of and represent:
>
> • a purchase contract under which the holder agrees to purchase, for $50, shares of our common stock on November 15, 2004. The number of shares the holder will receive will be determined by the settlement rate described below, based on the average trading price of our common stock at that time; and
>
> • a subordinated debenture with a principal amount of $50. The debenture will initially be pledged to secure the holder's obligations under the purchase contract.

At just past 6:00 p.m. on October 29, 2001, the Chief Deputy Commissioner of the IDOI, Greg Thomas, sent an e-mail to the IDOI Commissioner stating that he, along with the State's consultant Foxx-Pitt, had been monitoring the Anthem IPO process. He noted that Foxx-Pitt felt that things were going well and that there was going to be a high demand for the Anthem stock at an offering price of $36.00 per share, so much so that the amount of shares to be offered for sale to the institutional market had been increased to more than 40 million. The e-mail also indicated that Foxx-Pitt recommended that the IDOI concur that the IPO was fair, reasonable, and equitable to the members of the mutual company, and that the Commissioner's concurrence had already been given to Foxx-Pitt earlier that hour. At the request of Anthem, on October 31, 2010, the Commissioner sent a letter to Anthem's CFO, Michael Smith, confirming her concurrence "based on the information available to the IDOI" and noting that the pricing of the securities was the result of arms-length bargaining between Anthem and the underwriters, led by

Goldman-Sachs.

The IPO ultimately resulted in the sale of 55.2 million shares of Anthem Inc. at $36 per share.  In addition to the 55.2 million shares sold, Anthem issued approximately 48.1 million shares to those members who had requested stock.  Shares in Anthem's parent began trading on the stock market on October 30, 2001 and closed that day at $40.90 per share.  The Plan became effective November 2, 2001, upon the Indiana Secretary of State's approval of the appropriate amendments to the insurance companies' Articles of Incorporation (which the membership had previously approved at the special meeting) and Anthem stock closed that day at $42.90 per share.  Because of the 10% "top-up" provision and the prompt increase in market price for the Anthem stock, members of the mutual company who elected to receive cash received $39.60 per share of value assigned to them.  In December 2001, Anthem sent checks to all the members set to receive cash consideration.

This lawsuit was initially filed in August 2005, as a class-action in the United States District Court for the Northern District of Ohio, on behalf of those former mutual members who received cash in exchange for their interests.  The lawsuit asserted that the actions of Anthem and its new parent company, as well as the actions of lead underwriter and financial advisor Goldman Sachs, resulted in the IPO shares being severely undervalued.  Consequently, Plaintiffs allegedly received less than fair value for their interests in the mutual company.  The case was transferred to this Court in December 2005, prior to any ruling on class certification.  The Honorable John Tinder was the first judge of this district assigned to the matter, but he was elevated to the Seventh Circuit Court of Appeals soon thereafter.  Next, the case was assigned to the Honorable David  Hamilton, who spent several years with the case and rendered many

significant rulings. Those rulings resulted in several amendments to the Complaint, the dismissal of several claims and Defendants, and the certification of a class of Plaintiffs. Subsequently, Judge Hamilton was elevated to the Seventh Circuit. The case was then transferred to the undersigned judge – with no similar judicial ascent anticipated in the remaining life span of this litigation.

### *Key Prior Rulings*

On March 31, 2008, pursuant to Fed.R.Civ.P. 12(b)(6), Judge Hamilton issued an order dismissing the following: all claims brought pursuant to federal and state securities law, all claims for violations of Indiana demutualization law, and a claim for unjust enrichment. All claims against Goldman Sachs were dismissed as well. Significantly, in their motion to dismiss, Defendants advanced, but Judge Hamilton rejected, the argument that the Plaintiffs' sole remedy was an appeal of the Commissioner's order approving the Plan brought within 30 days of the issuance of the order or some other action brought within that 30-day period set forth in Ind. Code § 27-15-15-2. After a review of relevant Indiana and Seventh Circuit case law, Judge Hamilton reasoned that the case at bar was distinguishable from those Indiana cases where challenges were being made to the determination of utility rates as established by the Public Service Commission. In those types of utility cases, Indiana courts have refused to consider a challenge outside of judicial review afforded by administrative law. With utility rates, post-rate determination grievances may be pursued at the agency level in accordance with Indiana statutes; however, no similar post-determination grievance relief exists with demutualization. Judge Hamilton concluded that demutualization law and IDOI approval of a Plan do not strip Plaintiffs of their common law rights, where they allege that Anthem breached its contractual

and fiduciary duties to policyholders and acted negligently "both before *and after* the Commissioner had approved the demutualization." (Dkt. 79 at 53; emphasis in original).

Larry Glasscock, former CEO of Anthem, was added as a Defendant after the case was transferred to Indiana. In January 2009, Glasscock was dismissed from the case after Judge Hamilton found that Indiana's two-year statute of limitations was applicable and had run.[6] Judge Hamilton simultaneously allowed Plaintiffs to file a Fourth Amended Complaint, which is the version that remains current at the time of this order. But, notably, Judge Hamilton denied an amendment seeking to add a claim asserting that Defendants breached their obligations and duties to those members who chose to receive *stock* for their interests. This denial spawned the previously-mentioned *Jorling* lawsuit.

On September 9, 2009, Plaintiffs' class certification motion was, for the most part, granted. The court agreed that a "Depressed Price Class" should be certified, with an additional subclass certified of those class members who received proceeds because they were participants in employee benefit plans governed by ERISA. Judge Hamilton set forth his interpretation of the case that was moving forward as a class action:

> The members of the Depressed Price Class are those members who did not elect stock and received cash instead. Plaintiffs allege that defendants harmed the class by taking three actions: (1) allocating Anthem shares to "grandfathered groups" that were not entitled to them, e.g., Compl. ¶ 271; (2) setting an IPO price too low to minimize the compensation paid to Class members and to maximize the number of shares sold to the public, e.g., Compl. ¶¶ 272-73; and (3) diluting the Class Members' ownership interest in Anthem Insurance and causing them to pay

---

[6]In denying Defendants' Motion to Dismiss, Judge Hamilton applied the statutes of limitation of Ohio, based on Ohio's choice of law rules, since the case was transferred to this Court from Ohio. However, where there was no contractual agreement setting forth a choice of substantive law, Judge Hamilton found that Indiana had the most relevant and significant contacts with regard to the remaining substantive issues and therefore applied Indiana law.

unnecessary costs, e.g., Compl. ¶ 274.

(Dkt. 195 at 7). Judge Hamilton refused to certify subclasses of those Plaintiffs asserting the receipt of inaccurate tax information or those asserting that they wanted stock but received cash. The final detailed class description, as certified, reads as follows:

> All former members of Anthem Insurance residing in Ohio, Indiana, Kentucky and Connecticut who received cash compensation in connection with the demutualization of Anthem Insurance on November 2, 2001, and the communities comprised of them and their spouses, if any, excluding:
>
> > (i) all employers located in Ohio and Connecticut that maintained Anthem group health insurance policies on their respective employees and retirees and that received demutualization compensation (the "Grandfathered Groups");
> > (ii) Defendants, their predecessors and successors in interest;
> > (iii) the officers and directors of Defendants, their predecessors and successors;
> > (iv) counsel of record in this action and their respective parents, spouses and children; and
> > (v) judicial officers who enter an order in this action, and their respective parents, spouses and children.

(Dkt. 195 at 32).

### Discussion

This lawsuit is being litigated by very qualified attorneys on each side. Each side has filed motions at a relentless pace at every conceivable fork in the road. Issues have been raised and revisited at every possible juncture. Nonetheless, despite this backdrop and the advanced stage of the proceedings, Defendants have sought to revisit previously examined issues and Plaintiffs have raised new theories. However, those efforts reap little benefit. An explanation of why is the first order of business.

The Effect of the IDOI Order Approving the Anthem Conversion Plan

Defendants again advance their argument that Plaintiffs are pursuing claims clearly encompassed within Indiana's demutualization laws and, therefore, Plaintiffs were required to raise such claims by way of a timely appeal of the Commissioner's order approving the demutualization. This tactic is certainly understandable, given that this argument has immediate facial appeal and the support of the State of Indiana, which filed an amicus brief urging the Court to find Plaintiffs' claims to be deemed a collateral attack on the IDOI order and process. Indeed, the insurance business has been regulated by the states for many years. The commonsense question arises: Why require an insurance company to follow a detailed statutory approval process for demutualization, including an extensive agency review and approval of the related IPO terms, with the availability of judicial review, if that protracted and thoroughly-scrutinized process can subsequently be challenged by "Monday morning quarterbacks" who think that different terms should have applied to the IPO? Public policy should not condone a collateral attack that would cause the significant cost and efforts of the IDOI and its consultants to go to waste.

Plaintiffs respond by arguing that on essentially the same record as is before the court now, Judge Hamilton already addressed this issue on two occasions. Now, it is the settled "law of the case" that the IDOI order of October 25, 2001, and the 30-day statute of limitations in Ind. Code § 27-15-15-2 for challenging the IDOI approval of a Plan or for bringing an action arising out of that approval, do not prevent Plaintiffs from pursuing common law claims for "damages which could not have been known during or before the expiration of the thirty-day period." (Dkt. 79 at 50). Citing *Martin v. Richey*, 711 N.E.2d 1273 (Ind. 1999), Judge Hamilton ruled that

because there was no way to discover the injury inflicted on a mutual member's property interest during the 30-day limitation period, the application of this period would raise serious issues under Article I, Section 12 of Indiana's State Constitution, which guarantees a remedy in the courts for injury to property. Further, it is not the validity of the Commissioner's order which Plaintiffs' challenge, said Judge Hamilton in comparing this case to the circumstances in *Indianapolis Water Co. v. Boone Circuit Court*, 307 N.E.2d 870 (Ind. 1974), it is the actions of the Defendants in relation to their fiduciary and contractual obligations.

In *Indianapolis Water Co.*, 307 N.E.2d 870, the State of Indiana and the Indianapolis Water Company sought a writ of prohibition to stop the Boone Circuit Court from continuing to hear a class action suit brought on behalf of customers allegedly being charged excessive rates by the water company. The class claimed that the water rates were too high because the Commission failed to consider all appropriate information. Specifically, the Commission never considered the profit the water company was making by selling more than 6,000 acres of land around a reservoir to a residential developer. The State and the water company countered that this was a collateral challenge to the Commission's rate determination proceedings. The Indiana Supreme Court agreed in a 4-1 decision, finding that the plaintiffs should have pursued their gripes about rates through an appeal to the Commission.

In reaching its decision, the Indiana Supreme Court quoted favorably an earlier state appellate decision discussing the authority of the Public Service Commission:

> The Commission is entrusted with the authority to control and regulate public utilities. As an administrative agency, it is presumed to be qualified by knowledge and experience to perform this function. The regulation of public utilities is a technical field requiring expertise in just the kind of determination before us. ... Litigants in these circumstances cannot take flight from an adequate statutory

administrative remedy by seeking sanctuary in the courts.

*Id.* at 873 (quoting *Decatur County Rural Elec. Membership Corp. v. Public Service Co.*, 275 N.E.2d 857, 862 (Ind. Ct. App. 1971)).

Judge Hamilton discussed the case briefly in his order denying Defendants' motion to dismiss, highlighting that the Commission was aware of the water company's sale of its extra land and that, in written findings, the Commission had protested the company's failure to provide it with the land's market value. Even more important was the language in *Indianapolis Water Co.* addressing a statutory provision stating that the regulation of utility rates by the Commission did not release or waive any other rights that a person might possess. Addressing that statutory language, the *Indianapolis Water Co.* court stated: "[T]he above statute may well have afforded the plaintiffs in the court below an action had the Water Company fraudulently concealed or withheld information from the commission." Id. at 872. Based on that language, Judge Hamilton reasoned that the pursuit of common law claims by the class in this litigation was the type of challenge the Indiana Supreme Court said might survive if it had been made by the plaintiffs in the *Indianapolis Water Co.* case. Accordingly, Judge Hamilton rejected Defendants' contention that Plaintiffs' case is a collateral attack on the IDOI order.

"The doctrine of law of the case establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the suit." *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). However, it is only a presumption and not a "straightjacket." *Id.* Thus, following a transfer, a second judge may overturn a previous ruling by the first judge if she finds that the earlier ruling was clearly incorrect. *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). That said, litigants have a rightful expectation that a change

of judge does not undo prior rulings and a mere disagreement with the first judge's interpretation of fact or case law is not so compelling as to warrant changing a prior determination or sending the case back to square one. *Id.* (citing *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir.1997)).[7]

If deciding this issue anew, this judge's analysis might focus on the deference that Indiana courts have given the expertise gathered and employed by an agency specifically charged with overseeing a particular sophisticated process. *See e.g., Knox County Rural Elec. Membership Corp. v. PSI Energy, Inc.*, 663 N.E.2d 182, 191 (Ind. Ct. App. 1996). Nevertheless, there is no question that *Indianapolis Water Co.* left the door open to a challenge focused on the conduct of the regulated parties, as opposed to the final determination of the regulatory agency. *Indianapolis Water Co.*, 307 N.E.2d at 872. Any difference in the focus of this judge's interpretation is not so compelling as to require overturning the "law of the case." Nor should it require a *sua sponte* certification to the State Supreme Court, as was alternatively suggested in the State's amicus brief. Accordingly, the IDOI approval of the Plan and the failure to appeal or otherwise challenge that approval within 30 days does not bar Plaintiffs' common law claims, so long as the nature of the damages or the Defendants' conduct causing those damages could not have been discovered prior to IDOI approval. There is no evidence in the record to support a claim that Defendants misled or deceived the IDOI prior to its conditional approval; however, as will be discussed, there remains a question of material fact as to whether Defendant's actions immediately prior to the IPO lived up to the required standard of care.

---

[7]The standard set forth in *Bregettcy* for determining when a transferor judge can change the ruling of the prior judge is somewhat befuddling. After all, if a second judge disagrees about the first judge's interpretation of fact or law (*not a ground* to warrant overturning), then the second judge would presumably find the first judge's determination clearly incorrect (*a proper ground* for overturning). Nonetheless, trial judges are often called upon to use judicial discretion in determining when to act and when not to act.

<u>Plaintiffs' "New" Claims, the *Mell* Decision and the Grandfathered Groups</u>

Defendants take issue with what they describe as new or "backdoor" claims raised by Plaintiffs in their summary judgment response. The first new claim at issue is one based on third-party beneficiary status. Plaintiffs have always claimed that the grandfathered groups should not have been allocated value shares because they were not eligible members. With respect to the CMIC grandfathered groups, Plaintiffs contend that this argument is supported by the application of Ohio law prior to and at the time of the merger. In the case of the BCBS Connecticut grandfathered groups, Plaintiffs' pleadings and argument have always centered on the interpretation of the term "group as a whole" as used in BCBS Connecticut's bylaws. Defendants ask the Court to reject Plaintiffs' new assertion that they are making a claim for breach of contract based upon being third-party beneficiaries to the merger agreements.[8]

The claim of third-party beneficiary status is patently without support in the pleadings. The Court agrees with Defendants that such a claim is clearly a new theory. More specifically, of the counts pled by Plaintiffs in their Fourth Amended Complaint, only the breach of fiduciary duty and negligence counts (Counts One and Two) contain factual allegations even referencing an over-allocation to the grandfathered groups. Moreover, no third-party claim was mentioned in the order certifying a class, nor in any other entry in this action. Further, not all members of the class have standing to assert such claims, meaning the Court would have to reexamine issues related to class certification. The Court should not need to perform this task at this late stage of the litigation. At bottom, unlike the pleadings in *Jorling*, there has never been a third-party

---

[8]Because the merger agreements were between (1) Associated and CMIC and (2) Anthem and BCBS Connecticut, Plaintiffs would have to claim third-party beneficiary status in order to enforce them.

beneficiary claim predicated upon Anthem's granting value shares to the grandfathered groups pled in this case, and no such claim can be manufactured by raising the issue in a response to summary judgment. *Insolia v. Philip Morris, Inc.,* 216 F.3d 596, 606–07 (7th Cir. 2000).

Defendants claim that Plaintiffs seek to raise additional new claims in their response to summary judgment. As noted previously, one of the class claims recognized in the certification order, and set forth in the notice provided to class members, is a claim premised on Defendants having allocated value shares to grandfathered groups, which were allegedly not entitled to any shares. More specifically, paragraph 271 of the Fourth Amended Complaint alleges that Defendants breached their fiduciary duties by "allocating Anthem shares to certain grandfathered groups that, contractually and legally, were not entitled to **any** Anthem shares allocations." (Emphasis added). In their response to summary judgment, Plaintiffs have revised their approach and argued that even if "grandfathered groups," in general, were entitled to receive allocations of Anthem shares: (1) some groups that purchased self-insured or "cost plus" programs should not be recognized as members because there was no true "insurance relationship;" (2) groups which had no actual insureds at the appropriate time for assigning value should not have shared in the share allocations; and (3) those grandfathered groups that received shares calculated on the basis of altered company records received too many shares.

Defendants contend that these "new" claims have been raised at the eleventh hour as a tactical response to an adverse decision in a related case. Specifically, according to Defendants, a fairly recent decision in *Mell v. Anthem, Inc.*, 2010 WL 796751 (S.D. Ohio March 3, 2010) directly undercut Plaintiffs' theory that Ohio law prior to and at the time of the merger extinguished the grandfathered groups' ability to qualify for demutualization compensation in

the future. In *Mell*, it was determined that the Ohio grandfathered groups, which had been members of CMIC, were entitled to compensation when Anthem demutualized. *Id*. According to Defendants, Plaintiffs' three "new" theories have never been pled and create conflicts within the class; therefore, the Court should not allow Plaintiffs to pursue them at this stage of the litigation.

The *Mell* lawsuit was a class-action filed against the same two Defendants that are named in this case, along with the City of Cincinnati (the "City"). The complaint was filed on behalf of the employees of the City who were individual insureds under a group policy, which the City had originally purchased from CMIC. *Id*. at *5. As a result of the Anthem demutualization, the City received 870,021 shares of Anthem, Inc. stock, which it sold for approximately $55 million. *Id*. at *1. Three of the class counsel for Plaintiffs in this case were class counsel in *Mell*. In essence, the class in *Mell* alleged that because CMIC bylaws conflicted with the Ohio demutualization statutes in place at the time of the merger, an employer could not be a "policyholder" as that term was used in the relevant Ohio statutes. *Id*. at *6-7. Logically following, the insured employees, not the City, were entitled to the Anthem, Inc. stock and the corresponding $55 million in proceeds. *Id*. at *1. Here, Plaintiffs have made the same argument as to grandfathered groups being allocated value shares.

The parties in *Mell* filed cross motions for summary judgment and Judge S. Arthur Spiegel granted Defendants' motion, finding that pursuant to the insurance contract, the City was entitled to demutualization compensation for its equity interest in the group policy and that this result was not contrary to Ohio law. *Id*. at *11. An appeal of that ruling has been filed with the Sixth Circuit.

At summary judgment oral arguments in this case, the Court asked Plaintiffs' counsel whether the "new" arguments alleging that the grandfathered groups were inappropriately favored were designed to circumvent the adverse decision in *Mell*. Counsel disputed the contention that these were new arguments, and emphasized that "over-allocation" and "mis-allocation" have always been prominent issues in the case. Plaintiffs' counsel also argued that recent discovery yielded evidence of the over-allocation theory. Accordingly, even if the Court views these arguments as altogether new, Plaintiffs argue, they should be allowed to amend their pleadings to conform with the proof developed through discovery. Plaintiffs also encouraged the Court to allow an amendment to the class definition, if necessary, to avoid the limited number of conflicts that might exist within the class as a result of these "new" arguments.

First, the Court agrees with Judge Spiegel's decision in *Mell*. Ohio law does not forbid a group policy owner/employer from being the "policyholder" entitled to compensation for its equity interest upon demutualization. Moreover, the merger documents make clear that those who held membership rights in CMIC pre-merger – unquestionably, the grandfathered groups – would continue to hold those rights post- merger, including any rights to demutualization compensation. Here, both the Plan and the IDOI approval order recognized this. There is no need to rehash Judge Spiegel's detailed decision in *Mell*; suffice it to say, Plaintiffs' attempt to contort the language of Ohio demutualization law in their favor is strained.

Along those same lines, Plaintiffs have advanced a similarly strained argument with regard to the grandfathered groups from BCBS Connecticut. Plaintiffs do not base this particular argument on state statutes, as they did with the Ohio groups, but instead parse the language of the bylaws of BCBS Connecticut. Plaintiffs argue that by using the phrase "the group as a

whole" to define the policyholder in the case of group policies, the bylaws intended that each insured under the group policy hold, essentially, a pro-rata membership interest. That argument is an unreasonable interpretation of the bylaw language. After all, the bylaws specifically state that individual members of a group "shall not be considered Voting Members," and no other category of membership existed in BCBS Connecticut. Like with the Ohio grandfathered groups, the merger agreement, the Plan, and the IDOI order all recognized the membership rights of the Connecticut Grandfathered Groups and no question of fact remains with respect to those groups being entitled to the compensation associated with the demutualization.[9]

In sum, based on this Court's rejection of the arguments regarding Ohio and Connecticut grandfathered groups – and regardless of whether the claims are premised on tort law or breach of contract – Defendants' motion for summary judgment is **GRANTED**, with respect to Plaintiffs' claims that individual insureds under group policies originally issued by CMIC or BCBS Connecticut were the eligible members entitled to be allocated value shares and compensated for their interests.

The Court must still determine if that same conclusion can be reached with regard to what Defendants describe as Plaintiffs' "new" breach of contract claims, which contend that, even if the grandfathered groups were entitled to value shares, they received too many shares for three reasons:

1.  There is no "insurance relationship" in a "cost-plus" contract and therefore groups who held such contracts were not entitled to compensation.

---

[9]Although the Fourth Amended Complaint refers to grandfathered groups from the Kentucky merger, Plaintiffs have made no effort to argue any impropriety with regard to how those groups were treated by Anthem.

2. Groups that had no current insureds at the time of demutualization were treated as grandfathered groups.

3. Anthem altered its books and records to increase the number of shares that some grandfathered groups received.

Defendants first argue that Plaintiffs never pled this "even if" theory. The Court agrees. To the extent that the Fourth Amended Complaint alleges more than that grandfathered groups should not have been allocated *any* shares, the operative paragraphs are 169 through 171, which provide:

**169**. Thousands of employers in Ohio and Connecticut received millions of Anthem shares in the aggregate to which they were not properly entitled. Moreover, the aggregate shares allocated to these Ohio and Connecticut employers far exceeded the number of shares, in the aggregate, that would have properly been allocated the individual employees and retirees insured under group health policies.

**170**. A massive over-allocation of Anthem shares to the employers occurred because each employer's share allocation was based on the contribution to surplus from the group health policy during the period that began on January 1, 1990 and extended through June 30, 2000, inclusive. The contribution to surplus from each group health policy took into account the group health insurance coverage for all employees and retirees during the period from January 1, 1990 through June 30, 2000, inclusive, not just the group health insurance coverage for those employees and retirees that happened to have remained insured on June 18, 2001 and continuously thereafter through November 2, 2001, inclusive. Therefore, employers received credit in their Anthem share allocations for their insured employees who changed jobs or were fired at any time after January 1, 1990, but before November 2, 2001. Furthermore, employers received credit for insured employees and retirees that had died at any time after January 1, 1990, but before November 2, 2001. Employers also received credit for those employees and retirees that had been switched from fully-insured coverage to self-insurance at any time after January 1, 1990, but before November 2, 2001.

**171**. Under the Plan of Conversion, the entire value of Anthem Insurance was distributed to its members by the allocation of 100 million Anthem shares (subject to a slight upward adjustment) in individualized amounts among the membership. Therefore, the massive over allocation of Anthem shares to certain employers had the corresponding effect of reducing the number of shares allocated to all the other members of Anthem Insurance by the same amount in

the aggregate. As a result, each Class member has been damaged on account of having received in 2001 a smaller Anthem share allocation than each Class member was entitled had the Anthem Defendants not improperly allocated Anthem shares to certain employers.

While these three paragraphs set forth an assertion that the grandfathered groups received too many shares, the Court sees several problems in using these paragraphs to buttress Plaintiffs' "even if" over-allocation theories. First, these paragraphs are still premised on the faulty assumption, made in earlier paragraphs, that individuals insured by a group policy issued by CMIC or BCBS Connecticut prior to the mergers are the eligible members. The Court has just determined that this is simply not the law with respect to either the Ohio or Connecticut groups.

Second, these three paragraphs are not founded on a theory of "even if" the grandfathered groups were entitled to shares, they received too many. Rather, Plaintiffs are asserting that they were harmed because the grandfathered groups received shares based on an actuarial contribution formula. This formula allowed them to receive more shares than would have been issued to individuals insured under the group policies, if the individuals would have been deemed eligible members.

The ACM describing the method for calculating a member's contribution to surplus was provided to all the members in the first MIP and to the IDOI even earlier. It was clear from the ACM that group policies would be treated differently than individual policies. The Commissioner approved the formula and the members had knowledge of its application when they approved the Plan at the special members meeting, and the formula did not change. The data to be plugged into the formula was to come from the records of Anthem and state insurance regulators, with accommodation made for filling in data that might be missing or unreliable.

That process was overseen by the actuarial and accounting consultants employed by Anthem and the IDOI.

Unlike Plaintiffs' allegations that they were damaged by the Defendants' last-minute decisions to increase the number of shares or price the IPO at $36.00, the actuarial formula itself was not a moving target or the product of an eleventh hour decision by the Defendants. The formula was in the ACM, scrutinized by third-party experts and the IDOI, and provided to eligible members of Anthem long before it was put into use. Its use was known and its appropriateness could have been challenged within the 30-day limitation period of Ind. Code § 27-15-15-1. Thus, the concerns raised by Judge Hamilton with regard to Plaintiffs' potential inability to discover damages prior to the running of the limitation period are not an issue.

Accordingly, Plaintiffs' allegation essentially raises a complaint about the part of the formula giving credit to a member's contribution over the course of time, as opposed to allocating on a "snapshot basis." This is not only a new argument, but one that could have been raised as soon as the membership received their MIP with a copy of the ACM. Most certainly, it was something discoverable and available for challenge well within the 30-day period following the Commissioner's approval of the Plan.

The same could be said of "cost plus" contracts. Regardless of whether a "cost-plus" contract represents a true insured relationship or is similar to a self-insured plan (which did not bestow membership rights) for purposes of underwriting, such contracts were unquestionably treated the same as the holders of fully insured contracts for purposes of the demutualization. Further, such grandfathered cost-plus groups were entitled to membership certificates at the time

of merger, which gave them continuing membership rights, and no bylaw provisions can be interpreted as excluding cost-plus contracts from those groups entitled to membership rights. The issue for purposes of the Plan was whether groups with such contracts had membership rights, not whether there was an insurance relationship. Finally, as defense counsel noted during oral argument, if the Court allowed the cost-plus issue to proceed, it would create conflicts of interest within the class. The Court has no intention of amending the class definition to relieve such a conflict at this point unless the evidence absolutely requires it, which it does not.

The last of these "new claims" is that Anthem somehow altered its records to award more shares to some of the grandfathered groups. Again, no such allegations can be found in the Fourth Amended Complaint, but Plaintiffs contend that discovery has unearthed this chicanery. Anthem insists that any so-called alteration of records is simply the product of IDOI's approved effort to interpret, correct, and fill in missing information from the records as they existed on June 18, 2001. Plaintiffs retort that whether the retroactive changes amount to corrections or not, the Plan called for the actuarial contribution to be determined "on the basis of Anthem Insurance's records as of the Actuarial Contribution Date," which is defined as June 30, 2000. Thus, any calculation based on changes to numbers in those records amounts to a breach.

There are at least two problems with Plaintiffs' argument regarding alteration of records. First, it was anticipated that there would be difficulties in pulling together the electronic data necessary to make the contribution calculations, given that much of that data was to come from records kept in different forms by the various companies that had merged into Anthem. There was an expectation that some data would not be reliable and that "holes" in the data might exist. The ACM, which was referenced in and attached as an exhibit to the Plan, states very clearly that

"to the extent appropriate data are not available or are not credible for certain periods of time, reasonable approximations are made to estimate the missing data, or reasonable methodologies are developed that do not require such data."

Presuming for the moment that the Plan is an enforceable contract,[10] it must be interpreted as a whole, without deference to a single literal reference that might lead to absurd results. *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 859-860 (Ind. 2002). It has long been held that documents referenced and attached to a contract, such as the ACM, are to be considered in interpreting that contract. *Cleveland, C.C. & St. L. Ry. Co. v. Moore*, 82 N.E. 52, 56 (Ind. 1907); *MPACT Const. Group v. Superior Concrete Constructors, Inc.*, 785 N.E.2d 632, 639 (Ind. Ct. App. 2003). Consequently, in light of the ACM provision noting the likely need to fill in data, this Court rejects Plaintiffs' assertion that any change to the records reviewed for purposes of determining a member's contribution to surplus was an automatic breach of the Plan.

Furthermore, the members and the IDOI were informed by Anthem when it made its initial estimates of value shares held by members that these estimates were conservative and subject to change. It would be illogical and improper to infer a nefarious intent from the mere fact that there was an increase in shares allocated to one or more particular grandfathered groups. Simply stated, Plaintiffs' argument is not supported by any evidence of Defendants' bad faith (or bad faith of their third-party consultants) in the cultivation of the records and data necessary to reach those final determinations. To the contrary, the deposition testimony and e-mail exhibits referred to by both parties overwhelmingly reflect an effort by those involved in the contribution

---

[10]The Court will deal with Defendants' argument that the Plan is not an enforceable contract in the next section of this entry.

calculations to obtain the most accurate answers concerning the numbers of insureds in particular groups or types of groups.

For example, in support of their claim that Anthem inappropriately switched some "heads" in insured groups from ASO (non-insured administrative services only heads) to group medical (insured), Plaintiffs cite to the deposition testimony of Robert Dobson, who was one of the lead actuarial consultants from Milliman USA, the consulting team in charge of designing and running the actuarial model used to determine the shares allocable to eligible members. Dobson testified about an e-mail confirming that some ASO headcounts were switched to reflect that they were insured and not ASO headcounts. However, Dobson goes on to explain why he understood those changes to be legitimate, based on Anthem's efforts to obtain the most accurate records through investigation of the underwriting files and questioning of sales representatives when data was questionable. Further, the deposition testimony and affidavits from Cynthia Miller, Anthem's Chief Actuary who worked with Dobson and others from the Milliman team, confirm that the data changes made were to assure a more accurate picture of the history and status of various groups. Even the IDOI actuarial consultants from Arthur Anderson rendered an opinion to the IDOI confirming the appropriateness of numerous changes that occurred throughout the "modeling process" that led to the ultimate determination of member share allocations.

In the end, Plaintiffs ask the Court to endorse the speculation of their expert, Mark F. Meyer, Ph.D., who examined the changes made in value share allocation over the course of the modeling done by Milliman and Anthem and up to the final distribution of those shares. Dr. Meyer opined that the grandfathered groups were significantly over- allocated shares. However,

Dr. Meyer makes two calculations based on assumptions that this Court has now rejected. First, Dr. Meyer opines that, based on the assumption that grandfathered groups in Ohio and Connecticut were entitled to no allocation of shares, those groups were over-allocated approximately 15.7 million shares. His second theory is premised on the assumption that grandfathered groups are entitled to be deemed eligible members, but not entitled to compensation for any cost-plus contracts. Based on that assumption, Dr. Meyer opines that they received approximately 9.9 million more shares than they should have received. As discussed, though, neither of these assumptions holds water.

Dr. Meyer's report also contains "observations" with regard to the suspect timing of additional shares being assigned to grandfathered groups as the actuarial modeling process progressed. However, his observations are, at best, speculative; his report provides the Court with no evidence that the changes in the data were made in the absence of good faith. Speculation, regardless of whether it is part of an expert opinion or from a lay witness, cannot be the foundation for creating a material question of fact. *American Intern. Adjustment Co. v. Galvin*, 86 F.3d 1455, 1464 (7th Cir. 1996).

Summary judgment is therefore **GRANTED** with respect to any claim asserting a mis-allocation or over-allocation of shares to the grandfathered groups.

<u>Breach of Conversion Plan Claim</u>

The Court now turns to the issue of whether a question of fact exists regarding purported contractual breaches, other than those alleged and rejected in connection with the grandfathered groups. In Indiana, the essential elements of a breach of contract action are the existence of a

-33-

contract, the defendant's breach thereof, and damages. *Rogier v. American Testing and Engineering Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App.2000). In their response brief, Plaintiffs argue that the Plan is the contract at issue and Defendants breached the Plan by picking an improper valuation date and then underpricing and oversizing the IPO in a manner that led to Plaintiffs receiving less than fair value for their interests in the mutual company.

Defendants meet Plaintiffs head on, first arguing that the Plan is not actually a contract between Anthem and the Plaintiffs, but merely a plan required by the Indiana demutualization law. They argue that because the Court has already ruled that there is no private right of action associated with those statutes, no claim for breach of a document required by those statutes should accrue. At best, argue the Defendants, the Plan is a contract between the IDOI and Anthem. Plaintiffs counter that the Plan was offered to the voting members and accepted by way of the membership vote, resulting in a binding agreement. And even if the Plan is only a contract between IDOI and Anthem, Plaintiffs argue, they are third-party beneficiaries and thus entitled to enforce its provisions.

The Court finds the Plaintiffs' arguments regarding the existence of a contract most compelling and, perhaps just as important, Judge Hamilton has already ruled that Plaintiffs have a right to bring a cause of action for breach of the Plan.

> The plaintiffs have alleged that they had an enforceable contract with Anthem Holding and Anthem Insurance based on the Plan of Conversion and the Demutualization Law, under which they were entitled to receive fair compensation in exchange for their membership interests. Cmplt. ¶¶ 357-59. The plaintiffs are entitled to bring a claim for breach of that contract based on their assertion that they did not receive fair compensation, and they have done so.

(Dkt. 79 at 55).

"A contract is formed by exchange of an offer and acceptance between the contracting parties." *Rosi v. Business Furniture Corp.*, 615 N.E.2d 431, 435 (Ind. 1993). By submitting the Plan to the eligible members for approval, Anthem offered to compensate them in accordance with the Plan's terms in exchange for their interests in the mutual company. The members accepted that offer by way of their vote and, as a result, have a right to receive the agreed upon aggregate consideration – the fair value of Anthem as determined by the Plan. Whether they in fact received such consideration is the crucial question.

The aggregate membership interest was valued on October 29, 2001, instead of on November 2, 2001, which was the date the Secretary of State of Indiana approved the amendments to the articles of incorporation, making the conversion technically effective. As a result, Plaintiffs argue, the class lost more than $167,000,000 because the stock rose dramatically in those two days. The Plaintiffs rely on Section 1.3 of the Plan to bolster their position that the moment the amendments to the articles of incorporation were approved was the point in time at which Anthem was required to determine and distribute its fair value. Section 1.3 identifies the state approval of the amendments to the articles of incorporation as the conversion's effective date, unless the articles provide for a later date.

First, this is another argument that Plaintiffs raise for the first time, even though the basis for making it has existed since the IPO date was chosen. Raising it now, in response to a summary judgment motion, may in itself warrant rejection. *Whitaker v. T.J. Snow Co.*, 151 F.3d 661, 664 (7th Cir. 1998) (plaintiff may not amend the complaint by way of arguments raised in response to summary judgment). However, there are more substantive bases for rejecting this contention as well.

Section 6.3 of the Plan addresses what was to be paid to Plaintiffs, and it specifically states that the amount of cash consideration to be paid is tied to the IPO price, plus the potential application of the "top-up" provision. This "top-up" provision was designed to deal with potential stock price increases, while not penalizing the member for potential price decreases. Anthem based its payments on the IPO price, which the Plan determined was the appropriate measure of value. If cash payment to the class had been made on the basis of the stock price on November 2, 2010, Anthem would not have complied with Section 6.3 and it would have been an action not contemplated by the IDOI when it approved the Plan. Anthem, IDOI, and all of the consultants were well aware of the order of events that would occur leading to the pricing of the IPO and this process was explained at the IDOI public hearing and in the descriptive materials provided to the members. No evidence suggests that there was any attempt to cause the eligible members to believe that any other date or occurrence would be used as a benchmark for valuation and the establishment of what consideration would be paid.

Contracts are to be read as a whole and, under Indiana law, the touchstone of contract interpretation is to give meaning to the parties' intent. *Trustees of First Union Real Estate Equity and Mortg. Investments v. Mandell,* 987 F.2d 1286, 1289-1290 (7th Cir. 1993). No reasonable interpretation of the Plan required Anthem to do anything other than what it did, in terms of tying its cash payments to the IPO price, regardless of it predating the approval of the amendments to the articles of incorporation. Moreover, no evidence suggests that the parties intended for there to be a second valuation based on the price of the stock on the date the amendments were approved by the State. As the Court will go on to explain, the essential component of compliance with the requirement that fair value be paid to the eligible members

was Anthem's ability to obtain the agreement of the IDOI and Goldman Sachs on two things.

Plaintiffs argue that "fair value" is equal to "fair market value." However, the phrase "fair market value" is not used in the Plan and therefore cannot serve as the standard by which compliance with the contract is judged. Rather, the Plan provides that aggregate "fair value" will be the amount of consideration generated by the sale of 100 million shares of Anthem, Inc. through the IPO, so long as the financial advisor retained by Anthem confirms, as of the effective date, that this process has netted aggregate consideration equal to or greater than the statutory surplus of Anthem Insurance Companies, Inc. and is fair to the eligible members from a financial point of view. Also, the IDOI had to register its agreement in order for the conversion to become effective.

The Court notes that the Plan was structured to give a great deal of flexibility to the professionals involved in bringing the IPO and the contemporaneous capital raising transaction to the market and, ultimately, left the determination of whether fair value was provided to the eligible members to the financial advisor and the IDOI. The eligible members agreed to the flexible provisions within the Plan. What contractual requirements did exist with regard to the setting of the IPO price and the determination of the number of shares were met. The subcommittee of the Board of Directors charged with pricing the IPO did so, and followed the advice of Goldman Sachs with regard to the price. The IDOI and its consultants had access to the process that led to the IPO pricing and they were informed of the basis for choosing the price and quantity of the shares sold.

Although Defendants' contentions that it had no contractual obligation to maximize the

price of the IPO or to engage in "arms-length bargaining" with regard to the issuance may ring hollow in equity, such contentions are accurate. Simply stated, Anthem was not contractually required to do anything with regard to the IPO pricing or quantity of shares, other than gain the approval of the IDOI and Goldman Sachs that (1) the same were fair, (2) the transaction generated more than the statutory surplus, and (3) the transaction carried out the intent of the Plan. Anthem did that. If Anthem accepted patently bad or biased advice from Goldman Sachs or made critical decisions intending to benefit individuals other than its eligible members, it may have violated some other duty, but not a duty founded in contract. Therefore, the Court **GRANTS** summary judgment on this breach of contract claim.

<u>Breach of Tort Duties</u>

Generally, whether a party owes a duty to another is a question of law for the court. *Keybank Nat. Ass'n. v. Shipley,* 846 N.E.2d 290, 295 (Ind. Ct. App. 2006). Plaintiffs contend that Anthem owed its members a fiduciary duty to reasonably protect their interests and to refrain from gross negligence or wilful conduct that would diminish those interests. According to Plaintiffs, pricing the IPO at $36.00 per share violated that duty, as did significantly increasing the number of shares made available in the IPO.

Again, Anthem addresses the Plaintiffs' claim head on, arguing first that it owed no fiduciary duty and cannot be held liable in negligence when the parties relationship is based in contract. According to Anthem, only its officers and directors owed a duty to the members and none of those company officials remain defendants in this case. Anthem argues it cannot be held vicariously liable for any breach of duty on the part of a director or officer. In retort, Plaintiffs

argue that a director's violation of his duties can be imputed to the company.

To bolster their claim that a mutual insurance company owes a duty to its members, Plaintiffs point to cases from Iowa, Massachusetts, and Rhode Island. Anthem relies on case law from New York; it also argues that it is "black letter" law that officers and directors owe fiduciary duties, not the corporation. Plaintiffs contend that Anthem's cases represent a minority position with respect to a mutual company's duties and, even then, New York courts have not consistently followed that position. The Court has carefully reviewed cases cited by the parties addressing obligations of mutual insurance companies under similar circumstances, most of which are discussed below, and has also considered the more plentiful case law addressing a corporation's obligations to its shareholders. Simply stated, the Court sides with Plaintiffs on this issue.

In the year 2000, Metropolitan Life Insurance Company demutualized and went through a somewhat similar process as Anthem, only in accordance with New York's demutualization law. Several lawsuits were brought on behalf of the former mutual's members, all alleging that they had not received fair value for their interests. In *Shah v. Metropolitan Life Ins. Co.,* 20003 WL 728869 (N.Y. Sup. Feb. 21, 2003), *aff'd in par sub nom.*, *Fiala v. Metropolitan Life Ins. Co.,* 6 A.D.3d 320 (N.Y. App. 2004), the trial court consolidated several motions to dismiss. The lawsuits set forth numerous common law and statutory claims against various defendants, including Metropolitan Life, its directors, Goldman Sachs and Credit Suisse (the lead underwriters and financial advisors), and the New York Insurance Superintendent. Finding that the lawsuits amounted to a collateral attack on the Insurance Superintendent's decision to approve the demutualization, the court granted all of the pending motions to dismiss and the

Insurance Superintendent's motion to convert the declaratory action brought against him under the state conversion laws to one allowed under the general New York statutory provisions allowing for judicial review of a state officer's actions.[11]  *Id*. at *18.  In doing so, the court found that no private right of action was provided by the New York demutualization laws and that "the relationship between policyholders and a mutual life insurer is generally one of contract, and does not give rise to a fiduciary duty." *Id.*  at *14.

The appellate court agreed that the lawsuits were collateral attacks on the decision of the Commissioner and, as a result, all but one of the New York trial court's claim dismissals were affirmed. *Fiala v. Metropolitan Life Ins. Co.,* 6 A.D.3d 320, 321-322 (N.Y. App. 2004).  The appellate court also found that the claims brought based on a breach of fiduciary duty were unsustainable due to the lack of a common law fiduciary duty owed by the insurer to the policyholder.  *Id*. at 322.  However, courts in other states have seen things differently.

In *Rieff v. Evans*, 630 N.W.2d 278 (Iowa 2001), the Supreme Court of Iowa reviewed a lower court's decision to dismiss a lawsuit brought by a group of policyholders alleging that the directors of a mutual insurance company had, over time, constructed and executed a chain of corporate actions resulting in a *de facto* demutualization of the company without compensation to the policyholders.  The plaintiffs sued the directors of the mutual insurance company and the newer controlling stock company, who were for the most part one in the same, along with the stock company and nominally named the mutual company itself. *Id*. at 281-82.  The broad claim

---

[11]New York statutes provide a four month statute of limitations for challenging the actions or decisions of a state officer, such as the Insurance Superintendent.  Also, the demutualization laws limit the time for bringing an action arising out of the demutualization laws to one year from the Superintendent's approval or six months from the effective date of the conversion.  *Chatlos v. MONY Life Ins. Co.,* 298 A.D.2d 316, 317 (N.Y. App. 2002) (citing N.Y. Insurance Law § 7312).

was that the policyholders and the mutual company were owed compensation for a *de facto* conversion and, importantly, one of the theories pursued was breach of fiduciary duties. *Id.* at 283. The plaintiffs asserted breach of fiduciary duty claims against all the directors and the stock company itself. It was undisputed that the mutual company originally incorporated the stock company as a wholly owned subsidiary and that, subsequently, the directors authorized the sale of stock in the subsidiary to the public. The plaintiffs contended that a manipulation of corporate actions from that point on led to the stock company eventually gaining total control of the assets of both companies.

The lower court dismissed the action based on lack of standing and the running of the applicable statutes of limitation. *Id.* at 282. The Iowa Supreme Court reversed at least part of that determination, ruling that the existence of a fiduciary duty is dependent on the specific circumstances and, whether directors or not, those who assist in the breach of fiduciary duties may be held liable. *Id.* at 291. The uniqueness of the facts in that case drove the court to the conclusion that "we find that the policyholders have sufficiently pled the existence of a fiduciary relationship in every defendant to survive this stage of the case." *Id.* No more specific analysis of whether the corporation itself owed a fiduciary duty is found in the opinion.

In *Silverman v. Liberty Mutual Insurance Company,* 13 Mass.L.Rptr. 303, 2001 WL 810157 (Mass. Super. July 11, 2001), the Massachusetts Superior Court faced the issue of whether Liberty Mutual Insurance Company owed its policyholders a fiduciary duty in a different but equally convoluted circumstance involving demutualization. In that instance, the lawsuit was brought by a group of policyholders who sought to stop a demutualization approval vote, alleging that Liberty Mutual was engaging in an effort to mislead policyholders. *Id.* at *2.

Though complicated in proposed execution, the essence of Liberty Mutual's effort to demutualize was to exchange the policyholder's ownership interest in the mutual company for equity in a stock company which would maintain control over a reorganized Liberty Mutual and a number of other former mutual companies bearing similar branding, but offering different lines of insurance. *Id.*

Liberty Mutual filed a motion to dismiss, asserting in part that its relationship with policyholders was contractual and that it owed no fiduciary duty to its policyholders. *Id.* at *6. In deciding not to dismiss the complaint, the court opined:

> It may indeed be true that the relationship between a stock insurance company and its insured is purely contractual. It may also be true that, with respect to matters concerning the contractual rights of insureds in a mutual insurance company, the mutual insurance company has no fiduciary duty to its insured. However, this Court does not accept that, with respect to disclosures made to policyholders in [sic] a mutual insurance company asking them to surrender their equity rights, the mutual insurance company has no fiduciary duty to its policyholders. This Court need not decide, for purposes of this motion to dismiss, the precise scope of the fiduciary duty that a mutual insurance company owes to policyholders. Given the allegations of the complaint, it is sufficient here for that fiduciary duty to be simply a duty to act in good faith to ensure that policyholders, when asked to vote on a proposal that will extinguish their equity rights, are provided with accurate and adequate information on which to base their vote.

*Id.*

The Rhode Island Superior Court had the benefit of the decisions from Iowa and Massachusetts when it was asked to dismiss an action brought by the policyholders of a mutual insurance company. *Heritage Healthcare Services, Inc. v. The Beacon Mutual Insurance Co.,* 2004 WL 253547 ( R.I.Super. Jan. 21, 2004). The lawsuit was brought to force the mutual to issue dividends from excess surplus in accordance with a plan that the mutual had successfully

sought state legislative approval of a few years earlier.  *Id.* at *1. The policyholders alleged breach of contract and breach of fiduciary duty against the mutual and its directors and the defendants moved to dismiss, in part because the company owed no fiduciary duty to the policyholders.  *Id.* at *3.

Noting that the issue of whether a mutual insurance company owed a fiduciary duty to its policyholders was one of first impression in that state, the court compared the policyholders' position to the position of shareholders relative to a stock company.  *Id.* at *4.  It then reviewed the case law from other jurisdictions, and while it acknowledged that the contractual relationship existing between the mutual and its policyholders was cause for distinguishment in some circumstances, the court found that a fiduciary duty similar to that a stock company owes its shareholders is present when the policyholder is asserting ownership or equity rights as opposed to any right to coverage.  In doing so, the court reached the following conclusion:

> The case law suggests that whether a mutual insurance company owes a fiduciary duty to its policyholders hinges on the claim involved. Specifically, the insurance company does not owe a fiduciary duty requiring it to act with the utmost good faith where the insured is disputing the treatment of the insured's claim to the company. However, when dealing with claims involving policyholders who are acting in their capacity as owners, courts generally treat policyholders as being entitled to the same fiduciary duty as owed to stockholders.
>
> In the instant case, the fiduciary duty claims asserted by Plaintiff involve the decision by corporate executives to retain excess profits, rather than an individual claim under an insurance policy. Therefore, in this case, the claims as alleged implicate the policyholders' rights as owners rather than as insureds.  As a result, Defendants owe a fiduciary duty to its [*sic*] policyholders under the facts as pled.

*Id.* at *5.  The court never differentiated between the corporate defendant and the defendant directors in terms of the fiduciary duty owed to the policyholders.

-43-

Anthem takes the position that its directors owed a fiduciary duty to the eligible members, but it was not charged with such a duty as a corporate entity. This Court disagrees for a number of reasons, most of them arising out of the uniqueness of the relationship between Anthem and its eligible members, who are insureds as well.

The Indiana Supreme Court has said that the relationship between a policyholder and the insurance company is a special one. In discussing that relationship, the Indiana Supreme Court has stated: "This contractual relationship is at times a traditional arms-length dealing between two parties, as in the initial purchase of a policy, but is also at times one of a fiduciary nature, and, at other times, an adversarial one . . .". *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 518 (Ind.1993) (citation omitted). The special relationship that existed between Anthem and its eligible member policyholders was such that the traditional axiom – that individual directors, not the entity itself, owe a fiduciary duty – does not apply. The general rule that the directors, and not the corporation itself, owe a fiduciary duty to shareholders is grounded in the notion that there would be an analytical anomaly if shareholders held the corporation vicariously liable for the reckless acts of a director, because the cost of the director's breach of the fiduciary duty would end up falling back on the shareholders, who are the injured party seeking redress. *Arnold v. Society For Savings Bankcorp, Inc.,* 678 A.2d 533, 539-540 (Del. 1996). In the case at bar, no such anomaly would exist. Plaintiffs own no stock in Anthem, Inc. (at least none received as a result of the demutualization), and any damage award would not be paid out of the equity interests held by policyholders of Anthem Insurance Companies, Inc., as their interests were extinguished on the effective date of the conversion.

There are additional distinctions. While the Plaintiffs, like all eligible members, had an

equity interest in the corporation, it was completely tied to the insurance policy. Unlike a typical corporate shareholder, Plaintiffs did not have the ability to sell or otherwise divest themselves of their equity interest in the corporation other than to simply give up the insurance policy. Only the corporation could choose to excise the policyholder's equity interest from the insurance contract and extinguish it through a demutualization; therefore, the interest was in essence being held in trust by the corporation. Fiduciary duties arise when one holds something in trust for the benefit of others. *See, e.g., Singer v. Noe*, 238 N.E.2d 678, 680 (Ind. Ct. App. 1968).

This Court also finds the case law from Iowa, Massachusetts, and Rhode Island to be more persuasive. Defendants' New York cases focused more on whether Plaintiffs claims were a collateral attack on the Insurance Superintendent's order than on the relationship of the insurer to the insured, though they did indeed opine on the lack of a fiduciary duty. The bottom line is that this Court believes the Rhode Island court said it best by recognizing that the existence of a fiduciary duty on the part of a mutual insurance company hinges on the nature of the claim. *Heritage Healthcare,* at *5.

Even ignoring differences between the circumstances in the New York demutualization cases and the circumstances in the case at bar, our sister court in the Southern District of New York has found that New York does not disavow a fiduciary relationship between a mutual company and its policyholders as a matter of law. In *Dornberger v. Metropolitan Life Ins. Co. ,* 961 F. Supp. 506, 545-546 (S.D.N.Y. 1997), the court acknowledged that there was authority in New York case law for finding that the relationship was only one of arms-length and therefore no fiduciary duty attached. But the court also noted that at least one decision had held that there was room for finding a broader fiduciary relationship and another federal district court had

concluded that the assessment of the relationship and ensuing duties should be left to the jury. *Id.* at 546 (citing *United States v. Brennan*, 938 F. Supp. 1111, 1120-21 (E.D.N.Y. 1996) and *Estate of Wheaton, Meager v. Metropolitan Life Ins. Co.*, 463 N.Y.S.2d 727 (Sup. Ct. 1983)).

In the end, when a district court is faced with a novel issue under Indiana law, it must predict how the Indiana Supreme Court would rule. *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007). In *Erie Ins.*, the Indiana Supreme Court made it fairly clear that an insurer always has the contract-based duty to act in good faith toward a policyholder and may also have additional fiduciary obligations depending on the particular circumstance at hand. *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d at 518. That sounds similar to the decisions from Iowa, Massachusetts and Rhode Island.

Plaintiffs assert two tort counts in their Fourth Amended Complaint – a breach of fiduciary duty claim and a negligence claim. The Court sees no need for separate treatment here, as the key to any tort recovery is to define as a matter of law the duty, if any, imposed by Indiana law on the Defendants. To that end, the Court finds that Indiana would impose a duty on Anthem to act in good faith and with reasonable care in obtaining approval of its conversion plan and in executing that plan following IDOI's conditional approval. For purposes of this lawsuit, the inquiry is whether the company exercised such care in pricing and sizing the IPO. If Anthem's Board or pricing committee failed to act with the care that an ordinarily prudent person in a like position would exercise in pricing and sizing the IPO, the corporation itself can be held liable. This is consistent with the obligations Indiana law places on individual corporate

directors.[12] *See* Ind. Code § 23-1-35-1. Under the circumstances, the Court believes that these obligations would apply to the corporation.

The Court has determined that the relationship between Anthem and its members was more than a garden-variety, arms-length contractual relationship. Accordingly, Defendants' contention that the economic loss doctrine bars a tort claim is without merit. As the Indiana Supreme Court noted last year, the economic loss rule in Indiana has several exceptions, including where fiduciaries or insurers have assumed specific obligations. *U.S. Bank, N.A. v. Integrity Land Title*, 929 N.E.2d 742, 745-746 (Ind. 2010). Because the record includes evidence sufficient to create a material question of fact as to whether the appropriate business judgment was utilized by Anthem in executing the IPO, the economic loss rule will not operate to bar the trial of this claim. Summary judgment is **DENIED** on this tort claim for breach of duty.

ERISA Defense

Before examining the evidence of record with regard to what is clearly the crucial question here – whether the business judgement rule bars Plaintiffs' claims that their interests were diminished and diluted through the IPO – the Court must address whether Defendants' ERISA preemption defense bars the claims of the subclass of those who received demutualization proceeds because they were participants in employee benefit plans governed by ERISA. This issue is not too difficult, particularly in light of Judge Hamilton's class

---

[12]It is important to note that in the submitted deposition testimony excerpts from those directors who were deposed, there is testimony that they understood that they had a fiduciary responsibility to protect the interests of Anthem's eligible members.

certification order.

According to Defendants, the subclass members (who obtained eligible member status as a result of being employees who received their health coverage from Anthem through an ERISA-governed employee benefit plan) received consideration for their interests in Anthem as a benefit of participating in the plan. Therefore, they are seeking further plan benefits and would be required to pursue them in accordance with the benefit plan and ERISA. The argument rings hollow, however, given that Anthem applied for and received a prohibited transaction exemption from the Department of Labor. This exemption allowed it to proceed without the constraints that ERISA might have imposed on Anthem's distribution of demutualization proceeds to the members of the subclass.

What is good for the goose is usually good for the gander. It would make no sense to find that, despite Anthem receiving approval to avoid ERISA constraints in distributing the demutualization proceeds, the individuals receiving the proceeds are bound by ERISA with regard to challenging the distribution. In addition, as noted by Judge Hamilton, 29 U.S.C. § 1133 requires not only that a plan participant have an adequate opportunity to obtain a fair review of any claim for benefits which is being denied, but also that adequate notice be provided as to how the participant can challenge such a denial. There would be no compliance with this section if the Court were to find that the subclass claims are lost due to ERISA preemption. The Court finds that this defense has no merit.

Business Judgment Rule

From the outset, one of Anthem's central themes has been that its Board of Directors

simply followed their best business judgment and the advice of some of the top professionals in the financial markets in setting the terms of the IPO. The business judgment rule protects reasonable corporate management from litigation based merely on hindsight. *Lees Inns of America, Inc. v. William R. Lee Irrevocable Trust*, 924 N.E.2d 143, 157-158 (Ind. Ct. App. 2010). However, to be protected from second-guessing, the business decisions must be informed ones. *Brane v. Roth,* 590 N.E.2d 587, 591-592 (Ind. Ct. App. 1992). The business judgment rule provides protection to corporate directors who act in accordance with their responsibilities and refrain from reckless conduct; Indiana has codified the rule at Ind. Code § 23-1-35-1. Defendants argue that the business judgment rule applies to bar Plaintiffs' recovery in tort. Plaintiffs do not deny that the business judgment rule comes into play here, but, of course, they dispute its operation and ultimate effect.

The Court finds the Official Comments to Ind. Code § 23-1-35-1 singularly convincing in terms of the statutes' application under the circumstances. To explain why, the Court turns to the first subsection of Ind. Code § 23-1-35-1, which provides:

> (a) A director shall, based on facts then known to the director, discharge the duties as a director, including the director's duties as a member of a committee:
>
> (1) in good faith;
> (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
> (3) in a manner the director reasonably believes to be in the best interests of the corporation.

Ind. Code § 23-1-35-1(a).

Subsection (e) of that same statute provides:

> (e)    A director is not liable for any action taken as a director, or any failure to take any action, regardless of the nature of the alleged breach of duty, including alleged breaches of the duty of care, the duty of loyalty, and the duty of good

faith, unless:

> (1) the director has breached or failed to perform the duties of the director's office in compliance with this section; and
> (2) the breach or failure to perform constitutes willful misconduct or recklessness.

Ind. Code § 23-1-35-1(e).

The Official Comments to subsection (e) of the statute inform that:

> Subsection (e), while substantially narrowing the circumstances in which personal liability may be imposed on directors, does not alter the director's statutory duties themselves. Hence, a director's failure to exercise "the care an ordinarily prudent person in a like position would exercise under similar circumstances," *see* IC 23-1-35-1(a)(2), may have legal significance with respect to the validity of corporate action, even if the failure did not amount to "willful misconduct or recklessness."

In sum, an individual director may remain sheltered from personal liability if his or her conduct is not reckless or willful. However, this does not alter the overall requirement that a corporate board's actions should be consistent with the actions of an ordinarily prudent board of directors under the circumstances.

Not surprisingly, dueling business judgment rule experts have opined that their side is right and the other side is wrong. Defendants, in particular, make well supported arguments with regard to the directors having the benefit of and relying upon the involvement of the IDOI and numerous experts in the various relevant professional fields. Nonetheless, genuine issues of material fact remain as to the following issue: Did the Board (and its special committees) act with ordinary prudence to ensure it was not diminishing the value of its eligible members' interests during the critical time period following the conditional approval by the IDOI up to the point the IPO was finally priced and sized? The Court will do its best to identify, more

precisely, what remains for a jury's determination.

First, the Court rejects Plaintiffs' argument that the actions of the Board in approving the IPO pricing and sizing were contrary to the demutualization law and therefore not protected by the business judgment rule. Two considerations support this conclusion. Judge Hamilton long ago determined that there was no private right of action associated with the Indiana demutualization statutes. A contrary decision would allow Plaintiffs to get in through the back door what they could not get in through the front door. Equally important, in order to comply with the demutualization statutes, Anthem only had to get the formal approval of the Commissioner of the IDOI. Anthem satisfied this requirement. Nevertheless, one can comply with the law and still act unreasonably with regard to the rights of eligible members or be less than well informed when taking particular actions.

In the Court's view, several parts of the record support the view that a reasonable fact-finder could reach a conclusion that Anthem did not act with ordinary prudence when it approved the final pricing and sizing of the IPO. First, Goldman Sachs was by far the most influential advisor with regard to pricing and sizing the IPO, and it stood to gain handsomely from the decisions it advised on. This fact should not have been lost on anyone assuming an oversight role for the corporation. The deposition testimony and affidavits of record do not allow the Court to find as a matter of law that the Board acted with requisite care in terms of evaluating the recommendations of Goldman Sachs. For example, Board member and pricing committee member Victor Liss testified that, to the best of his recollection, the Board did nothing to independently assess Goldman Sachs' recommendations with regard to pricing and

sizing of the IPO.  Another Board member, William Ryan, testified similarly.  It is true that representatives of Foxx-Pitt and certain IDOI advisors were privy to the information furnished by Goldman Sachs with regard to pricing and sizing, and did not challenge it.  While this clearly provides Anthem with some evidence in its favor on the issue, it does not carry the day, especially when the record does not show that Anthem's Board knew what the IDOI advisors thought about price and size when the Board or committee  accepted Goldman Sachs' recommendations.

Anthem's Board and the pricing committee were also aware of the very high demand for the IPO issuance via the results of what the parties have referred to as the "road show" – an effort to assess demand for Anthem, Inc.'s first-issued shares.  This higher demand led to an increase in the number of shares issued, which at least some Board members saw as a good thing due to the increase in cash raised for purposes of compensating the large number of eligible members who elected cash.[13]  There is however, no indication in the record that any significant discussions were held with regard to the obvious alternative of using the high demand as a basis for increasing the IPO price.  Discussions of increasing the IPO price were warranted by the reports the Board had

---

[13]Plaintiffs posit that there was an undue emphasis on cashing-out the eligible members, but the Court isn't so sure.  It is clear from the record not only that a high percentage of eligible members of Anthem wanted to receive cash instead of stock, but that many policyholders never even knew they had an equity interest until they received notice of a potential demutualization.  This is typical of such a transaction. *See* James Smallenberger, *Restructuring Mutual Life Insurance Companies: A Practical Guide Through The Process,* 49 Drake L. Rev. 513 , 517 (2001)("Few, if any, mutual policyowners realize they possess an ownership stake in the mutual company, complicating their understanding of any proposal to change the corporate structure of the company.").  If for no other reason, the recognized phenomena in the financial markets of "overhang" (smaller share owners selling off newly gained stock shortly after receiving it through a demutualization), which both sides have discussed, demonstrates the layperson's general preference for cash.  And, the fact that it is less costly for a company to manage a shareholder population that does not have numerous small shareholders is a legitimate concern for a board to consider for the good of the company.  The Board's duty was not to maximize the consideration of eligible members while neglecting consideration of what is best for the whole.

of the company's most recent quarterly financial performance.

In the end, the Court can imagine a reasonable jury reviewing the record as it stands today and, depending on which witnesses it finds most credible, deciding in favor of either side. And, while the court may have its own opinion as to the persuasiveness of the evidence, it must not usurp the jury's function where a decision would rest on an assessment of the weight of the evidence or the credibility of witnesses.

### *Conclusion*

For the reasons set forth above, Defendants' Motion for Summary Judgment (Dkt. 263) is **GRANTED IN PART** and **DENIED IN PART.** Plaintiffs' tort claim for breach of duty in connection with the pricing and sizing of the Anthem, Inc. IPO survives for trial; however, Defendants are entitled to summary judgment with respect to all other claims.

IT IS SO ORDERED.

Date: _07/01/2011_

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution attached.

Distribution to:

Matthew Thomas Albaugh
BAKER & DANIELS - Indianapolis
matthew.albaugh@bakerd.com

Dennis Paul Barron
dennispbarron@aol.com

Michael F. Becker
THE BECKER LAW FIRM CO., L.P.A.
mbecker@beckerlawlpa.com

Peter R. Bisio
HOGAN LOVELLS US LLP
peter.bisio@hoganlovells.com

Todd S Collins
BERGER & MONTAGUE, P.C.
tcollins@bm.net

T. David Copley
KELLER ROHRBACK, L.L.P.
dcopley@kellerrohrback.com

Edward O'Donnell DeLaney
DELANEY & DELANEY LLC
ed@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Thomas M. Fisher
INDIANA OFFICE OF THE ATTORNEY
GENERAL
tom.fisher@atg.in.gov

Craig A. Hoover
HOGAN LOVELLS US LLP
cahoover@hhlaw.com

Peter R. Kahana
BERGER & MONTAGUE, P.C.
pkahana@bm.net

Kevin M. Kimmerling
BAKER & DANIELS - Indianapolis
kevin.kimmerling@bakerd.com

Cari C. Laufenberg
KELLER ROHRBACK L.L.P.
claufenberg@kellerrohrback.com

Adam K. Levin
HOGAN LOVELLS US LLP
aklevin@hhlaw.com

Neil F Mara
BERGER & MONTAGUE, P.C.
nmara@bm.net

H. Laddie Montague Jr
BERGER & MONTAGUE P.C.
hlmontague@bm.net

Anne Kramer Ricchiuto
BAKER & DANIELS - Indianapolis
anne.ricchiuto@bakerd.com

Lynn L. Sarko
KELLER ROHRBACK, L.L.P.
lsarko@kellerrohrback.com

Christopher G. Scanlon
BAKER & DANIELS - Indianapolis
chris.scanlon@bakerd.com

Paul A. Wolfla
BAKER & DANIELS - Indianapolis
paul.wolfla@bakerd.com

Eric Hyman Zagrans
eric@zagrans.com